IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| JOSHUA JARRETT and<br>JESSICA JARRETT, | ) ) | Case No. 3:24-cv-01209 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF**
**THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# Table of Contents

Introduction............................................................................................................ 1

Argument ............................................................................................................... 8

I.    Standard of Review....................................................................................... 8

II.    The staking rewards the Jarretts reported on their 2020 income tax return are gains that constitute "gross income" under 26 U.S.C. § 61(a). ...................................................................... 9

    A.    Under section 61(a) and *Glenshaw Glass,* the staking rewards the Jarretts received constituted economic gain that was "clearly realized" and over which they had complete dominion in 2020. ................................................................................ 10

    B.    Alternatively, staking rewards are compensation for services......................................... 13

III.    The Jarretts cannot meet their burden to show staking rewards are excluded from income under the theory they are "self-created property" taxed only upon later sale or exchange. ......... 16

IV.    The proper measure of the Jarretts' economic gain from their staking rewards is the fair market value of the rewards at the time they were received....................................................... 17

    A.    The undisputed facts show that XTZ rewards can be immediately converted to cash at a publicly-known, and easy-to-determine market price on actively-traded markets. ............... 19

    B.    The Jarretts can point to no evidence that the market price fails to accurately account for the value of XTZ realized by the Jarretts on receipt. ................................................. 19

Conclusion ............................................................................................................ 23

i

**Table of Authorities**

**Cases**                                                                                   **Page(s)**

*Alves v. Comm'r*,
  734 F.2d 478 (9th Cir. 1984) ............................................................16

*Baker v. Comm'r*,
  88 T.C. 1282 (1987)............................................................18, 22

*Calderone v. United States*,
  799 F.2d 254 (6th Cir. 1986) ............................................................8

*Comm'r v. Glenshaw Glass Co*,
  348 U.S. 426 (1955)............................................................9, 10, 13

*Comm'r v. Indianapolis Power & Light Co.*,
  493 U.S. 203 (1990)............................................................12

*Comm'r v. Kowalski*,
  434 U.S. 77 (1977)............................................................9

*Comm'r v. Schleier*,
  515 U.S. 323 (1995)............................................................10

*Greer v. United States*,
  207 F.3d 322 (6th Cir. 2000) ............................................................9, 17

*Jacobowitz v. Comm'r*,
  T.C. Memo 2023-107, 2023 WL 5274240 (Tax. Ct. 2023)............................................................11

*James v. United States*,
  366 U.S. 213 (1961)............................................................11

*Koons v. United States*,
  315 F.2d 542 (9th Cir. 1963) ............................................................18

*McNaughton v. United States*,
  888 F.2d 418 (6th Cir. 1989) ............................................................15, 16

*Moldowan v. City of Warren*,
  578 F.3d 351 (6th Cir. 2009) ............................................................8

*Oklahoma Tax Comm'n v. United States*,
  319 U.S. 598 (1943)............................................................17

*Rooney v. Comm'r*,
  88 T.C. 523 (1987)........................................................................................................18

*Sherwin-Williams Co. v. United States*,
  403 F.3d 793 (6th Cir. 2005) .....................................................................................8, 9

*Stadnyk v. C.I.R.*,
  367 F. App'x 586 (6th Cir. 2000) ...................................................................................16

*United States v. Janis*,
  428 U.S. 433 (1976).........................................................................................................8

*Wade v. Comm'r*,
  55 T.C.M. (CCH) 413 (T.C. 1988) ...............................................................................18

**Statutes**

26 U.S.C. § 61................................................................................................... *passim*

26 U.S.C.§ 83.......................................................................................15, 16, 18, 21

**Regulations**

26 C.F.R. § 1.61-1...................................................................................................9, 14

26 C.F.R. §. 1.61-2.......................................................................................13, 14, 18, 21

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................8

## Introduction

This refund case is about the application of well-settled principles of taxation and clear statutory language to the novel technology of blockchain and its associated cryptocurrencies. In essence, the plaintiffs Joshua and Jessica Jarrett argue here that because participation in blockchains generates "new" units of cryptocurrency, these units should be taxed under their own special rules, rather than the well-worn rules of the road. But despite the novel nature of cryptocurrency, the rules are the rules. And the Jarretts have the burden of showing that the rules either do not apply or are otherwise wrong. They cannot meet their burden to do so.

The Jarretts' challenge here is to whether "staking rewards"—newly minted units of cryptocurrency that Mr. Jarrett received for validating transactions on a blockchain ledger called Tezos—are income. The Jarretts received 13,713.63 units of XTZ (the crypto unit associated with Tezos) as rewards, with a fair market value of $32,836. These units are just like pre-existing units: they have value, can be traded on exchanges for fiat currency (cash) or other crypto assets, and can be used as medium of exchange and payment themselves, without conversion at all. The only difference is, because they were newly minted, no one else owned them before Mr. Jarrett did. For the purpose of gross income, that difference does not matter: in all ways, the staking rewards constitute "gain," and in all ways Mr. Jarrett obtained complete control over them in 2020. Because none of this is actually in dispute, the Court can (and should) rule that the rewards are includable by statute as a matter of law in the Jarretts' gross income. 26 U.S.C. § 61(a).

The Jarretts also argue that the "fair market value" of the rewards they received—calculated from historical pricing data from established crypto exchanges—is not the correct measure of the value they received. Instead, they advance a complicated argument that, in fact, the minting of new XTZ dilutes the total value of all XTZ, and the Jarretts only received XTZ worth

less than a fifth of its market value. But this novel theory runs headlong into statutory language. Property that is included in income is properly reported at its fair market value; the statutes, regulations, and cases all agree. And the Jarretts' expert offers no data or factual argument in support of his dilution claim. Thus, the Jarretts offer little more than theory in support of a request to sidestep or avoid the requirements of the Internal Revenue Code. Such claims cannot survive summary judgment. The Court should enter summary judgment for the Government.

<b>Factual Background</b>

### A. Cryptocurrencies and Blockchains

A cryptocurrency is a kind of digital asset, which has alternately been described as a "digital representation of value and "medium of exchange," and (in this case) as a "digital payment system operating independently of a central authority." United States' Separate Statement of Undisputed Material Facts ("SSUMF") ¶¶ 1–2. Cryptocurrencies use cryptography[1] to control and verify transactions. SSUMF ¶ 2. Specifically, they utilize a public key, which is a cryptographic code, to receive digital assets and verify the digital signatures of others (similar to a bank account number). SSUMF ¶ 3. And they utilize a private key, a cryptographic code known only to the user to sign transactions and prove ownership of an account (similar to an account password or PIN). SSUMF ¶ 4. Owners of cryptocurrency use software called "wallets" to manage their public and private keys. SSUMF ¶ 5.

Transfers of cryptocurrency are done on blockchains. SSUMF ¶¶ 6–7. A blockchain is a permanent digital ledger that records transactions across a distributed network that is secured by cryptography. SSUMF ¶ 8. Transactions on a blockchain are grouped together in "blocks," that

---

[1] Cryptography uses mathematical algorithms to encode information; here, the transactions showing the transfers of digital assets. SSUMF ¶¶ 7–8.

2

each refer to the prior block that came before it. SSUMF ¶ 9. When those blocks are confirmed, and published, they are linked together to the preceding block. SSUMF ¶¶ 9–10. The linking together of those blocks creates a permanent chain of transactions that shows the entire history of all transactions. Most blockchains have a "native" cryptocurrency" – e.g., Bitcoin, Ethereum, etc., and log transactions involving that asset. SSUMF ¶ 21. In that way, assets can be traced all the way back through the blockchain to the moment they were minted.

Blockchains are decentralized and distributed, meaning they are maintained by multiple parties who verify each other's work according to rules encoded in software to reach a "consensus" about the verified state of the ledger. SSUMF ¶ 11. Users participate in blockchains by operating nodes—i.e., computers that maintain a copy of the ledger and associated software containing the protocol (the rules under which the blockchain operates). SSUMF ¶ 12. Blockchains employ "consensus mechanisms" to reach agreement about the validity of the logged transactions. SSUMF ¶¶ 13–15, 22.

The specific type of "consensus mechanism" at issue in this case is called a "proof of stake" protocol. SSUM ¶¶ 22, 42. In a blockchain that uses a "proof of stake" mechanism, only holders of the native cryptocurrency can validate transactions and publish new blocks to the blockchain. SSUMF ¶ 24. For example, the native cryptocurrency for the Ethereum blockchain is the cryptocurrency ETH. The users who validate transactions on a proof-of-stake blockchain are referred to as "stakers." SSUMF ¶ 24. The staker's holding of native crypto assets are called a "stake," because the owner puts them up as collateral both: (i) for the possibility to be selected to validate a specific block of transactions; and (ii) as security forfeited for failing to properly validate the transactions. SSUMF ¶¶ 25, 31. The rules by which validation operates are determined by the

coded rules of the protocol itself, which (in the case of the protocol at issue here) are decided upon by the users of that specific blockchain. SSUMF ¶¶ 31, 50.

If a user "stakes" some portion of his or her native asset and is selected by the software to validate a block, they must validate the block according to the predefined rules. SSUMF ¶¶ 25–31. This is sometimes called "solo staking." SSUMF ¶ 36. The validator's work is confirmed and "endorsed" or "attested" by other stakers. SSUMF ¶¶ 28–30. These endorsers essentially check the validator's work and confirm whether it is correct by adding their own digital signature to the proposed block. SSUMF ¶¶ 29–30. If the block is properly validated and endorsed, it is published—i.e., added to the ledger and linked to the preceding block. SSUMF ¶ 30. The validators and the users who endorse the blocks receive "newly minted" native crypto assets as rewards in return for successfully validating or endorsing the validation of a new block. SSUMF ¶ 32. Those "newly minted" rewards have not been held or owned by anyone else prior to being received by the validators and endorsers. SSUMF ¶ 33. Validators and endorsers also receive a small amount of fees from the parties whose transactions they validate; these fees are paid with a portion of the transfers, they are not newly minted. SSUMF ¶ 34.

Solo staking requires labor, hardware, and substantial existing holdings of the native crypto asset. SSUMF ¶ 36. In order to stake, the validator operate a node that is up to date, secure, with substantial "uptime" – that is, time connected to the network. SSUMF ¶ 58. And it requires strict adherence to the protocol's rules. SSUMF ¶¶ 31, 58, 63. A proof of stake protocol often (as is the case with Tezos here) selects validators for each block using essentially a weighted lottery based on the amount of units staked. SSUMF ¶ 55. Once selected, the validator's hardware and software have a predetermined amount of time to complete the validation process. SSUMF ¶ 27. If that

4

process is not complete, the validator receives no rewards. If the validator does not comply with the protocol's rules, the validator forfeits a portion of the staked assets. SSUMF ¶¶ 31, 63.

## B. Tezos

Tezos is an open-source, self-amending proof of stake protocol. SSUMF ¶ 42. "Open-source" means that anyone can see and review the Tezos computer code ("source code"). SSUMF ¶ 42. "Self-amending" means that owners of Tezos have the right to propose, vote on, and amend the protocol's rules. SSUMF ¶ 50. Tezos uses a "proof of stake" consensus mechanism for validating transactions and blocks on its ledger. SSUMF ¶ 42.

On the Tezos blockchain, stakers are called "bakers," and the native cryptocurrency is called XTZ or "tez." SSUMF ¶¶ 43, 52. Owners of XTZ may participate in block validation and staking either as solo stakers (running their own validator node and staking their own XTZ), or they may delegate their XTZ to another owner who performs the validation of transactions. SSUMF ¶¶ 35–36, 37–38 (defining delegated staking), 53. As discussed above, Tezos uses a weighted lottery to select stakers who will propose a specific block; the staker's odds of being selected are weighted to their XTZ holdings. SSUMF ¶ 55. Thus, an individual who stakes a certain percentage of XTZ should, over time, expect to be selected to validate and propose blocks proportionate to their holdings. SSUMF ¶ 55. Bakers receive newly minted XTZ for successfully proposing a new block to the Tezos blockchain. SSUMF ¶ 61.

Owners of XTZ who are not selected to validate and propose a new block can also participate in staking by attesting or endorsing the work of other validators. SSUMF ¶ 53. It is like auditing a validator's work; the endorsements (or attestations) "show that the new block is valid and deserves to be permanently added to the blockchain." SSUMF ¶ 53 (*quoting* Ex. 1 at ¶ 65).

5

Owners of XTZ also received newly minted XTZ as rewards for attesting, albeit a smaller amount of rewards. SSUMF ¶ 72.

Rewards are issued at regularly scheduled intervals. SSUMF ¶ 56. In 2020, staking rewards were issued around every thirty to sixty seconds. SSUMF ¶ 56. The Tezos protocol "issues new tez" to bakers, and bakers "receive" those rewards on successful completion of all the staking requirements. SSUMF ¶¶ 61–63. The newly minted XTZ rewards are frozen for about 14 days, during which time they cannot be accessed or transferred. SSUMF ¶ 63. This "freeze" period allows the users of the protocol to detect malicious activity or other violations of consensus rules. If such a violation occurs, the newly minted XTZ are not issued, and a portion of the staked XTZ are "slashed" (i.e., forfeited) as a penalty. SSUMF ¶ 63.

XTZ is actively traded on major global digital asset exchanges, including Coinbase and Binance. It can be readily exchanged for cash or other digital assets or used as collateral for borrowing. SSUMF ¶¶ 64–66. It can also be used as a medium of exchange—i.e., as a formal payment mechanism for goods and services. SSUMF ¶¶ 67–70.[2]

### C. IRS 2014 and 2023 guidance

On March 25, 2014, the IRS issued guidance, Notice 2014-21, to answer frequently asked questions about the taxation of cryptocurrency. In that notice, the IRS informed taxpayers of its position that "mined" cryptocurrencies like Bitcoin, were includible in gross income. In 2023, the IRS issued Revenue Ruling 2023-14. In that guidance, the IRS directed that cash-method taxpayers

---

[2] *See also* Werner Vermaak, *A Deep Dive Into Tezos*, https://coinmarketcap.com/academy/article/a-deep-dive-into-tezos [https://perma.cc/9MEM-2CBA] (last visited April 23, 2026).

who receive staking rewards must include them as gross income at "fair market value . . . in the taxable year in which the taxpayer gains dominion and control over the . . . rewards."

**D. Joshua Jarrett's staking in 2020 and his 2020 federal income tax return**

In 2020, Joshua Jarrett staked on the Tezos protocol, primarily as a solo-staker. In 2020, he received 13,713.63 XTZ in staking rewards. SSUMF ¶¶ 73, 80. Mr. Jarrett and Mrs. Jarrett jointly filed a Form 1040 Income Tax return for the 2020 tax year on April 29, 2021. SSUMF ¶ 75. On the Jarretts' original Form 1040 return, they reported $384,253 in taxable income but reported no income from staking. The original return reported a tax owing of $807. SSUMF ¶ 76.

On August 24, 2023, the Jarretts filed a First Amended Form 1040 income tax return for the 2020 year. SSUMF ¶ 77. The First Amended Return reported $32,836 in additional income from Joshua Jarrett's staking rewards, and an additional $13,050 in taxes (income and self-employment taxes) owed. SSUMF ¶ 78. The Jarretts paid $13,600 with the First Amended Return to account for the unpaid tax and interest accruing thereon. SSUMF ¶ 81.

On October 16, 2023, the Jarretts filed a Second Amended Return that excluded from the Jarretts' income the $32,836 previously reported from Mr. Jarrett's staking rewards and sought a refund of the tax and interest paid with the First Amended Return. SSUMF ¶ 82. The return was filed with an explanation for the refund request on substantially the same grounds as the Jarretts have raised here. SSUMF ¶ 82. The IRS never formally denied or granted the refund request. SSUMF ¶ 83.

7

**Argument**

The Jarretts have the burden of showing that they overpaid their taxes. Here, that requires them to show either: (1) that the staking rewards they reported for the 2020 tax year are not within the definition of gross income under the Internal Revenue Code; or (2) that the "fair market value" at which they are reported as income is not the proper legal measure, and that instead a lower amount is appropriate. The undisputed facts and evidence show that they can meet neither burden. Staking rewards convey real economic value over which the Jarretts had complete dominion and control in 2020, and they cannot as a matter of law show that the fair market value of those rewards overstates their value.

## I. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When the moving party does not have burden of proof at trial, it "need show only that the opponent cannot sustain his burden at trial." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). In other words, the moving party meets its burden "by showing 'that there is an absence of evidence to support the nonmoving party's case." *Moldowan v. City of Warren*, 578 F.3d 351, 375 (6th Cir. 2009). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In a tax refund suit, the taxpayer "bears the burden of proving the amount he is entitled to recover." *United States v. Janis*, 428 U.S. 433, 440 (1976); *Sherwin-Williams Co. v. United States*, 403 F.3d 793, 796 (6th Cir. 2005). The Service's tax liability determination is "presumed correct" and "the presumption is that taxes paid are rightly collected upon assessments correctly made by the IRS, and in a suit to recover them the burden rests upon the taxpayer to prove all the facts

8

necessary to establish the illegality of the collection." *Sherwin-Williams*, 403 F.3d at 796. The

taxpayer must meet that burden by a "preponderance of the evidence." *Id.*

Thus, where (as here) the taxpayers assert that certain amounts are not includable within

their gross income, they bear the burden of proving that section 61(a) does not apply to those

amounts, or that they are exempted by some other section of the Internal Revenue Code. *Greer v.*

*United States*, 207 F.3d 322, 326 (6th Cir. 2000).

## II. The staking rewards the Jarretts reported on their 2020 income tax return are gains that constitute "gross income" under 26 U.S.C. § 61(a).

Under the Internal Revenue Code, taxpayers must pay taxes on all gross income, which the

Code defines as "all income from whatever source derived." 26 U.S.C. § 61(a). Income includes

"income realized in any form, whether in money, property, or services." 26 C.F.R. § 1.61-1(a).

Section 61(a) also includes a non-exhaustive list of items within this definition, "including (but

not limited to) . . . (1) compensation for services." These examples, however, are simply "the more

common items of gross income for purposes of illustration. . . . Gross income, however, is not

limited to the items so enumerated." 26 C.F.R. § 1.61-1(a).

"The starting point in the determination of the scope of 'gross income' is the cardinal

principle that Congress in creating the income tax intended 'to use the full measure of its taxing

power.'" *Comm'r v. Kowalski*, 434 U.S. 77, 82 (1977). Thus, as the Supreme Court has instructed,

section 61(a) must "be construed liberally 'in recognition of the intention of Congress to tax *all*

*gain* except those specifically exempted.'" *Greer v. United States*, 207 F.3d 322, 326 (6th Cir.

2000) (quoting *Comm'r v. Glenshaw Glass Co*, 348 U.S. 426, 430 (1955)) (emphasis added).

*Glenshaw Glass*, in turn, explains that "gain" encompasses "undeniable accessions to wealth,

clearly realized, and over which the taxpayers have complete dominion." 348 U.S. at 431. That

approach has not changed over the intervening seventy years since *Glenshaw Glass* was decided;

over that period, the Court has consistently confirmed the "sweeping scope" of section 61(a) to include "all gains." *E.g.*, *Comm'r v. Schleier*, 515 U.S. 323, 327 (1995).

The sole issue presented in this case is whether the XTZ Joshua Jarrett received in 2020 as rewards from staking qualify as "gains" at the time he received them and are included his gross income for that year. There is no dispute that the reward tokens constitute economic gain to the Jarretts within the broad reach of Section 61(a)'s definition: both their expert and the United States' expert agree that they do. And even if there were not total agreement that staking rewards meet the broad definition of income, the receipt of staking rewards can (and does) meet the definition of "compensation for services," which is expressly included within section 61(a)'s reach.

Either way, the undisputed facts show that staking rewards are an accession to wealth that is "clearly realized" and within the Jarretts' complete dominion in 2020 and thus are properly included within their income for that year.

**A.   Under section 61(a) and *Glenshaw Glass,* the staking rewards the Jarretts received constituted economic gain that was "clearly realized" and over which they had complete dominion in 2020.**

The first issue here—whether staking rewards are "gain" under section 61(a)—turns on *Glenshaw Glass*. The undisputed facts show that staking rewards are "gains" under the *Glenshaw Glass* standard because they: (1) constitute an "undeniable accession to wealth," that is (2) "clearly realized," and the Jarretts had (3) complete dominion over them in 2020. Both the plaintiffs' expert, Stephen McKeon, and the Government's expert, Wulf Kaal, also agree. Because there is no "battle of the experts" to be resolved at trial on this point, the Court may (and should) rule on taxability as a matter of law.

Turning first to whether staking rewards constitute an "accession to wealth," the evidence shows that they do. It is undisputed that staking rewards are both immediately convertible to cash and can be used as a medium of exchange to pay for goods and services without converting to

10

cash. SSUMF ¶¶ 65–67. Thus, they are both a store of value and a medium of exchange. SSUMF ¶¶ 67–70.

The Jarretts' expert, Stephen McKeon, confirms these facts and that conclusion. Plaintiffs retained Mr. McKeon to examine whether "[Joshua] Jarrett's *gain from staking* in 2020 was $32,836, which is the amount the IRS seeks to include in his 2020 income; and if not, how his gain should correctly be calculated." SSUMF ¶ 80 (emphasis added). As to that question, Mr. McKeon was clear: that stakers receive "economic gain from staking." He explained "economic gain," as "the value that they hold sort of before and after" receiving the rewards. SSUMF ¶ 81. That description of economic gain is also the description of an "accession to wealth": where the taxpayer's "net worth is increased over what it would have been if the original transaction had never occurred." *Jacobowitz v. Comm'r*, T.C. Memo 2023-107, 2023 WL 5274240, at * 4–*5 (Tax. Ct. 2023).

The Government's expert, Wulf Kaal, also confirms this. As Mr. Kaal noted, reward tokens, "hold demonstrable value, readily realizable upon earning," because they are "tangible, liquid assets with immediate tradability" and "can be used as a form of payment." SSUMF ¶¶ 66, 66. Thus, they constitute economic gain to stakers. SSUMF ¶¶ 67–68. And that gain is a tangible accession to wealth, since "staking still yields gains relative to non-stakers." SSUMF ¶ 69.

As to the remaining questions of whether and when the Jarretts realized the economic value of the staking rewards and had complete dominion over them in 2020, the facts are undisputed and the experts again agree. According to the Supreme Court, "a gain constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." *James v. United States*, 366 U.S. 213, 219 (1961) (citing *Rutkin v. United States*, 343 U.S. 130, 137 (1952)). That control must be "without restriction as to [the property's]

disposition." *Comm'r v. Indianapolis Power & Light Co.*, 493 U.S. 203, 209 (1990). In that way, realization and dominion are related, and can in fact be simultaneous.

Here, once a staker meets the Tezos protocol's requirements to validate a block, new XTZ are minted. The rewards tokens are then frozen for around 14 days. SSUMF ¶ 61. This lockout period allows time for the detection of bad behavior or non-compliance, after which the rewards are fully within the control of the staker. *Id.*. Thus, no later than 14 days after validation, the rewards can be used by the staker for any purpose.

Again, the experts agree. Mr. McKeon agrees that staking rewards confer economic value on stakers once they are unfrozen and thus "spendable." SSUMF ¶¶ 61, 82. Mr. Kaal said much the same. *Id.*; SSUMF ¶¶ 53, 68. At that point, the owner of the newly minted tokens may, among other things, immediately convert it to cash on an exchange or transfer it directly to another user to pay for goods or services. SSUMF ¶¶ 62–68. As Mr. McKeon stated in his report, it is "standard industry practice to measure fair market value of the [XTZ staking rewards] on the date the tokens become spendable." SSUMF ¶ 83. So, in his opinion, "the best approach [to calculate the gain] is to use the price on the date the rewards tokens become spendable, or in other words, the date when the staker becomes able to sell, exchange, or otherwise dispose of the [XTZ staking rewards]." SSUMF ¶ 88. It is undisputed that staking rewards "become spendable," after "a delay of about 14 days, meaning the rewards are initially frozen and do not become spendable until the delay has elapsed." SSUMF ¶ 61.[3] This is dispositive: if a user can do whatever he or she wants with the rewards after fourteen days (complete dominion), including converting them immediately to fiat

---

[3] It is similarly undisputed that his fourteen-day "freeze," is imposed so that other users on the network have time to "detect and punish misbehavior like double-baking." These rules–like all the rules of the Tezos protocol–are determined by consensus: that is, by a vote of the users themselves.

currency or using them as currency, then definitionally the taxpayer "clearly realizes" gain at least at that point, if not earlier.

### B. Alternatively, staking rewards are compensation for services.

Even though staking rewards need only meet the general *Glenshaw Glass* formulation to be includable in gross income, they are also included as income as compensation for services. 26 U.S.C. § 61(a)(1). As with all of section 61(a), "compensation for services" reaches broadly to "wages, salaries, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses (including Christmas bonuses), termination or severance pay, [and] **rewards**. . . are income to the recipients unless excluded by law." 26 C.F.R. §. 1.61-2 (emphasis added).

Here, stakers provide services to other Tezos users and to the blockchain itself by validating transactions. As both experts agree, the security and economic viability of the Tezos blockchain, and its basic function as a ledger, depend on staking. SSUMF ¶ 57. Staking requires investment and effort from validators: they must meet hardware uptime, accuracy, and performance standards, to receive rewards. SSUMF ¶ 58. According to Mr. McKeon, "stakers contribute to network security and consensus, which is essential for maintaining the blockchain's functionality." SSUMF ¶ 59 (quoting Ex. 1, ¶ 75). Mr. Kaal also agrees, noting that staking "upholds the network's functionality, security, accuracy, and governance." SSUMF ¶ 59 (quoting Ex. 2, ¶8).[4]

---

[4] *See also* "Tezos," CoinMarketCap, accessed July 9, 2025, https://coinmarketcap.com/currencies/tezos/ [https://perma.cc/2KTJ-SVTF] ("Tezos' LPoS (Liquid Proof-of-Stake) consensus mechanism enables any stakeholder to take part, directly or by delegation, in the consensus process, and to be rewarded for securing the network. Rather uniquely, Tezos' on-chain governance system also enables stakeholders to create and vote on protocol upgrade proposals. This pioneering system allows the protocol to self-amend and upgrade itself without leading to a split (or fork) in the blockchain, empowering the community without slowing down innovation").

But it is not just that stakers provide a valuable service to each other and to the blockchain itself by validating users' transactions; they are also rewarded and incentivized financially specifically in connection with providing that valuable service. Indeed, section 61's regulations expressly include "rewards." 26 C.F.R § 1.61-2(a).

The Jarretts have argued that staking rewards cannot constitute "compensation" because they are "newly minted," and thus not transferred "from a source" (like an employer) to the staker. They will thus claim an amount can only be "compensation" if it is transferred from one person to another and accounted for an expense (from the sending party) and a receipt (to the receiving party). This argument is misguided both legally and factually.

The Jarretts' narrow construction of the statute is not consistent with its language or its implementation. Neither the Code nor the cases interpreting the Code state that a gain is income only if it is a "transfer" from a specific type of "source," or that the "source" must be a separate legal person. In fact, the statute says that income can be "from whatever source." 26 U.S.C. § 61(a). Section 61's regulations clarify that income means "all income from whatever source *derived.*" 26 C.F.R. § 1.61-1(a). Here, the source from which staking rewards are "derived" is undisputed: they are "derived" from the source code of the Tezos protocol, which establishes the rules and conditions under which rewards tokens are earned, minted, and received.[5] SSUMF 52–61. Even if staking rewards were "derived" purely from the staker themselves, they would still meet this definition. Or put another way, "whatever source" means what it says.

---

[5] If there were a basis for finding that a gain is not income because it is not from "a source," the Jarretts have the burden to show in their own motion that the Tezos protocol's source code and rules is not a "source," as section 61(a) uses that word. The Government does not bear the burden of showing the opposite in this motion; or of proving a "source" at all. Thus, for the purpose of the present motion, the undisputed fact that the source code causes the minting of new XTZ is sufficient.

Thus, the focus for determining whether a gain is income, is not on what the *source* is but on whether the taxpayer's *receipt* constituted a gain, that was "clearly recognized," and over which he or she had "complete dominion." As for compensation, again the focus is on the *taxpayer* and his or her "services" — not on the whether a separate "source" is paying for services, or what (if any) legal status or personhood that source possesses.

Section 83(a) of the Internal Revenue Code, which addresses the transfer of property in connection with the performance of services, confirms that (for gross income reporting purposes) the Code's focus is on the nature of the property and the purpose for which it is received, as opposed to the identity of its "source." Thus, application of section 83 to staking rewards reaches the same result.

Under section 83(a) "if, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of -- (1) the fair market value of the property . . . at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture. . . over (2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services[.]" Again, the taxability turns on the property and the recipient: the property must "be transferred to [a] person"; it must be "in connection with the performance of services," and the recipient of the property must not also be "the person for whom such services are performed." *Id.* It does not matter from where the property "is transferred," and nothing in the Code requires that it "be transferred" from a person *at all*.

A staker's receipt of staking rewards looks like a Section 83(a) transfer. Section 83(a) does not require a quid pro quo of "compensation *for* services," but only that the transfer be "in connection with the performance of services." *McNaughton v. United States*, 888 F.2d 418, 421

15

(6th Cir. 1989) (section 83(a) transfer is not limited to "compensation" because "no reference is made [in the statute] to the term compensation."); *Alves v. Comm'r*, 734 F.2d 478, 481–82 (9th Cir. 1984) ("[I]f Congress intended section 83(a) to apply solely to restricted stock used to compensate employees, it could have used much narrower language").[6] As discussed above, the undisputed facts show that stakers perform services: they confirm the validity of transactions and secure the blockchain for all the blockchain's users. And those services benefit the other users of Tezos, as well as the ledger itself. So even if the rewards are not *for* those services (under section 61(a)), they are at least *in connection with* those services (under section 83(a)).

Section 83(a) also does not by its terms require that a *person* transfer the property to the recipient, or that the transfer even be made by a person who benefited from the services. To be sure, often a section 83(a) transfer is made from a person to the taxpayer (e.g., from an employer to an employee or an independent contractor). But the statute is not so limited: it reaches any transfer. Since the Tezos blockchain has existed, the protocol "issues new tez" to bakers as rewards and bakers "receive" them. SSUMF 58–59. It does not matter whether the protocol is an employer, or even a separate legal person. The "issuance" and "receipt" of staking rewards constitutes a transfer of property, in connection with staking services. And thus the value of that property (the XTZ) is income.

## III. The Jarretts cannot meet their burden to show staking rewards are excluded from income under the theory they are "self-created property" taxed only upon later sale or exchange.

Since staking rewards constitute taxable gain, the Jarretts "can only avoid paying taxes [on them] if [they] fall under an exclusion." *Stadnyk v. C.I.R.*, 367 F. App'x 586, 590–91 (6th Cir.

---

[6] Section 83(a) arises principally in the context of transfers of stock as compensation by an employer to an employee, as was the case in *McNaughton*. But though that is the common context in which it arises, the statute applies to "property," not solely "stock."

2000). Exemptions from taxation cannot be implied; they must be express. *Oklahoma Tax Comm'n v. United States*, 319 U.S. 598, 606 (1943). And the Jarretts have the burden of showing an express exclusion exists. *Greer*, 207 F.3d at 326.

The IRS has notified taxpayers of its position that staking rewards must be included within gross income under section 61(a). The Jarretts can point to no provision of the Internal Revenue Code that expressly excepts staking rewards from the definition of gross income, because there is no such provision. That is fatal to their refund claim: without an exception, they cannot meet their burden "of proving the amount [they] are entitled to recover." *Greer*, 207 F.3d at 326.

The Jarretts and their expert analogize staking to other categories of "self-created" property that, they claim, are taxed not upon "creation" but only when later sold, such as books (intellectual property) and crops (agricultural products). But analogizing to the taxation of other types of property is not enough. Exclusions from section 61(a) must be "express," and even "express" provisions "are narrowly construed." *Greer*, 207 F.3d at 326 (quoting *Comm'r v. Schleier*, 515 U.S. 323, 328 (1995)). So unless staking rewards are books, crops, or some other type of property that is not included in income, it does not matter whether they are *like* any of those things.

## IV.     The proper measure of the Jarretts' economic gain from their staking rewards is the fair market value of the rewards at the time they were received.

Along with challenging the threshold taxability of staking rewards, the Jarretts have also challenged the requirement that they report them at their fair market value at the time they obtain control over them. Their expert, Stephen McKeon, opines that the actual "economic value" of newly minted staking rewards is $7,023, far less than the $32,836 they reported on their return, based on the historical sale-price of XTZ. Again, the Jarretts have the burden to show their calculation is correct, and again they cannot meet that burden.

Gross income includes the fair market value of property received in payment for goods and services. *Baker v. Comm'r*, 88 T.C. 1282, 1288 (1987) (citing 26 U.S.C. § 61(a) and 26 C.F.R. § 1.61-2(d)(1)); *see also* § 83(a) (service providers must include in their income the fair market value of the property they received, minus any amount paid by them for the property). It also includes the fair market value of property such as prizes and awards received by a taxpayer. *Wade v. Comm'r*, 55 T.C.M. (CCH) 413 (T.C. 1988) (citing § 61(a)).

"In the context of valuation questions arising under section 61, courts have emphasized objective factors in determining the amount to be included in a taxpayer's income upon the receipt of property other than cash." *Wade*, 55 T.C.M. (CCH) 413; *see also Rooney v. Comm'r*, 88 T.C. 523, 528 (1987). The "sound administration of the tax laws requires that there be as nearly objective a measure of the value of [goods or] services that are includible in income as possible, and the only such objective measure is fair market value." *Koons v. United States*, 315 F.2d 542, 545 (9th Cir. 1963). Thus, where an item has an accepted price in the market where it is normally sold, a taxpayer may not arbitrarily discount the value of those items solely for income tax purposes. *Baker*, 88 T.C. 1282 (addressing the value of "trade units" received by a taxpayer as commission in connection with operating a barter exchange, and where those units were normally valued at $1 per unit).

Accordingly, for income tax purposes, the proper measure of the Jarretts' taxable economic gain from their staking rewards is the fair market value of the rewards at the time they were received. *See* § 61(a); 26 C.F.R. § 1.61-2(d)(1); § 83(a).[7]

---

[7] Under § 83, service providers must include in their income the fair market value of the property they received, minus any amount paid by them for the property. But stakers do not pay for staking rewards, so they must include in income the fair market value at the time of receipt of these rewards. 26 U.S.C. § 83(a).

**A. The undisputed facts show that XTZ rewards can be immediately converted to cash at a publicly-known, and easy-to-determine market price on actively-traded markets.**

There is no dispute that XTZ staking rewards can be immediately exchanged for cash at publicly known prices on actively traded markets. Nor is there any dispute that the cash received for XTZ at market price would be fair market value.

As the Government's expert, Wulf Kaal, explains, XTZ tokens are actively traded on major global crypto asset exchanges at publicly quoted prices and with significant trading volumes. SSUMF ¶ 64. XTZ tokens are "tangible, liquid assets with immediate tradability" and "hold demonstrable market value." SSUMF ¶ 66. And they can be used as a form of payment and even as collateral for borrowing. SSUMF ¶ 68. "In practice, many crypto assets [like XTZ] are not only used as stores of value but as mediums of exchange." SSUMF ¶ 67.

The plaintiffs' expert, Stephen McKeon, confirms these facts. He acknowledges that it is undisputed "that XTZ tokens have value, are tradable, and can be used as collateral." SSUMF ¶ 69. Mr. McKeon admits that XTZ tokens can be traded for equivalent U.S. dollar assets as well. SSUMF ¶ 65. And he himself uses aggregated crypto exchange price data to calculate the fair market value of XTZ. Ex. 1 (McKeon Rep.), ¶ 111 (using aggregated crypto asset exchange price data to calculate fair market value of staking rewards).

The parties thus agree that the fair market value of the XTZ staking rewards the Jarretts received is readily ascertainable from publicly available price data from global crypto asset exchanges.

**B. The Jarretts can point to no evidence that the market price fails to accurately account for the value of XTZ realized by the Jarretts on receipt.**

The plaintiffs nevertheless argue that the real economic value of their XTZ rewards is not accurately reflected by the prices set by actively traded markets. In other words, these market

19

prices are not an accurate reflection of XTZ tokens' fair market value, and they should therefore be taxed on a lesser amount. Ex. 1 (McKeon Rep.) ¶ 86 ("the staker's economic gain from staking is not the fair market value . . . of the rewards"); Ex. 5 (McKeon Dep.) at 117:6–9 ("So the economic gain is not the same as what you could sell the new units for").

The plaintiffs' expert, Mr. McKeon, defines "economic gain" as "the [added] value that they hold [between] . . . before and after the [XTZ staking rewards are issued]." Ex. 5 (McKeon Dep.) at 101:12–15. It is undisputed that the plaintiffs could sell their XTZ staking rewards immediately after they receive them for fair market value on crypto asset exchanges. SSUMF ¶¶ 64–68; *cf.* Ex. 1 (McKeon Rep.), ¶ 111 (using aggregated crypto asset exchange price data to calculate fair market value of staking rewards). According to the plaintiffs, however, the fair market value of their XTZ rewards overstates their economic gain by nearly five times because the issuance of new XTZ tokens via staking dilutes the value of all existing tokens. Ex. 13 (McKeon Rebuttal Rep.), ¶¶ 23, 112. "The assumption underpinning th[is] . . . dilution claim is that market capitalization is not directly affected by the creation of new units." *Id.*, ¶ 27; *cf.* Ex. 2 (Kaal Rep.), ¶ 70 (dilution claim "rests on a static and unrealistic assumption that market capitalization remains fixed, so that every new token issued reduces price in exact proportion"). But the plaintiffs do not point to any evidence that this is the case.

Mr. McKeon, instead attempts to argue "by construction," Ex. 5 (McKeon Dep.) at 105:3–7, 107:6–7, 108:14–20, 110:17–111:2, that the issuance of new XTZ tokens via staking mechanically dilutes the values of all existing tokens because issuing tokens is "no different from cutting pie slices in half but charging the same price for each slice." Ex. 1 (McKeon Rep.), ¶ 116. Mr. McKeon, however, has done no type of econometric analysis to support this theory. Indeed, he admits that it would be "very difficult to do an economic analysis in the context of supply

20

increases from staking because it's effectively . . . happening all the time." Ex. 5 (McKeon Dep.) at 108:5–10; 135:14–136:2 ("you don't have a discrete event to test as an econometrician"); *cf.* Ex. 13 (McKeon Rebuttal Rep.), ¶ 39 ("difficult if not impossible").[8]

The sole basis for the plaintiffs' claim rests on analogizing XTZ staking rewards to additional shares an owner received in stock splits, but XTZ is not stock and the staking rewards issued are not done proportionally among all holders as stock splits are. SSUMF ¶ 71. Moreover, Mr. McKeon admits that when a stock split occurs, it is immediately observable in a "mechanical" reduction in the stock price. Ex. 5 (McKeon Dep.) at 107:9–18. For example, when a company splits its stock 2:1, the stock price splits in half on the day of the split. *Id.*

As explained by the Government's expert, Mr. Kaal, the plaintiffs' dilution claim is not supported by economic theory and market evidence. SSUMF ¶¶ 88–93. New XTZ tokens are issued according to deterministic protocol rules which are public, stable, and known to all market participants. SSUMF ¶ 89. As a result, issuance of new XTZ tokens is fully anticipated and "priced in," which even Mr. McKeon concedes. SSUMF ¶ 90; Ex. 5 (McKeon Dep.) at 103:8–10 ("information is priced in as soon as that information becomes publicly available to market participants"), 109:5–7 ("fair to say that the price is an aggregate of . . . [demand-side and supply-side] variables").

Accordingly, rather than seeing a regular, predictable downward pressure on the token's price coinciding with each issuance cycle (which would be consistent with the plaintiffs' dilution

---

[8] In his rebuttal, Mr. McKeon takes the Government's expert to task for not doing an econometric analysis to disprove dilution, but he improperly shifts the plaintiffs' burden of proof to the United States. As discussed above, for income tax purposes, the proper measure of the Jarrett's taxable economic gain from their staking rewards is the fair market value of the rewards at the time they were received. *See* § 61(a); 26 C.F.R. § 1.61-2(d)(1); § 83(a). To the extent the plaintiffs contend otherwise, they need to prove the amount that they believe should be taxed and therefore need to establish that dilution is happening.

claim based on a fixed market capitalization), market data show no such pattern. SSUMF ¶ 91. In fact, the data shows the opposite: market capitalization has often increased even as new XTZ entered circulation through rewards. SSUMF ¶ 92. While the rate of token issuance was relatively constant in 2020, market capitalization of XTZ did not remain constant. SSUMF ¶ 93. Instead, there were periods during which XTZ's market capitalization rose significantly, despite continued increases in supply. *Id.*

The plaintiffs have thus not carried their burden of showing that the market price fails to accurately account for the value of the XTZ staking rewards they receive. *Baker*, 88 T.C. 1282. And they can point to no provision of the Internal Revenue Code that permits them to decrease the fair market value of these XTZ tokens to roughly one-fifth of what they could be immediately exchanged for on actively traded markets.

## Conclusion

For all these reasons, the Jarretts cannot meet their burden to prove that they overpaid their federal income taxes in 2020. The Court should deny their motion for summary judgment and grant the Government's motion.

Dated: April 24, 2026

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General, Tax Litigation Branch

*/s/ Ryan O. McMonagle*
RYAN O. MCMONAGLE
STEPHEN S. HO
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, D.C. 20044
202-307-1355; 202-616-8994 (v)
202-514-6866 (f)
Ryan.McMonagle@usdoj.gov
Stephen.S.Ho@usdoj.gov