IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| JOSHUA JARRETT and JESSICA JARRETT, | ) ) ) | Case No. 3:24-cv-01209 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

**UNITED STATES'
SEPARATE STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

## I. Cryptocurrency and Blockchain Technology

1. A digital asset, as defined by the Internal Revenue Code, is "any digital representation of value which is recorded on a cryptographically secured distributed ledger or any similar technology as specified by the [IRS]." 26 U.S.C. § 6045(g)(3)(D).

2. A cryptocurrency is a type of digital asset, widely understood to include "digital payment systems operating independently of a central authority and employing cryptographic techniques to control and verify transactions in a unique unit of account." Oxford English Dictionary, available at https://www.oed.com/dictionary/cryptocurrency_n; Ex. 1 (Expert Report of Stephen McKeon), ¶ 26.

3. A "public key" is a cryptographic code used to receive digital assets and verify digital signatures on a blockchain account. It is similar to a bank account number. Ex. 2 (Expert Report of Wulf Kaal), ¶ 15 n. 10, at 68 (pdf 71) (App'x C – Glossary). It can be shared openly with others, so that they know where to send transfers. *Id.*

4. A "private key" is a cryptographic code known only to the user that is used to sign transactions and prove ownership of a blockchain account. Ex. 2, ¶ 15 n. 11, at 69 (pdf 72) (App'x C – Glossary). It is similar to a bank account password or PIN. *Id.*

5. Owners of cryptocurrencies use "wallets"—software or hardware that manage private keys and public keys—to authorize transactions on a blockchain network. Ex. 2, ¶ 15, at 70 (pdf 73) (App'x C – Glossary).

6. A "blockchain" is a permanent digital ledger that records transactions across a distributed network of computers. Ex. 2, ¶ 13, at 67 (pdf 70) (App'x C – Glossary).

7. Blockchain technology and blockchain ledgers are used for cryptocurrency transactions; e.g., when users want to transfer their crypto asset to another user. Ex. 2, ¶¶ 14–15; Ex. 1, ¶ 27.

8.      Blockchain technology uses cryptography to protect information and prevent unauthorized parties from executing or altering transactions. Ex. 2, ¶ 14; Ex. 1, ¶¶ 27, 29, 31.

9.      Transactions on a blockchain are grouped into blocks, and each block refers to the block that came before it, forming a continuous chain. Ex. 2, ¶ 13; Ex. 1, ¶¶ 31–33.

10.     Blocks contain groups of transactions that have been validated by users of the blockchain to be authentic and authorized. Kaal ¶¶ 13–15, at 66 (pdf 69) (App'x C – Glossary); Ex. 1, ¶ 29.

11.     Blockchain ledgers are "decentralized and distributed," which means they are maintained by multiple parties who verify each other's work according to predefined rules. Ex. 2, ¶¶ 13, 16; Ex. 1, ¶ 31.

12.     Users of the blockchain network operate nodes—i.e., computers connected to the network—each of which maintain a copy of the distributed ledger and associated software containing the protocols or rules under which the blockchain operates. Ex. 2, ¶¶ 13, 16, at 68 (pdf 71) (App'x C – Glossary).

13.     Blockchain ledgers require a mechanism to ensure all the users operating nodes agree on the validity of transactions. Ex. 2, ¶ 16; Ex. 1, ¶ 58.

14.     Blockchain ledgers use "consensus mechanisms," or "consensus protocols," to determine which transactions are valid. Ex. 2, ¶ 16, at 67 (pdf 70) (App'x C – Glossary); Ex. 1, ¶ 58.

15.     Consensus mechanisms (consensus protocols or consensus algorithms) are a set of rules, encoded in software, for determining agreement on which transactions are legitimate and should be validated. Ex. 2, ¶ 16, at 67 (pdf 70) (App'x C – Glossary).

### A.  "Proof of Work" consensus mechanisms

16.     One widely adopted consensus mechanism approach for validating blocks on a blockchain is called "Proof of Work." Bitcoin, for example, uses a "proof of work" algorithm. Ex. 2, ¶¶ 17–18; Ex. 1, ¶ 59.

17.     In a blockchain utilizing a Proof of Work consensus mechanism, the network users' computers (nodes) compete to solve mathematical puzzles. Ex. 2, ¶ 18; Ex. 1, ¶ 59.

18.     The participants in "Proof of Work" blockchains are called "miners." Ex. 2, ¶ 18; Ex. 1, ¶ 58.

19.     The first miner to solve the mathematical puzzle broadcasts their solution to the network of other nodes, which is then verified by other participants. Ex. 2, ¶ 18.

20.     Miners expend significant computational work, as well as energy, to complete the mathematical puzzles. Ex. 2, ¶¶ 18–19; Ex. 1, ¶ 60.

21.     In return for validating the block, once the new block is added to the blockchain, the miner receives a rewards in the form of native cryptocurrency to that blockchain. Ex. 2, ¶ 18.

### B.  "Proof of Stake" consensus mechanisms

22.     Another widely adopted consensus mechanism used for validating blocks on a blockchain is called "Proof of Stake." Ethereum, for example, uses a "proof of stake" mechanism. Ex. 2, ¶ 17; Ex. 1, ¶ 58.

23.     In a blockchain using a Proof of Stake consensus mechanism, the network users' nodes are called "validators." Ex. 2, ¶ 21.

24.     To participate, a validator (also called a "staker") must hold existing units of the native cryptocurrency, and must commit a portion of them to validate a block. Ex. 2, ¶ 21, at 69 (pdf 72) (App'x C – Glossary); Ex. 1, ¶ 63.

3

25. Stakers are selected to propose and attest new blocks to be added to the blockchain, typically based on the amount of the native cryptocurrency they have staked. Ex. 2, ¶ 22; Ex. 1, ¶ 63.

26. Stakers must stake their units of native cryptocurrency to propose new blocks themselves, and to attest to the validity of new blocks proposed by others. Ex. 2, ¶¶ 21, 22, 24.

27. Proposing new blocks occurs at predetermined scheduled intervals. Ex. 2, ¶ 24. At each of these intervals, the protocol selects a staker to aggregate pending transactions from network participants into a new block and submit it to be included in the blockchain's permanent ledger. *Id.*

28. When a staker is not selected to propose the block, the staker instead will review and confirm the block proposed by the staker who was selected, this is called "attesting." Ex. 2, ¶ 25.

29. To "attest," the staker must confirm whether the block follows the consensus rules, confirm the authenticity of the transaction, and detect any signs of invalidity or malicious activity. Ex. 2, ¶ 25; Ex. 1, ¶ 65.

30. A staker "attests" to a block by producing a digital signature, referred to as an "attestation." Ex. 2, ¶ 25. A properly validated and attested block is then published or added to the blockchain. *Id.*

31. If a staker does not follow the pre-established rules of the protocol, or engages in malicious conduct, the validator will not receive rewards or (in the case of malicious conduct) will forfeit the native cryptocurrency they have staked. Ex. 2, ¶¶ 21 & n.24, 22, 45; Ex. 1, ¶¶ 67–68; *cf.* Ex. 3 (Expert Rebuttal Report of Wulf Kaal), ¶ 24. In that way, the staked units are security for validating blocks. *Id.*

4

32. In return for proposing blocks and attesting the proposed blocks of others, stakers receive newly-minted units of native cryptocurrency as rewards. Ex. 2, ¶ 23; Ex. 1, ¶ 19; Ex. 4 (Dep. Ex. 12 (Tezos Docs)) at 1 (Tezos Docs, *Staking*, https://docs.tezos.com/using/staking [https://perma.cc/5PRT-BX5P]).

33. The rewards are "newly-minted" by the protocol —that is, they are not transferred from one participant to another. Ex. 2, at 70 (pdf 73) (App'x C – Glossary), ¶ 42; Ex. 5 (Excerpts of Deposition of Stephen McKeon) at 80:4–14.

34. Additionally, the stakers receive a small amount of "fees" from the parties whose transactions they validate and propose to add to a block. Ex. 1, ¶¶ 47, 109; Ex. 6 (Open Tezos, *Economics and Rewards*, https://opentezos.com/tezos-basics/economics-and-rewards/ [https://perma.cc/4JGA-QAKS]). The sender includes these fees in the transaction. *Id.*

35. There are two primary ways to stake: as primary (or "solo") stakers or as delegators. Ex. 2, ¶¶ 29, 39.

36. In "solo staking," the staker operates their own node, which requires staking the minimum collateral required by the protocol and managing the necessary hardware, software, and security to comply with the protocol's standards. Ex. 2, ¶¶ 30.

37. In "delegated staking," individual token holders ("delegators") can participate in staking without running their own node. Ex. 2, ¶ 33, at 67 (pdf 70) (App'x C – Glossary); Ex. 4 at 2–3.

38. In "delegated staking", delegators assign their own staking power (i.e., the right to use their units of native cryptocurrency) to an existing active validator. When a validator is selected to validate a block and receives rewards as a result, the delegators receive a proportional share of the staking rewards. Ex. 2, ¶ 33; Ex. 1, (App'x B) at 45–46; Ex. 6 at 3–4; Ex. 7 at 4–5

5

(Octez, *The consensus algorithm*, https://octez.tezos.com/docs/active/consensus.html [https://perma.cc/5QP8-QZUD]).

### C. Economics and use of cryptocurrencies

39. Owners of cryptocurrencies can sell them to others in exchange for cash or another cryptocurrency through online trading venues. One such venue is Coinbase. Ex. 1, ¶ 72.

40. Crypto asset trading platforms operate twenty four hours per day, trading continuously. Ex. 3, ¶ 36; Ex. 1, ¶ 111.

41. Owners of cryptocurrencies can also use them as payment for a good or a service, or as a gift. Ex. 1 ¶ 72.

## II. Tezos

### A. Background

42. Tezos is an open source proof-of-stake protocol, meaning that users of the Tezos protocol have access to the source code. Ex. 2, ¶ 37; Ex. 1, ¶ 85.

43. The native cryptocurrency of Tezos is called tez or XTZ. Ex. 2, ¶ 37; Ex. 1, ¶ 50.

44. Tezos has had numerous amendments to its operation over the years. Ex. 2, ¶¶ 38 n. 46, 48–49; Ex. 8 (Tezos Docs, *History of amendments*, https://docs.tezos.com/architecture/governance/amendment-history [https://perma.cc/N45Y-WBPL]).

45. The source code for the Tezos protocol is called Octez. Octez is used by developers. Ex. 5 at 46:16–18.

46. One of the primary developers of Tezos is Nomadic Labs. Ex. 5 at 81:21–82:8.

47. Octez contains both the Tezos source code and explanatory documentation of the source code. Ex. 5 at 46:16–18, 78:2–6, 126:8–10; Ex. 2, ¶ 38.

6

48.     Training and explanatory materials for Tezos are published and available at htts://opentezos.com ("Open Tezos"). "Open Tezos" is an authoritative source with respect to describing Tezos. Ex. 5 at 60:19–61:1.

49.     Tezos protocol documentation is also available at https://docs.tezos.com ("Tezos Docs") and https://opentezos.com ("Open Tezos").

50.     The Tezos protocol is also self-amending, meaning that the participants on the network have the right to propose, vote on, and amend the protocol's rules. Ex. 2, ¶¶ 37 n.49, 48–49, 68; McKeon Dep at 59:8–12; Ex. 9 at 1; (OpenTezos, *On-chain governance*, https://opentezos.com/tezos-basics/governance-on-chain/ [https://perma.cc/F3FL-KRML]).

51.     Protocol amendments can change various things, including (e.g.) the per-block reward for staking. Ex. 2, ¶¶ 42, 48–49. All changes done to the protocol are done by consensus. *Id.*

**B.     Staking on Tezos**

52.     Stakers on the Tezos network are referred to as "bakers." Ex. 2, ¶ 39, at 66 (pdf 69) (App'x C – Glossary); Ex. 4 at 1 ; Ex. 6 at 3.

53.     Individuals can participate in staking as bakers (validating or endorsing new blocks), or as delegators. Ex. 1, at 45 (Appendix B), ¶ 65; Ex. 2, ¶ 39.

54.     When bakers stake their XTZ, the software locks up the staked XTZ. Ex. 2, ¶ 23 & n.28; Ex. 5 at 62:2–15.

55.     Bakers are selected semi- randomly for opportunities to validate a block, with their chances of being selected weighted to the amount of their staked XTZ. Ex. 3, ¶ 22; Ex. 10 (Octez, *Baking Power*, https://octez.tezos.com/docs/alpha/baking_power.html [https://perma.cc/5TER-3C9P]) ("for this selection process, each baker is weighted according to its baking power. .

7

.[which] is determined from the staked and non-steaked funds owned by the baker itself and all its delegators."); Ex. 1, ¶ 63.

56. Blocks are validated and XTZ are minted at regular intervals, per the protocol; in 2020, that interval was every thirty to sixty seconds. Ex. 5 at 109:9–12; Ex. 3, ¶ 21; *cf.* Ex. 2, ¶¶ 24, 64 n.103.

57. The security and economic viability of the Tezos blockchain, and its basic function as a ledger, depend on staking. Ex. 1, ¶ 75; Ex. 2, ¶ 44.

58. Staking requires investment and effort from validators: they must operate a node (computer running the required software) that is connected to the other nodes on the network, hold a certain amount of XTZ, and meet accuracy and performance standards, to receive rewards. Ex. 2, ¶¶, 45 n. 68 (requirements include "server available round the clock and stable internet connection" and "at least one roll (8000tz)"), 54.

59. Staking "upholds the network's functionality, security, accuracy, and governance. Ex. 2, ¶ 8; *see also id.* ¶ 36; Ex. 1, ¶ 75 ("stakers contribute to network security and consensus, which is essential for maintaining the blockchain's functionality.")

C. <u>**The mechanism of tez rewards**</u>

60. Tez rewards are "minted" only once the validator has met the requirements of the protocol necessary to propose or attest a block. Ex. 2, ¶¶ 52, 54–55; Ex. 3, ¶¶ 7, 16–20, 24.

61. Tezos documentation does not anywhere state that bakers "create" new units of XTZ as staking rewards; rather, the documentation states that bakers "receive" staking rewards upon completion of the staking requirements of the protocol. Ex. 6 at 4; Ex. 7 at 13 at 4–5; *see also* Ex. 3, ¶ 8.

62. The Tezos source code also states that its economic protocol "issues new tez" to bakers. Ex. 11 at 1 (Octez, *Adaptive Issuance*,

8

https://octez.tezos.com/docs/active/adaptive_issuance.html, https://perma.cc/L3MS-R9BY]);
Ex. 5 at 124:21–126:1.

63.     Newly minted XTZ staking rewards are frozen for around 14 days. Ex. 12 at 2
(Open        Tezos,        *Rewards*,        https://opentezos.com/node-baking/baking/reward/
[https://perma.cc/39ZG-PLSL]); Ex. 1, ¶ 69 ("Rewards for staking on Tezos are subject to a delay
of about 14 days, meaning the rewards are initially frozen and do not become spendable until the
delay has elapsed."). This lockout period allows time for the detection of bad behavior or non-
compliance with the protocol's rules. Ex. 2, ¶ 23. If that is the case, then the frozen rewards are
slashed and do not enter circulation. Ex. 5 at 71:10–15.

**D.   Economics of XTZ**

64.     XTZ are actively traded on major global crypto asset exchanges, including
Coinbase, at publicly quoted prices and with significant trading volumes. Ex. 2, ¶¶ 9, 56; Ex. 5 at
52:6–14; *see also* Ex. 13 (Expert Rebuttal Report of Stephen McKeon) ¶¶ 3, 50.

65.     On these exchanges, XTZ can readily be exchanged for fiat currency (cash) or other
digital assets. Ex. 2, ¶ 56; *see also* Ex. 5 at 52:6–14 ("There are trading venues that will trade Tez
against an equivalent US dollar asset as well as other assets.").

66.     XTZ tokens are tangible, liquid assets with immediate tradability and hold
demonstrable market value, readily realizable upon earning. Ex. 2, ¶¶ 8–9, 56–59.

67.     In practice, many cryptocurrencies like XTZ are not only used as stores of value
but as mediums of exchange. Ex. 2, ¶ 57; *see also* Ex. 13, ¶¶ 3, 50.

68.     XTZ tokens have served as a formal payment mechanism within the Tezos
community itself, and global cryptocurrency exchanges provide owners of XTZ access to
liquidity by lending them funds against the value of the tokens being held by the exchange. Ex.
2, ¶¶ 59, 61.

69. The ability to exchange XTZ for other assets, to use it directly for goods and services, or to use it as collateral for borrowing, confirms that stakers received tokens with actual, spendable value. Ex. 2, ¶ 62; *see generally id.* ¶¶ 56–69; *see also* Ex. 13, ¶¶ 3, 50 ("There is no dispute that XTZ tokens have value, are tradable, and can be used as collateral").

70. Staking rewards constitute genuine economic value for stakers. Ex. 2, ¶ 63; Ex. 1, ¶¶ 22 ("it is my opinion that Jarrett's economic gain from staking . . . "), 86 ("For staking rewards, the staker's economic gain from staking is . . . ").

71. Among other things, staking yields gains relative to non-stakers since passive holders who do not stake see their proportional share decline as stakers accumulate additional tokens. Ex. 2, ¶ 73.

### III. Joshua Jarrett's staking in 2020

#### A. Staking rewards rates

72.     From October 2019 through February 2021, staking rewards amounts were allocated as follows:

#### FIGURE 1: BLOCK AND ATTESTATION REWARDS ON TEZOS IN 2020

| Protocol [A] | Period [B] | Maximum Reward for Proposing a Block [C] | Maximum Attestation Reward per Validator [D] | Maximum Number of Attestations [E] | Maximum New Tokens Minted per Block [F] |
|---|---|---|---|---|---|
| Babylon | October 2019 – March 2020 | 16 XTZ | 2.00 XTZ | 32 | 80 XTZ |
| Carthage 2.0 | March 2020 – November 2020 | 40 XTZ | 1.25 XTZ | 32 | 80 XTZ |
| Delphi | November 2020 – February 2021 | 40 XTZ | 1.25 XTZ | 32 | 80 XTZ |

Ex. 2, ¶ 48; Ex. 8, https://docs.tezos.com/architecture/governance/amendment-history;

https://blog.unit410.com/tezos/2020/02/11/voting-yay-on-carthage.html [https://perma.cc/5TER-3C9P].

73.     In 2020, Joshua Jarrett staked on the Tezos network, which he documented, and which generated 13,713.63 XTZ in staking rewards to him. Ex. 14 (Cointracking Report).

74.     Mr. Jarrett also earned a small amount of rewards from delegated staking activities through Coinbase. Ex. 15 (Coinbase Report).

#### B. The Jarretts' 2020 income tax return

75.     The Jarretts filed their Form 1040 Joint Income Tax return for the 2020 tax year on April 29, 2021. Ex. 16; Ex. 17 at USAJAR000035.

76.     On the Jarretts' original Form 1040 return, they reported $384,253 in taxable income, but reported no income from staking. With payments and credits, their original Form 1040 income tax return reported a tax owing of $807. Ex. 16 at 1 (row 15), 2 (row 37).

11

77. On August 24, 2023, the Jarretts filed a Form 1040X Amended United States Income Tax Return for the 2020 tax year ("First Amended Return"). Ex. 18 (1040X amended return).

78. The First Amended return reported an additional $32,836 in income from Joshua Jarrett's staking activities on the Tezos platform, resulting in an increase in tax of $13,050. Ex. 18 at USAJAR000081 (row 1), USAJAR000084 (row 37).

79. Attached to the First Amended Return was a "Staking Schedule," showing the dates and amounts of XTZ Joshua Jarrett received as staking awards, along with a column reporting the "value in USD" of the amount of XTZ as of the date of receipt. Ex. 18 at USAJAR000108–112.

80. The "Staking Schedule" reported that Joshua Jarrett received 13,713.63 XTZ in staking rewards in 2020. Ex. 18 at USAJAR000112.

81. With the First Amended Return, the Jarretts made a payment of $13,600. Ex. 17 at USAJAR000035.

82. On October 16, 2023, the Jarretts filed a Second Amended Return that excluded from the Jarretts' income the $32,836 previously reported from Joshua Jarrett's staking, and sought a refund of the $12,179 in income tax paid with the First Amended Return, plus interest. Ex. 19 (1040X second amended return). Attached to the return was an explanation of Mr. Jarrett's position that staking rewards are not taxable as income. *Id.* at USAJAR000141.

83. The IRS did not grant or deny the requested refund and the Jarretts filed this action on October 10, 2024.

## IV. Economic Gain from Staking on Tezos

84. The Jarretts retained Stephen McKeon as an expert to opine as to whether "[Joshua] Jarrett's gain from staking in 2020 was $32,836, which is the amount the IRS seeks to include in

12

his 2020 income; and if not, how his gain should correctly be calculated." Ex. 1, ¶¶ 2, 19; Ex. 5 at 48:15–49:1.

85. Mr. McKeon testified that "economic gain" is "the value that they hold sort of before and after the XTZ staking rewards are issued." Ex. 5 at 102:8–15.

86. Staking rewards confer economic value on stakers once they are unfrozen and thus spendable. Ex. 1, ¶ 69; Ex. 2, ¶¶ 23 n. 28, 56–59, 62.

87. It is standard industry practice to measure fair market value of the newly created property on the date the tokens become spendable. Ex. 1, ¶ 70.

88. The minting of new XTZ does not dilute the economic value of XTZ. Ex. 2, ¶¶ 63, 70.

89. New XTZ tokens are issued according to deterministic protocol rules which are public, stable, and known to all market participants. Ex. 2, ¶¶ 64–66; *see also* Ex. 5 at 121 ("it is publicly available what the supply schedule will be"); Ex. 20 (Octez, *Validation and Application*, https://octez.tezos.com/docs/alpha/validation.html [https://perma.cc/C4NS-CA2P]) ("The economic protocol is responsible for providing the rules that govern the Tezos network, and for enforcing that these rules implement a correct blockchain protocol").

90. As a result, issuance of new XTZ tokens is fully anticipated and "priced in," which even Mr. McKeon concedes. *Id.*; Ex. 5 at 103:8–10 ("information is priced in as soon as that information becomes publicly available to market participants"), 109:5–7 ("fair to say that the price is an aggregate of . . . [demand-side and supply-side] variables"); 110:17–19 ("fair market value is determined by numerous factors, information entering the market").

91. Rather than seeing a regular, predictable downward pressure on the token's price coinciding with each issuance cycle (which would be consistent with the plaintiffs' dilution claim

based on a fixed market capitalization), market data show no such pattern. Ex. 2, ¶¶ 66–67, 70–75.

92.     The data shows the opposite: market capitalization has often increased even as new XTZ entered circulation through rewards. Ex. 2, ¶¶ 63, 74–77.

93.     While the rate of token issuance was relatively constant in 2020, market capitalization of XTZ did not remain constant. Ex. 2, ¶¶ 63, 74–77. Instead, there were periods during which XTZ's market capitalization rose significantly, despite continued increases in supply. *Id.*

Dated: April 24, 2026

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General, Tax
Litigation Branch


*/s/ Ryan O. McMonagle*
RYAN O. MCMONAGLE
STEPHEN S. HO
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, D.C.  20044
202-307-1355; 202-616-8994 (v)
202-514-6866 (f)
Ryan.McMonagle@usdoj.gov
Stephen.S.Ho@usdoj.gov

14