# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |
|---|---|
| JOSHUA JARRETT, and<br>JESSICA JARRETT<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 3:24-cv-1209<br><br><br>Chief Judge William L. Campbell, Jr.<br>Magistrate Judge Luke A. Evans |

**BRIEF OF BLOCKCHAIN ASSOCIATION, CRYPTO COUNCIL FOR INNOVATION, AND SOLANA POLICY INSTITUTE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ..................................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................................................2

BACKGROUND ........................................................................................................................3

ARGUMENT ..............................................................................................................................5

I.      New Tokens Created By Stakers Like Jarrett Are Not Taxable As Income.........................5

II.     Treating New Tokens Created By Staking As Income Risks Degrading The Important
        Security And Policy Interests That Staking Furthers...........................................................7

        A.      The IRS's Position Undermines Staking's Critical Role In Ensuring
                Blockchain Security And Discourages Innovation ...................................................7

        B.      The IRS's Treatment Of Staking Rewards As Income Clashes With Other
                Government Efforts To Embrace Digital Assets .......................................................9

III.    The IRS's Position Creates Liquidity, Dilution, And Administrability Challenges..........10

        A.      The IRS's Position Disincentivizes Long-Term Network Participation By
                Encouraging Stakers To Immediately Liquidate Their Rewards..........................10

        B.      The IRS's Approach Overlooks The Economic Realities of Staking And
                Token Pricing..........................................................................................................11

CONCLUSION...........................................................................................................................12

**Page(s)**

**Cases**

*Campbell v. Prothro*,
 209 F.2d 331 (5th Cir. 1954) ........................................................................................6

*Tootal Broadhurst Lee Co. v. Commissioner*,
 30 F.2d 239 (2d Cir. 1929)............................................................................................5

*Weingarden v. Commissioner*,
 825 F.2d 1027 (6th Cir. 1987) .....................................................................................6

**Statutes, Rules, & Regulations**

26 U.S.C. § 61(a) ...............................................................................................................5

26 U.S.C. § 61(a)(1), (4), (10) ...........................................................................................5

26 U.S.C. § 61(b) ...............................................................................................................6

26 U.S.C. §§ 101-140 ........................................................................................................6

26 C.F.R. § 1.61-4(a)(1).....................................................................................................5

Rev. Proc. 2025-31, 2025-48 I.R.B. 743 ........................................................................10

Rev. Rul. 2023-14 ..............................................................................................................6

**Other Authorities**

*Are There Risks Associated with Staking?*, Solana, https://tinyurl.com/yr7yy8tr ...........................7

Chairman Paul S. Atkins, *American Leadership in the Digital Finance
 Revolution*, SEC (July 31, 2025), https://tinyurl.com/2dc78puf...............................8

Coinbase Global, Inc., Annual Report (Form 10-K) (Feb. 13, 2025),
 https://tinyurl.com/49spawap.....................................................................................8

Coinbase Global, Inc., Annual Report (Form 10-K) (Feb. 15, 2024),
 https://tinyurl.com/543xpaey .....................................................................................8

Dhiraj Nallapaneni, *Dubai Crypto Tax: 2026 Guide*, Coin Ledger,
 https://tinyurl.com/46rajerk ......................................................................................7

Dhiraj Nallapaneni, *Singapore Crypto Tax: A Comprehensive Guide (2026)*, Coin
 Ledger, https://tinyurl.com/4ayndbkh........................................................................7

Exec. Order No. 14178, 90 Fed. Reg. 8647 (Jan. 31, 2025).............................................................9

*Helium 2025: Year in Review*, Medium (Dec. 19, 2025),
    https://tinyurl.com/33dbyxme.............................................................................................9

Ji Kim & Alison Mangiero, *Let Staking Flourish in the U.S.*, a16zcrypto (Feb. 4,
    2025), https://tinyurl.com/2zdk7yp4....................................................................................4

Letter from Jeffrey S. Mooney, Associate Director, SEC to Brian Steele,
    Managing Director, DTCC (Dec.11, 2025), https://tinyurl.com/5dep92ba..............................8

Mattia Landoni & Abraham Sutherland, *Dilution and True Economic Gain from
    Cryptocurrency Block Rewards*, 168 Tax Notes 1189, 1214 (2020)......................................12

Presidential Working Group on Digital Asset Markets, *Strengthening American
    Leadership in Digital Financial Technology*, 135 (July 17, 2025),
    https://tinyurl.com/3fxe3p3d................................................................................................9

*Rewards*, Open Tezos, https://tinyurl.com/2zwdvhke ....................................................................12

SEC, *Application of the Federal Securities Laws to Certain Types of Crypto
    Assets and Certain Transactions Involving Crypto Assets*, Securities Act
    Release No. 33 11412 (Mar. 17, 2026)...................................................................................9

*Staking and Inflation FAQ*, Solana, https://tinyurl.com/4swwnzwj ................................................4

*Success Stories*, SpruceID (Oct. 25, 2023), https://tinyurl.com/wcbh7mym...................................9

*The New York Stock Exchange Develops Tokenized Securities Platform*, Ice (Jan.
    19, 2026), https://tinyurl.com/5bvyh96b ................................................................................8

*The Next Chapter for Crypto: 2025 Review & 2026 Outlook*, Everstake (Dec. 15,
    2025), https://tinyurl.com/ycff2phe ......................................................................................8

*What is Proof of Stake?*, Solana, https://tinyurl.com/4swwnzwj......................................................7

*Why Stake?*, Solana, https://tinyurl.com/bd4z2m87 .......................................................................7

**INTERESTS OF *AMICI CURIAE*[1]**

Blockchain Association ("BA") is the leading nonprofit membership organization dedicated to promoting a pro-innovation policy environment for digital assets. Serving as the unified voice of the blockchain industry, BA works to achieve regulatory clarity and educate policymakers, regulators, courts, and the public about how blockchain technology can pave the way for a more secure, competitive, and consumer-friendly digital marketplace. It represents more than 100 companies that reflect the diversity of the blockchain industry, including software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem.

Crypto Council for Innovation ("CCI") is the premier global alliance of industry leaders dedicated to advancing understanding of digital assets and demonstrating their transformational potential. CCI's members, which include leading global companies and investors in the industry, share the goal of encouraging responsible global regulation of digital assets that unlocks economic potential, improves lives, fosters financial inclusion, protects national security, and combats illicit activity. CCI believes that achieving these goals requires informed, evidence-based policymaking realized through sustained, collaborative engagement between regulators and industry.

Solana Policy Institute is a non-partisan non-profit focused on educating policymakers on how decentralized networks like Solana are the future of the digital economy—and why the people building on and using them need legal certainty to flourish.

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person other than amici, their members, or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

Together, amici comprise some of the largest and most influential associations in the blockchain industry. They have a direct and substantial interest in this case because the tax treatment of staking rewards affects who participates in the critical process of validating proof-of-stake networks and the locations from which they do so, as well as crypto industry economics, regulatory coherence, and U.S. competitiveness. Additionally, they have a strong interest in ensuring that lawmakers, regulators, and courts confront novel legal and policy questions with an accurate understanding of the functioning of blockchain networks.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Joshua Jarrett, like countless others, performs a function that is vital to the security and integrity of blockchain networks. Such networks are essentially digital ledgers of transactions, and they are maintained by the collective efforts of individuals and entities from around the world. By "staking" some of his own digital assets, and "validating" transactions on a blockchain (the Tezos blockchain,[2] in particular), Jarrett helps ensure that the blockchain remains a secure and reliable ledger. Blockchains like Tezos are structured to encourage this essential activity. Baked into the protocol—*i.e.*, the rules of the road—for Tezos and similar networks are "rewards" for staking, including the creation of new digital assets called "tokens."

Amici and their members know firsthand how essential staking is to the viability of blockchain networks and of the digital assets (or "cryptocurrency") those networks enable. As the United States increasingly embraces and uses blockchain technology, regulators need an accurate understanding of how transformative technologies function when applying the law to cases that involve those technologies. The IRS did not develop such an understanding here.

---

[2] As detailed in the Jarretts' brief, Tezos is a public, open-source blockchain whose native digital asset is called "tez" or "XTZ." Pls. MSJ Br. 4, ECF No. 39 at 4. The Tezos blockchain relies on participants to validate transactions by staking their XTZ. *See id.*

2

Based on its misunderstanding, the IRS made a legal error by taxing at the time of creation rather than upon disposition the new tokens that Jarrett creates through staking. As Plaintiffs explain, those tokens are not "received" from any other person or entity; Jarrett's staking activity brings them into existence, thereby making him the first owner. Like any first owner of property, Jarrett should not be taxed unless and until the property is sold.

The IRS's approach also creates serious practical consequences. It discourages staking in the United States and weakens network security. By failing to account for the economic realities of staking—including that the creation of new tokens dilutes the value of existing ones—the IRS's approach saddles stakers like Jarrett with artificially high tax bills and generates artificial liquidation pressure. And it requires taxpayers and the IRS to value and track large numbers of small-reward events across fragmented markets. Amici respectfully request that this Court reject the IRS's flawed interpretation and grant the Jarretts' motion for summary judgment.

## BACKGROUND

The Jarretts' brief and accompanying expert report describe the relevant technology in detail. *See, e.g.*, Pls. MSJ Br. 2-5. Amici will not repeat that discussion, but highlight here the mechanics of blockchain technology most relevant to the tax question presented.

Proof-of-stake blockchains, like Tezos, rely on validators to reach consensus (*i.e.*, agreement)—in the absence of a central authority—regarding the validity of transactions on the blockchain. To participate, token holders commit tokens as their "stake" and perform validation functions consistent with the rules of the protocol for a given blockchain. When the conditions of the protocol are met, new tokens may come into existence as staking rewards. When that happens, the staker is not being paid by a counterparty. Rather, by staking their tokens and performing validation functions pursuant to the rules of the protocol, the staker brings these new tokens into existence and becomes their first owner.

3

Those who run a validator and stake their tokens maintain the blockchain's security by participating in the consensus mechanism that ensures the state of the blockchain is accurate and current.[3]  Because new blockchain entries require consensus, malicious activity directed at the blockchain would require that the party engaging in it have a majority of the staked tokens.  The more staked tokens across the network, the higher the cost of manipulating a blockchain.  Therefore, those who run a validator and stake their tokens ensure the blockchain is secure and stable, protecting it from invalid or malicious entries and any other attacks.

There are multiple ways that token holders can participate in staking.  Token holders may operate their own validator hardware and software to stake their tokens, often referred to as solo staking.  Solo staking requires technical expertise and meeting the blockchain protocol's requirements, which in some cases can be prohibitively time-consuming and expensive.  As an alternative, token holders can place their tokens with third parties known as "staking-as-a-service" providers, who "do the technical work of running validator[]" infrastructure and enable token holders without the time, expertise, or infrastructure "to participate in proof-of-stake networks."[4]  Although Jarrett happens to be a solo staker, the concerns with the IRS's position apply to all stakers regardless of the particular method used because, in all cases, the token holder maintains ownership of the tokens in question.

---

[3] *See Staking and Inflation FAQ*, Solana, https://tinyurl.com/4swwnzwj (last visited Apr. 22, 2026).

[4] Ji Kim & Alison Mangiero, *Let Staking Flourish in the U.S.*, a16zcrypto (Feb. 4, 2025), https://tinyurl.com/2zdk7yp4.

<u>**ARGUMENT**</u>

**I.    New Tokens Created By Stakers Like Jarrett Are Not Taxable As Income**

Amici do not repeat Plaintiffs' full statutory argument.  They elaborate only on one point most relevant to that analysis:  When staking results in the creation of new tokens, a staker does not receive property from another person or entity but instead is the first owner of newly created property.  Like all newly created property, the tokens are not taxable as income until sold.

Statutory text commands that result.  As Plaintiffs explain, Section 61 of the Internal Revenue Code reaches income derived from a "source."  26 U.S.C. § 61(a); *see* Pls.' MSJ Br. 10.  As the items enumerated in Section 61 illustrate, deriving income from a "source" requires some person or entity—other than the taxpayer himself—to be the originator of the derived income.  For instance, to qualify as gross income, someone else must provide "[c]ompensation for services," a bank must pay "[i]nterest," or an employer must offer a "pension[]."  26 U.S.C. § 61(a)(1), (4), (10).

By contrast, newly created property is not taxed when it comes into existence in the hands of its first owner; the relevant tax event comes when the property is sold or otherwise exchanged.  *See Tootal Broadhurst Lee Co. v. Comm'r*, 30 F.2d 239, 240-41 (2d Cir. 1929) ("Where the same organization makes and sells, the income is earned only upon the sale, and the prior increment flowing from manufacture is not income.").  The Treasury Department's regulations similarly reflect this distinction for crops, livestock, manufactured goods, and mined property.  *See* 26 C.F.R. § 1.61-4(a)(1) (farming);  *id.* § 1.61-3(a) (manufacturing and mining).

The government does not dispute that these other forms of newly created property are taxed as income upon disposition; instead, it argues that fact is beside the point because staking rewards are not expressly exempted from Section 61(a).  *See* Gov. MSJ Br. 17, ECF No. 36.  But the government points to no express statutory exemption for these other kinds of newly created

5

property, and none exists. *See* 26 U.S.C. §§ 101-140 (items expressly excluded from gross income pursuant to 26 U.S.C. § 61(b)). There is no basis for treating staking rewards differently.

Revenue Ruling 2023-14 reaches a different conclusion only by treating staking rewards as though they were transferred to the taxpayer by another person. That characterization, however, does not accurately reflect how proof-of-stake networks operate. Specifically, the IRS assumed the tokens are created by *someone* other than the taxpayer and that the taxpayer then "receives" these in exchange for actions that validate the transactions on the blockchain. Rev. Rul. 2023-14 at 1. But the IRS's framing begs the question: received from whom? A staker no more "receives" new tokens than a farmer "receives" crops from the ground. In both cases there are a set of external constraints—the blockchain's protocol in one case and the farmer's land and environmental conditions in the other—that the taxpayer acts on to yield new property. That others may have designed the protocol does not change the analysis. Setting the rules under which property may be created is not the same thing as serving as a source for income—*i.e.*, owning that property and then transferring it to another person.

That Jarrett's effort results in the creation of new assets does not change the analysis. *Contra* Gov. MSJ Br. 13. Tax law distinguishes between work that produces income from a source and work that produces new property. Where a taxpayer's activity results in the creation of new property, that property is not income until it is realized through sale or other disposition. *See, e.g.*, *Campbell v. Prothro*, 209 F.2d 331, 335 (5th Cir. 1954) (farmer's calves not "regarded as ordinary income" until "sold by the taxpayer").

At a minimum, Section 61 does not speak to the novel issue of how to treat new tokens created by stakers. That ambiguity should not be resolved by extending the statute to reach newly created property before sale or disposition. *See Weingarden v. Comm'r*, 825 F.2d 1027,

1029 (6th Cir. 1987) (recognizing the "general canon of construction … that statutes imposing a tax are interpreted liberally (in favor of the taxpayer)").

## II.      Treating New Tokens Created By Staking As Income Risks Degrading The Important Security And Policy Interests That Staking Furthers

The IRS's legal error also has profound practical consequences.  Proof-of-stake networks depend on broad validator participation, and taxing newly created tokens before sale could discourage staking and decrease the amount of tokens that are staked, both of which weaken network security and operation.

### A.      The IRS's Position Undermines Staking's Critical Role In Ensuring Blockchain Security And Discourages Innovation

Staking plays a central role in proof-of-stake network security.[5]  By committing their assets, stakers help the network reach consensus.  That goal is bolstered by potential disincentives—like financial penalties—for dishonest or malicious behavior.[6]  Broad validator participation is critical because the more concentrated validation becomes, the more vulnerable a network may be to disruption, outages, or single-jurisdiction pressure.[7]

Taxing newly created tokens at the time of creation discourages participation by U.S. stakers.  That pressure is magnified because staking participants can choose whether and where to continue staking, including in other countries.[8]  Discouraging U.S. staking participation in blockchains like Tezos risks concentrating validator power in fewer jurisdictions.  That exposes

---

[5] *What is Proof of Stake?*, Solana, https://tinyurl.com/4swwnzwj (last visited Apr. 22, 2026).

[6] *Are There Risks Associated with Staking?*, Solana, https://tinyurl.com/yr7yy8tr (last visited Apr. 22, 2026).

[7] *Why Stake?*, Solana, https://tinyurl.com/bd4z2m87 (last visited Apr. 22, 2026).

[8] For example, the United Arab Emirates and Singapore do not consider staking rewards to be taxable income and have 0% capital gains tax.  Dhiraj Nallapaneni, *Dubai Crypto Tax: 2026 Guide*, Coin Ledger, https://tinyurl.com/46rajerk (last visited Apr. 22, 2026); Dhiraj Nallapaneni, *Singapore Crypto Tax: A Comprehensive Guide (2026)*, Coin Ledger, https://tinyurl.com/4ayndbkh (last visited Apr. 22, 2026).

blockchain networks to greater vulnerabilities by making the networks less distributed, which undermines their reliability for users. As traditional financial markets increasingly migrate onto blockchain networks, the integrity of these networks will become even more critical. U.S. capital markets are beginning to integrate blockchain technology for securities settlement, trading, and asset management, as well as payments.[9] If individuals are discouraged from staking and validating in the United States, then it will impair the United States' ability to shape the evolution of blockchain technology and help secure the networks on which financial activity increasingly takes place. Indeed, payment stablecoins—a type of digital asset whose value is pegged to a fiat currency (*e.g.*, the U.S. dollar)—rely on proof-of-stake networks and are necessary to facilitate capital market activity on blockchains. Placing the security of next-generation financial infrastructure in the hands of other countries and their regulators would undermine the security and reliability of that infrastructure—an area where the United States would otherwise be positioned to lead.

Today, more than $700 billion of value is secured by staking on proof-of-stake networks, with approximately $245 billion in assets directly staked.[10] And those numbers are increasing. For example, tax filings from Coinbase—a major retail staking provider—show that staked assets by retail investors on its platform grew by 62% from 2023 to 2024.[11] The value

---

[9] *See, e.g.*, *The New York Stock Exchange Develops Tokenized Securities Platform*, Ice (Jan. 19, 2026), https://tinyurl.com/5bvyh96b; Chairman Paul S. Atkins, *American Leadership in the Digital Finance Revolution*, SEC (July 31, 2025), https://tinyurl.com/2dc78puf; Letter from Jeffrey S. Mooney, Associate Director, SEC to Brian Steele, Managing Director, DTCC (Dec.11, 2025), https://tinyurl.com/5dep92ba.

[10] *The Next Chapter for Crypto: 2025 Review & 2026 Outlook*, Everstake (Dec. 15, 2025), https://tinyurl.com/ycff2phe.

[11] *See* Coinbase Global, Inc., Annual Report (Form 10-K) (Feb. 15, 2024), https://tinyurl.com/543xpaey; Coinbase Global, Inc., Annual Report (Form 10-K) (Feb. 13, 2025), https://tinyurl.com/49spawap.

8

committed to proof-of-stake networks will likely further increase as the use cases for those networks continue to expand. New networks are increasingly built for purposes like financial technology infrastructure, data availability, digital identity, supply chain management, and physical infrastructure management for telecommunications.[12] The IRS's position would jeopardize the future security and operability of these functions.

### B. The IRS's Treatment Of Staking Rewards As Income Clashes With Other Government Efforts To Embrace Digital Assets

The IRS's position is also at odds with other efforts to promote the digital asset ecosystem in the United States—efforts to which amici have contributed extensively. In January 2025, President Trump issued an executive order that affirmed the importance of "promot[ing] United States leadership in digital assets and financial technology while protecting economic liberty" and established the President's Working Group on Digital Asset Markets. Exec. Order No. 14178, 90 Fed. Reg. 8647 (Jan. 31, 2025). That working group issued a report calling on "Treasury and the IRS" to "review previously issued guidance related to the timing of income from staking" and to "consider whether to clarify, modify, or reverse that guidance."[13]

In a similar vein, the U.S. Securities and Exchange Commission ("SEC") and Treasury have both provided clarifying guidance that avoids shoehorning staking into disanalogous regulatory frameworks that apply to traditional financial products. The SEC has recognized that staking crypto assets is a technical process and does not give rise to an investment contract subject to the federal securities laws. *See generally* SEC, *Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets*,

---

[12] *See, e.g.*, *Success Stories*, SpruceID (Oct. 25, 2023), https://tinyurl.com/wcbh7mym; *Helium 2025: Year in Review*, Medium (Dec. 19, 2025), https://tinyurl.com/33dbyxme.

[13] Presidential Working Group on Digital Asset Markets, *Strengthening American Leadership in Digital Financial Technology*, 135 (July 17, 2025), https://tinyurl.com/3fxe3p3d.

9

Securities Act Release No. 33 11412 (Mar. 17, 2026). And Treasury has issued guidance that allows exchange-traded products that are organized as trusts and that hold digital assets on proof-of-stake networks to stake those assets without losing their classification as investment trusts or grantor trusts under applicable regulations. *See* Rev. Proc. 2025-31, 2025-48 I.R.B. 743. Taxing staking rewards upon sale, rather than at their creation, would align tax incentives with national priorities in blockchain technology innovation.

## III. The IRS's Position Creates Liquidity, Dilution, And Administrability Challenges

The IRS's treatment of staking rewards creates a host of additional challenges. Taxing those rewards when new tokens are created both creates pressure to immediately liquidate the rewards (to cover tax liability in a potentially volatile market) and overstates their value. It also makes the mechanics of tracking the amount of "income" from new tokens needlessly complex, causing further headaches for taxpayers and the IRS.

### A. The IRS's Position Disincentivizes Long-Term Network Participation By Encouraging Stakers To Immediately Liquidate Their Rewards

Proof-of-stake networks are designed to reward sustained participation. Stakers commit tokens over time, and rewards are often staked rather than immediately sold. Taxing staking rewards upon the creation of new tokens undermines this design by creating immediate liquidity pressures that distort stakers' behavior. If these new tokens are treated as taxable income, it creates pressure to sell staking rewards to cover tax liabilities, regardless of the taxpayer's long-term expectations for the blockchain network. This pressure is compounded by price volatility: Because markets for tokens may be volatile, even waiting a few hours to sell new tokens could leave the taxpayer with a loss, which may create an incentive to reduce long-term staking positions to cover losses associated with fluctuations in price (with no guarantee that the price will increase again). On the other hand, if the new tokens are taxed at the time of sale,

10

taxpayers would not face a liquidity issue because they would have already disposed of the asset and therefore would not be at risk of incurring a loss.

Over time, these liquidity dynamics risk discouraging sustained participation in proof-of-stake networks and may push stakers to reduce exposure or avoid staking altogether. This burden will fall most heavily on individuals, entrepreneurs, early-stage startups, and small businesses, who are less able to manage tax-driven liquidity needs than large institutions. The consequence could be to discourage the breadth and diversity of participation on which proof-of-stake networks depend. By contrast, taxing staking rewards at the time of sale better aligns the Revenue Code with the economic realities and security objectives of proof-of-stake networks. Deferring taxation until the time of sale allows stakers to maintain their positions, allows their newly created tokens to be staked to contribute to network security, and facilitates decisions based on realized value rather than volatile market prices. This approach reinforces long-term alignment among stakers and the blockchain network itself, which strengthens decentralization, reduces churn, and supports the network's security. Realization-based taxation complements the fundamental architecture of proof-of-stake systems, whereas creation-based taxation actively works against it.

**B.      The IRS's Approach Overlooks The Economic Realities of Staking And Token Pricing**

Treating staking rewards as income creates additional challenges for taxpayers in light of how those tokens are created and priced. First, the same token will often have slightly different prices in different markets and trading venues. That variation poses little difficulty when a token is actually sold for a known price, but it creates uncertainty if taxpayers and the IRS must assign value at the time of creation.

11

Second, treating the *price* of a token at the time of creation as the same as the *income* from that token ignores that creating a new token through staking dilutes the value of the existing tokens. This is due to basic supply and demand mechanics: When new tokens are created, the total supply of tokens increases, which decreases the value of existing tokens. As a result, the price of staking reward tokens is not a reasonable metric for assessing the value of the staker's supposed income, given that the gain will be overstated. By contrast, if these new tokens are taxed only when sold, then the taxpayer would *receive* the full value of the token's price, and that full value would be treated as income. Taxing at the time of sale would thus align taxation with the taxpayer's actual economic gain, rather than illusory gains that ignore dilution.[14]

Finally, tracking every staking reward is complex due to the manner in which token rewards are generated. New tokens are created as frequently as every 8 seconds,[15] and they are created in small amounts at a time. The mechanics of accurately documenting the amount, timing, and price of every instance in which these new tokens are created are burdensome for taxpayers and difficult for the IRS to administer. By contrast, if the *sale* of tokens is the event that converts them to income, the challenges evaporate.

### CONCLUSION

For the foregoing reasons and reasons set forth by the Jarretts, amici respectfully request that Plaintiffs' motion for summary judgment be granted.

Dated: May 1, 2026

Respectfully submitted,

_/s/ Mark Alexander Carver_____
Mark Alexander Carver (No. 36754)
Sherrard Roe Voigt & Harbison, PLC

---

[14] *See, e.g.*, Mattia Landoni & Abraham Sutherland, *Dilution and True Economic Gain from Cryptocurrency Block Rewards*, 168 Tax Notes 1189, 1214 (2020), https://tinyurl.com/yew9eccw.

[15] *Rewards*, Open Tezos, https://tinyurl.com/2zwdvhke (last visited Apr. 22, 2026).

12

1600 West End Avenue, Suite 1750
Nashville, TN 37203
Tel. (615) 742-4200 | Fax. (615) 742-4539
acarver@srvhlaw.com

Tiffany J. Smith* (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
tiffany.smith@wilmerhale.com

Kelly P. Dunbar* (*pro hac vice* forthcoming)
Cristina Jaramillo-Rincon* (*pro hac vice*
forthcoming)
Michael Baer* (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
kelly.dunbar@wilmerhale.com
cristina.jaramillo@wilmerhale.com
michael.baer@wilmerhale.com

*Counsel for Amici*

13