# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

|  |  |
|---|---|
| JOSHUA JARRETT, and JESSICA JARRETT<br><br>          Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>          Defendant. | No. 3:24-cv-01209 |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Table of Authorities ...................................................................................................................................iii

Introduction.............................................................................................................................................1

Argument ................................................................................................................................................1

    I.    Jarrett's staking rewards are not income the moment he creates them. ......................................2

        A.   The government does not genuinely dispute that Jarrett created the tokens.........................2

        B.   The government does not dispute that created property is generally not income.................4

        C.   The government's theories for taxing the Jarretts' staking rewards fail................................6

            1.   Staking rewards are not income under §61(a)'s sweeping clause.....................................6

            2.   Staking rewards are not compensation for services..........................................................13

    II.    The government's "burden" argument fails. ...............................................................................16

    III.   Even under the government's theory, dilution means the Jarretts were overtaxed. ..............18

Conclusion ............................................................................................................................................25

Certificate of Service ............................................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*3M v. Comm'r*,
154 F.4th 574 (8th Cir. 2025)..................................................................................21

*Aeroquip-Vickers, Inc. v. Comm'r*,
347 F.3d 173 (6th Cir. 2003)..................................................................................21

*Alpenglow Botanicals v. United States*,
894 F.3d 1187 (10th Cir. 2018)..............................................................................24

*Alves v. Comm'r*,
734 F.2d 478 (9th Cir. 1984)..................................................................................18

*Baker v. Comm'r*,
88 T.C. 1282 (1987)...............................................................................................23

*Beamer v. Franchise Tax Bd.*,
563 P.2d 238 (Cal. 1977)................................................................................. 10, 13

*Burnet v. Logan*,
283 U.S. 404 (1931)...............................................................................................24

*C.I.R. v. Glenshaw Glass*,
348 U.S. 426 (1955) ...........................................................8, 9, 10, 11, 13, 15

*Campbell v. Prothro*,
209 F.2d 331 (5th Cir. 1954) .................................................. 4, 5, 8, 11, 15

*Clark v. United States*,
211 F.2d 100 (8th Cir. 1954)..................................................................................23

*Comm'r v. Indianapolis Power & Light Co.*,
493 U.S. 203 (1990) ..........................................................................................12, 24

*Comm'r v. Schleier*,
515 U.S. 323 (1995) ................................................................................................9

*Credit Bureau Servs. of Ne. Ohio v. United States*,
980 F.2d 729 (6th Cir. 1992) ................................................................................13

*Eisner v. Macomber*,
252 U.S. 189 (1920) ...................................................................................21, 25, 26

*Est. of Farrier v. Comm'r*,
15 T.C. 277 (1950)...................................................................................................5

*FedEx v. United States*,
768 F. Supp. 3d 912 (W.D. Tenn. 2025)................................................................21

*Friedman v. Comm'r*,
346 F.2d 506 (6th Cir. 1965)...................................................................................5

*Gilbreath v. Brookshire Grocery*,
400 F. Supp. 3d 580 (E.D. Tex. 2019)....................................................................28

*Gould v. Gould*,
245 U.S. 151 (1917) ........................................................................................................20

*Greer v. United States*,
207 F.3d 322 (6th Cir. 2000) .................................................................................10, 19, 20

*Helvering v. Bruun*,
309 U.S. 461 (1940) ..........................................................................................................8

*Helvering v. Horst*,
311 U.S. 112 (1940) ..................................................................................................... 8, 13

*James v. United States*,
366 U.S. 213 (1961) ........................................................................................................12

*Loper Bright v. Raimondo*,
603 U.S. 369 (2024) .............................................................................................18, 21, 22

*McGowan v. United States*,
143 F.4th 686 (6th Cir. 2025) ...................................................................................... 22, 30

*Moore v. United States*,
602 U.S. 572 (2024) ............................................................................... 5, 11, 14, 15

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ........................................................................................................10

*Parmer v. Comm'r*,
468 F.2d 705 (10th Cir. 1972) .................................................................................4, 8, 11, 15

*Peter v. Nantkwest, Inc.*,
589 U.S. 23 (2019) ..........................................................................................................8

*Raytheon Production v. Commissioner*,
144 F.2d 110 (1st Cir. 1944) ............................................................................................24

*Rogers v. Comm'r*,
38 T.C. 785 (1962) ..........................................................................................................5

*Rutkin v. United States*,
343 U.S. 130 (1952) ................................................................................................... 10, 12

*San Francisco v. EPA*,
604 U.S. 334 (2025) ..........................................................................................................8

*Sheehan v. Daily Racing Form*,
104 F.3d 940 (7th Cir. 1997) ............................................................................................28

*Smietanka v. First Tr. & Sav. Bank*,
257 U.S. 602 (1922) ........................................................................................................20

*Smith v. Mich. Dep't of Corr.*,
159 F.4th 1067 (6th Cir. 2025) .........................................................................................18

*Tootal Broadhurst Lee Co. v. Comm'r*,
30 F.2d 239 (2d Cir. 1929) ..............................................................................................12

*Towne v. Eisner*,
 245 U.S. 418 (1918) ...........................................................................................................25, 29

*United States v. Merriam*,
 263 U.S. 179 (1923) .................................................................................................................20

*United States v. Safety Car Heating & Lighting Co.*,
 297 U.S. 88 (1936) ............................................................................................................ 4, 13

*Veltor Underground v. SBA*,
 143 F.4th 727 (6th Cir. 2025)...............................................................................................18

*Wodehouse v. Comm'r*,
 177 F.2d 881 (2d Cir. 1949) ............................................................................................. 4, 5

*Wood v. United States*,
 863 F.2d 417 (5th Cir. 1989) ................................................................................................13

**Statutes**
26 U.S.C. §61 .............................................................................................................7, 8, 19

26 U.S.C. §83 .....................................................................................................................15

26 U.S.C. §263A ..................................................................................................................5

26 U.S.C. §305 ........................................................................................................... 11, 20

26 U.S.C. §7491 ...........................................................................................................18, 25

26 U.S.C. §1001 ..................................................................................................................19

26 U.S.C. §1221 ....................................................................................................................5

**Regulations**
26 C.F.R. §1.61-2 ...............................................................................................................14

26 C.F.R. §1.61-3 ........................................................................................................... 5, 6

26 C.F.R. §1.61-4 .................................................................................................................5

26 C.F.R. §1.61-6 ........................................................................................................... 6, 19

26 C.F.R. §1.61-7 ................................................................................................................19

Rev. Rul. 2023-14 (July 31, 2023) .........................................................................................6

Rev. Rul. 55-138 (Jan. 1, 1955) .............................................................................................5

Rev. Rul. 55-531 (Jan. 1, 1955) .............................................................................................5

**Constitutional Provisions**
U.S. Const. amend. XVI ........................................................................................................7

**Other Authorities**
Black's Law Dictionary (12th ed. 2024) ...............................................................................14

Black's Law Dictionary (3d ed. 1933) ..................................................................................14

Black's Law Dictionary (4th rev. ed. 1968) ..........................................................................14

Black's Law Dictionary (6th ed. 1990)..................................................................................15

Lee & Solum, et al., *Corpus Linguistics and the Original Public Meaning of the Sixteenth Amendment*, 73 Duke L.J. Online 159 (2024)........................................................................................................9

Mertens Law of Fed. Income Tax'n ......................................................................... 6, 11, 17, 19

vi

**INTRODUCTION**

This case presents two main questions, one factual and one legal. The factual question is whether Jarrett created the 13,714 Tezos tokens at issue through staking rather than receiving them from another source. The legal question is whether newly created property in the hands of its first owner is immediately taxable as income.

To get summary judgment in its favor, the government has two possible paths. First, it could deny that Jarrett created the tokens, meaning this case involves an ordinary receipt of property from another source. Second, it could show that, even if Jarrett created them, the tokens are nevertheless income under the tax code as a matter of law.

Now that discovery is complete and the parties have briefed the merits, the government does not try the first path. The government largely abandons its expert and accepts the facts that matter: Jarrett was the first to hold, and the first to own, his newly created Tezos tokens. The government opts instead for the second approach: It argues that, regardless where they come from, Jarrett's tokens are income.

The problem with the second approach is the text, history, and caselaw surrounding the federal income tax. Under our tax law, created property in the hands of its first owner is taxable when sold, not when created. No provision of the tax code could, or purports to, disturb that settled principle. The government's theory also creates a knotty problem of dilution, for which the government gives this Court no real answers. Rather than rewriting settled tax principles so the government can tax certain cryptocurrency a little earlier, this Court should hold that Jarrett's staking rewards are not income until he disposes of them. It should grant the Jarretts' motion for summary judgment, deny the government's motion for summary judgment, and enter all appropriate relief.

**ARGUMENT**

The government's motion makes three main points. It asks this Court to hold, for the first time in the history of tax law, that the federal income tax covers property that the taxpayer creates and

1

does not receive from anyone else. It asks this Court to hold that, whatever the right answer under the tax code, the Jarretts somehow failed to carry their "burden." And it asks this Court to hold that staking rewards should be taxed not only immediately, but taxed immediately at their fair market value without any adjustment for dilution (and without considering the serious "[a]dministrability [c]hallenges" inherent in its approach, *Amicus* Br. 10 (Doc. 41)). These arguments all fail, as a matter of law.

## I.    Jarrett's staking rewards are not income the moment he creates them.

The government does not dispute that Jarrett created the tokens. It also does not dispute the principle that taxpayer-created property is usually not income. Though it tries to say that rule does not apply to cryptocurrency and to recharacterize the tokens as compensation, neither theory finds any footing in the text or history of the tax code.

### A.    The government does not genuinely dispute that Jarrett created the tokens.

Earlier in this litigation, the government denied that Jarrett created the tokens and retained an expert to dispute Plaintiffs' created-property theory. Dr. Kaal ultimately advanced two theories about where the tokens come from. At times, he described the tokens as "newly issued native tokens minted by the blockchain protocol" that are "receive[d]" by stakers as "compensation for services rendered." Kaal-Rep. ¶23, ¶44, ¶54. Elsewhere, he maintained that the tokens were not newly created at all, but instead transferred from preexisting "source accounts." Kaal-Rebut. ¶¶7-14; *e.g.*, Kaal-Depo. 29:21-23, 33:16-19, 35:21-24. Both theories attempted to negate the conclusion that Jarrett created the tokens through staking. The Jarretts thus expected that the government would advance these theories in its summary-judgment motion. *See* Jarretts-MSJ 12-16.

The government's motion, however, largely abandons its expert's theories. The government nowhere argues or even asserts that Jarrett did not create the tokens. It sometimes assumes a "transfer," but never explains the absence of any transferor. *E.g.*, IRS-MSJ 15-16. And while the government asserts in passing that the Tezos protocol "issues" new tokens, IRS-MSJ 6, it never actually develops

or defends the remarkable proposition that inanimate, open-source software can create or own property, compensate someone, or serve as a counterparty in a transaction. The government's expert agrees that the Tezos "protocol" is lines of code with no personhood or agency. Kaal-Depo. 30:14-31:17.

Instead, the government now agrees that Jarrett's staking rewards were "newly minted units of cryptocurrency," as opposed to "preexisting units." IRS-MSJ 1. It further agrees that "no one else owned them before Mr. Jarrett did," IRS-MSJ 1, and that Jarrett is the only person to have ever "held" or "owned" the tokens, IRS-MSJ 4. And it describes staking as a process requiring "labor, hardware, and substantial existing holdings" combined with "strict adherence to the protocol's rules." IRS-MSJ 4.

Those concessions eliminate any basis for summary judgment on the theory that Jarrett merely received ordinary preexisting property from another source. The government's own factual presentation adopts the core predicates of Plaintiffs' created-property theory: staking rewards as newly minted property, Jarrett as the first person to hold or own that property, and productive activity by Jarrett that caused the property to come into existence. Indeed, when describing the critical moment of creation, the government resorts to the passive voice: "once a staker meets the Tezos protocol's requirements to validate a block, new XTZ are minted." IRS-MSJ 12. Minted by whom? The government cannot say, because the answer is no one other than Jarrett. So after a year of discovery and dueling experts, the government appears to acquiesce to the core factual allegations in the complaint. *See, e.g.*, Compl. (Doc. 1) ¶8, ¶11, ¶¶20-51.

While the government still occasionally says Jarrett "received" the tokens, *e.g.*, IRS-MSJ 10, that label does no analytical work given the agreed-upon fact that Jarrett is the first to hold or own the tokens, IRS-MSJ 1, 4. It is undisputed that no other account shows a debit matching Jarrett's credit. Kaal-Depo. 42:18-21; McKeon-Rep. ¶21, ¶23, ¶¶64-65, ¶74. Poetic license permits the farmer

3

to say he "receives" apples from his tree, or the business to say it "receives" goodwill from its customers. *See, e.g.*, McKeon-Rep. 20. But as concerns the income tax, apples and goodwill do not "come in" to the taxpayer. They are property created by the farmer or business. An account of where property comes from is *necessary*, because apples and goodwill and tokens and any other type of property can indeed be someone's income, if paid by and received from someone else. But created property in the hands of its first owner does not produce income until it's sold.

### B. The government does not dispute that created property is generally not income.

Since the birth of the modern income tax in the early twentieth century, the IRS and courts have distinguished between income and created property. Income is taxable on receipt. Created property is not income but gives rise to income when sold or exchanged. The difference? Income "comes in" from another source; but newly created property, though it has immediate value and can appreciate over time, can generate income only when it "goes out" from its first owner. Taxpayer-created assets like an author's manuscript, a farmer's crop of corn, and a baker's loaf of bread are all "income-producing property rather than income itself." *Parmer v. Comm'r*, 468 F.2d 705, 707 (10th Cir. 1972); *accord Campbell v. Prothro*, 209 F.2d 331, 334-35 (5th Cir. 1954); *Wodehouse v. Comm'r*, 177 F.2d 881, 884 (2d Cir. 1949). Though these creations have "value" and "an expectancy of income," "[w]e do not identify the seed with the fruit that it will yield." *United States v. Safety Car Heating & Lighting Co.*, 297 U.S. 88, 99 (1936). Any other conception of "income" would violate the original public meaning of the Sixteenth Amendment and thus render the federal income tax unconstitutional as applied to taxpayer-created property. *See* Jarretts-MSJ 11-12.

Though the government knows this principle is a central feature of the Jarretts' case, its summary-judgment motion nowhere denies that created property in the hands of its first owner is not income. *See, e.g.*, IRS-MSJ 17 (appearing to agree that "books" and "crops" are "not included in income"). Nor could the government deny this principle, since the IRS has long honored and followed

4

it. After Congress introduced the modern income tax, courts distinguished between property (not income) and the proceeds received from property (income). *See Friedman v. Comm'r*, 346 F.2d 506, 508 (6th Cir. 1965) (collecting cases). A "patent is an inventor's property," for example, while "royalties are the income." *Moore v. United States*, 602 U.S. 572, 606 (2024) (Barrett, J. concurring). Same for a writer's manuscript. *See Wodehouse*, 177 F.2d at 884 (distinguishing between an author's "story," which is "property," from the "income" that is "later" received as "royalties"). Courts have made the same distinction across many taxpayer-created assets. *E.g.*, *Prothro*, 209 F.2d at 334-35 (farmer's crop); *Est. of Farrier v. Comm'r*, 15 T.C. 277, 284 (1950) (rancher's cattle); *Rogers v. Comm'r*, 38 T.C. 785, 788-89 (1962) (interest in timber). The IRS agrees with this body of caselaw. *See, e.g.*, Rev. Rul. 55-138 (Jan. 1, 1955) (accepting *Prothro* and related cases); Rev. Rul. 55-531 (Jan. 1, 1955) (similar).

The tax code and regulations are replete with examples that assume the correctness of this principle. A farmer's income, for example, includes what he receives "from the *sale* of livestock and produce which he raised." 26 C.F.R. §1.61-4(a) (emphasis added). For a manufacturer and miner, income means "total *sales*, less the cost of goods sold." §1.61-3(a) (emphasis added). And throughout, the tax rules ensure that eventual gains from taxpayer-created property are properly calculated when taxed upon sale—further proving that sale is the key income-producing moment. *See, e.g.*, 26 U.S.C. §1221(a)(3)(A) (providing that specified taxpayer-created property generates ordinary income rather than capital gain when later sold, thus presupposing that the property's creation was not a taxable event); §263A(b)(1) (requiring capitalization of certain costs allocable to "real or tangible personal property produced by the taxpayer," thus presupposing that production is not a taxable event). Taxing the creation of property itself would turn that principle on its head and throw tax law into chaos.

The government suggests that staking rewards might be different from crops, manuscripts, and other created property; but it never develops or supports any argument on this score. Stressing

the "currency" in "cryptocurrency," the government notes that staking rewards are "immediately convertible to cash" and "can be used as a medium of exchange to pay for goods and services without converting to cash." *E.g.*, IRS-MSJ 10-11. But those supposedly distinguishing factors distinguish nothing. Robust commodities markets mean that a crop of soybeans is no less liquid than a Tezos token. And a famous photographer who spends a day shooting can produce images that are "immediately convertible" to hundreds of thousands of dollars. Indeed, *any* property "can be used as a medium of exchange" with anyone willing to accept it as payment, regardless how easily it can be converted to cash. *See* 26 C.F.R. §1.61-6 (calculation of taxable gain from exchanging goods for other goods). Even gold in the hands of the person who mines it is not income until it is sold. *See* 26 C.F.R. §1.61-3(a) Yet neither miners nor farmers nor photographers nor anyone else is taxed on the predicted market value of their creations. Their created property produces taxable income only when sold or exchanged. Nothing about cryptocurrency changes these rules. *See* 1 Mertens Law of Fed. Income Tax'n §5:20 ("For federal tax purposes, virtual currency is treated as property rather than currency. General tax principles applicable to property transactions apply"); Rev. Rul. 2023-14, at 2 (July 31, 2023) (same).

### C. The government's theories for taxing the Jarretts' staking rewards fail.

To prove that Jarrett's staking rewards are nevertheless income, the government makes two major arguments. First, citing *Glenshaw Glass*, the government says §61(a)'s definition of "income" covers all "gain," even if that gain is property created by the taxpayer that came from no other source. IRS-MSJ 9-10. Second, the government weakly defends its expert's theory that staking rewards are "compensation for services." IRS-MSJ 13-16. Both arguments are wrong as a matter of statutory interpretation (not to mention constitutional law).

#### 1. Staking rewards are not income under §61(a)'s sweeping clause.

The government says any "gain" is income under §61(a) so long as it meets the three requirements from *Glenshaw Glass*: an "undeniable accession to wealth," that is "clearly realized," and over

which the taxpayer has "complete dominion." IRS-MSJ 9 (quoting *C.I.R. v. Glenshaw Glass*, 348 U.S. 426, 431 (1955)). But the government skips over a key threshold question: whether the gain comes in from another source rather than being created by the taxpayer himself. And even under *Glenshaw Glass*, the government loses because created property like Jarrett's staking rewards do not satisfy the second, "realization" requirement.

**1.** Contra the government, "economic gain is not always taxable as income." *Helvering v. Bruun*, 309 U.S. 461, 469 (1940); *accord Helvering v. Horst*, 311 U.S. 112, 115 (1940) ("[N]ot all economic gain of the taxpayer is taxable income."). One key scenario when economic gain is not income is when the gain comes from property that the taxpayer created himself. Though §61(a) covers "all income," 26 U.S.C. §61(a), the word "income" has limits. *See San Francisco v. EPA*, 604 U.S. 334, 348 (2025) ("The adjective 'any' is indeed a broad term, but it cannot expand the reach of the noun it modifies."); *Peter v. Nantkwest, Inc.*, 589 U.S. 23, 31 (2019) (same for "all"). "Income" must "come in" from somewhere else, not be created anew by the taxpayer. *See Prothro*, 209 F.2d at 334-35; *Parmer*, 468 F.2d at 707. Section 61(a) makes this clear by specifying that income must be "derived" from a "source." 26 U.S.C. §61(a); *accord* U.S. Const. amend. XVI (similarly requiring income to be "derived" from a "source"). And the illustrative examples listed in §61(a) all involve situations where gains come in from another person. *See* 26 U.S.C. §61(a)(1)-(14); *see also Amicus* Br. 5 ("As the items enumerated in Section 61 illustrate, deriving income from a 'source' requires some person or entity—other than the taxpayer himself—to be the originator of the derived income.").

True, the code says "from *whatever source* derived." *Id.* (emphasis added). But the government reads "whatever source" to strip "derived" of any meaning. It insists that §61(a) applies "[e]ven if staking rewards were 'derived' purely from the staker[s] themselves." IRS-MSJ 14. But if the taxpayer and the source are the same, the alleged income has not been derived from anywhere. The "source" from which income is "derived" cannot be the taxpayer himself, 26 U.S.C. §61(a), else the author

7

"derives" income from himself as soon as he adds the last period on his manuscript. And the "source" from which income is "derived" cannot be an inanimate object like open-source software, *id.*, else the farmer "derives" income from the soil when he picks the corn he planted. On the government's reading, "from whatever source derived" adds nothing to the statute and §61(a) might as well read, "gross income includes all income," full stop. Courts are not supposed to read the tax code that way. *See Glenshaw Glass*, 348 U.S. at 430 (rejecting attempts to "say" that this "whatever source" language "adds nothing to the meaning of 'gross income'").

*Glenshaw Glass* does not suggest otherwise. In *Glenshaw* and most cases that apply it, there is no question that the gain came in from another source. *Glenshaw* itself involved "damages" that the defendant "paid" to the plaintiff after a settlement. 348 U.S. at 427-28; *accord, e.g.*, *Comm'r v. Schleier*, 515 U.S. 323, 325 (1995) (similar); *Greer v. United States*, 207 F.3d 322, 325 (6th Cir. 2000) (similar); *Rutkin v. United States*, 343 U.S. 130, 134 (1952) ($250,000 "paid … in cash" as part of alleged extortion scheme). In these situations, *Glenshaw* holds that the gains are income when they are "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." 348 U.S. at 431. But the Court did not deny that the gain must first come in from a source—requirements enshrined in the text of §61(a). *See Beamer v. Franchise Tax Bd.*, 563 P.2d 238, 244 (Cal. 1977) (making a similar observation about the limits of *Glenshaw Glass*). In fact, *Glenshaw* warns against taking broad statements from tax opinions and using them as "a touchstone to all future gross income questions," ignoring the context in which those statements were made. 348 U.S. at 431; *accord Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373-74 (2023). The government thus errs by reading *Glenshaw Glass* as permission to ignore other essential elements of what it means for something to be income.

Applying the three-part definition from *Glenshaw Glass* to something that hasn't come in puts the cart before the horse. It makes no sense to ask whether a particular dollar or piece of property is income without knowing its history. In answering the threshold question of whether something came

8

in, a court must first learn who got it and how. Is a tree income? Trick question; that's not enough information. How did that taxpayer get it? If he grew the tree in his backyard by planting seeds, no. If he received the tree in exchange for agreeing to do the arborist's taxes, yes. Rare is the case that might expose the need for this threshold question, because only rarely do taxpayers and the government disagree on whether the gain in question came in from another source. But the "novel nature of cryptocurrency" can present these threshold questions anew. IRS-MSJ 1. And as the government stresses, this novelty is not an excuse to ignore the "well-worn rules of the road," IRS-MSJ 1—perhaps none more well-worn than the often unquestioned, yet bedrock principle that "income" must first "come in."

**2.** Even if the three requirements from *Glenshaw Glass* were the only relevant questions, the government's taxation of Jarrett's staking rewards violates the second requirement from *Glenshaw Glass*: realization. Realization is required not just under *Glenshaw Glass* and §61(a), but also to make the federal income tax constitutional under the Sixteenth Amendment. *See Moore*, 602 U.S. at 604-07 (Barrett, J., concurring); Lee & Solum, et al., *Corpus Linguistics and the Original Public Meaning of the Sixteenth Amendment*, 73 Duke L.J. Online 159, 160 (2024). Under the tax code and Constitution, a gain is not income until it is "clearly realized." *Glenshaw Glass*, 348 U.S. at 431. Though realization can take different forms in different contexts, the "common thread is that to realize income, one must receive something new and valuable beyond the property she already owns." *Moore*, 602 U.S. at 611 (Barrett, J., concurring). When property is created by the taxpayer himself, it follows that income is "realized only by a sale" or other transaction. *Prothro*, 209 F.2d at 335; *accord Parmer*, 468 F.2d at 707 (same); *Moore*, 602 U.S. at 607 (Barrett, J., concurring) (explaining that realization requires a "sale or other transaction"). Put differently, "[w]here the same [taxpayer] makes and sells, the income is earned only upon the sale, and the prior increment flowing from manufacture is not income." *Amicus* Br. 5 (quoting *Tootal Broadhurst Lee Co. v. Comm'r*, 30 F.2d 239, 240-41 (2d Cir. 1929)).

9

The government's realization analysis is so flimsy that accepting it would eliminate the realization requirement altogether. The government never explains how taxpayer-created property satisfies the "clearly realized" element of *Glenshaw Glass* or the Sixteenth Amendment, or even *when* it thinks Jarrett satisfied the realization requirement here. The government's argument that Jarrett "realized the economic value of the staking rewards" conflates realization with dominion and with the existence of an ascertainable fair market value. IRS-MSJ 11-13.

The government's authorities do not support its position. Each of its three cases involved an undeniable receipt of money or property from another party. *E.g.*, *Comm'r v. Indianapolis Power & Light Co.*, 493 U.S. 203, 214 (1990) (funds received by a power company as deposits). The dispute was whether the taxpayer exercised sufficient dominion or control over that receipt for it to count as income—the third requirement from *Glenshaw Glass*, not the second requirement. *See James v. United States*, 366 U.S. 213, 219 (1961) (plurality); *Rutkin*, 343 U.S. at 137. In *James* and *Rutkin*, the receipt of money was never in doubt; the question was whether unlawful possession defeated the "complete dominion" required under *Glenshaw Glass*. The full quoted sentence makes that clear: "An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." *Rutkin*, 343 U.S. at 137; *accord James*, 366 U.S. at 219 (similar). *See generally Wood v. United States*, 863 F.2d 417, 418-19 (5th Cir. 1989) (explaining that *James* was discussing the "dominion" element); *Credit Bureau Servs. of Ne. Ohio v. United States*, 980 F.2d 729 (6th Cir. 1992) (similar).

While the ability to "deriv[e] readily realizable economic value" from property bears on whether the taxpayer exercises the "complete dominion" required under *Glenshaw Glass*, dominion alone is not realization. *See Beamer*, 563 P.2d at 244. An economic gain that is "readily realizable" in the future is definitionally not realized yet. *See Safety Car*, 297 U.S. at 99 ("Income … is the fruit that

10

is born of capital, not the potency of fruition."); 1 Mertens Law of Fed. Income Tax'n §5:5 ("Realization of income, not the acquisition of the right to receive income, is the trigger for taxation, and realization is not deemed to occur until the income is paid"); *cf. Glenshaw Glass*, 348 U.S. at 431 (requiring that gains be "clearly realized" *before* being taxed as income).

Realization is an event. Sometimes realization does not involve straightforward receipts. It can occur when "the last step is taken by which [the taxpayer] obtains the fruition of the economic gain which has already accrued to him." *Horst*, 311 U.S. at 115. But realization always requires some identifiable event—a receipt, conversion, disposition, or exchange through which a gain undergoes some separation from the source, activity, or property giving rise to it.

Creation is not a realization event. A taxpayer who creates property has not sold it, exchanged it, disposed of it, or received it. Nor has accrued gain been converted into proceeds or otherwise been separated from anyone or anything. Sometimes, creation happens at the same time as realization, as when one party "issues" property, such as stock shares, into the hands of another. In that case, the same rules apply: the creator of the issuance does not have income; the recipient might, and that receipt marks the realization event. *E.g.,* 26 U.S.C. §305 ("Distributions of stock and stock rights"). Typically, creation is not even a discrete *event* at all. When is Old Rip Van Winkle bourbon "created"? Upon distillation, after the mandatory ten years in the barrel, or when the bottle is filled, capped, and labeled? When does the farmer "create" a crop of sweet corn? When the plants first sprout from the soil, when the crop is harvested, or when the produce is finally packaged? The idea that creation itself is a realization event does not make sense. Realization requires a genuine external transaction, not just production. *See* 1 Mertens Law of Fed. Income Tax'n §5:5 ("Imputed income, wealth arising from a taxpayer's labor …, is generally not considered to have been realized.").

The government found no cases suggesting that creation is a realization event—for good reason. "Realize" and "derive" refer to the same concept. *See Moore*, 602 U.S. at 606-07 (Barrett, J., concurring) (comparing early dictionary definitions and collecting cases). Like the statutory phrase "income from whatever source derived," realization presupposes some separation between the taxpayer and the gain obtained as income. "[O]ne must receive something *new*." *Id.* at 612 (emphasis added)). One cannot pay oneself income merely by moving property from one hand to the other. Nothing has been derived because no separating event has occurred. For the same reason, one cannot derive—or realize—income from oneself merely by creating valuable property. The government points out that the correct focus "is not on what the *source* is but on whether the taxpayer's *receipt* constituted a gain." IRS-MSJ 15. That's not wrong. If the facts show a genuine receipt, then the gain was derived from a source. But under the tax law, the right hand does not "receive" property from the left hand. A true receipt implies the derivation, or "clea[r] realiz[ation]," that section §61(a) and the Sixteenth Amendment require. *Glenshaw Glass*, 348 U.S. at 431; *Moore*, 602 U.S. at 607 (Barrett, J., concurring). A taxpayer's production of valuable property lacks any such receipt. *See Prothro*, 209 F.2d at 334-35; *Parmer*, 468 F.2d at 707.

Jarrett's reward tokens lack realization. The government never explains *when* it thinks Jarrett satisfied the realization requirement. It seeks to tax Jarrett's tokens at the moment he established dominion over them. Discussing that moment—the moment tokens become unfrozen and Jarrett could first sell them—the government avers that "the taxpayer 'clearly realizes' gain at least at that point, *if not earlier*." IRS-MSJ 12-13 (emphasis added). The government's uncertainty highlights that no realization occurred. The government cannot pinpoint the realization event because there was no transfer or other event separating his gain from the underlying productive activity that created the tokens. The government's only argument for realization is Jarrett's dominion over the tokens. Yet it simultaneously admits uncertainty whether realization occurred "at that point, if not earlier." IRS-MSJ 12-13. In other

12

words, even on the government's own theory, dominion does not identify the realization event or determine when realization supposedly occurred.

Because Jarrett created but did not sell his reward tokens in 2020, the government impermissibly taxed him before realization. So even misreading *Glenshaw Glass* as permission to ignore the tax code's other requirements for "income," the Jarretts are entitled to summary judgment.

### 2. Staking rewards are not compensation for services.

The lead argument in the government's expert report—that Jarrett's reward tokens are compensation for services—is now relegated to a back-up in the government's motion. *Compare* Kaal-Rep. ¶23, ¶44, ¶54. *with* IRS-MSJ 13-16. The government claims that Jarrett's tokens could count under the phrase "compensation for services," the first listed example of income in §61(a)(1). IRS-MSJ 13-15. The government also contends that the tokens could count as income under §83(a), a provision concerning the timing of income from certain "[p]roperty transferred in connection with performance of services." IRS-MSJ 15-16. Neither provision expands the meaning of income to cover taxpayer-created property, and neither provision reaches Jarrett's staking rewards.

**1.** Start with §61(a)(1), which lists "[c]ompensation for services, including fees, commissions, fringe benefits, and similar items" as an example of income. As the government stresses, the scope of "gross income" under §61's sweeping clause is "all income from whatever source derived." IRS-MSJ 9. Items on the non-exhaustive list that follows the sweeping clause, such as §61(a)(1), illustrate but do not expand the clause's reach. If something does not "come in," is not derived from a source, or is not clearly realized, then it is not "gross income" under §61 and cannot be taxed as such. So this argument fails for all the reasons given already.

Even taking §61(a)(1) in isolation, staking rewards are not "compensation for" anything, services or otherwise. "Compensation" has always required, at minimum, a counterparty to do the compensating. It encompasses a transaction between two or more parties. *See Compensation*, Black's Law

13

Dictionary 232 (2d ed. 1910) ("[T]he remuneration or wages given to an employé or officer."); *Compensation*, Black's Law Dictionary 378 (3d ed. 1933) ("The remuneration of wages given to an employee, or especially, to an officer. Salary, pay, or emolument"); *Compensation*, Black's Law Dictionary (4th rev. ed. 1968) (same); *Compensation*, Black's Law Dictionary (12th ed. 2024) ("Remuneration and other benefits received in return for services rendered; esp., salary or wages."). Yet here, the government concedes that "no one else owned [the newly minted staking reward tokens] before Mr. Jarrett did," IRS-MSJ 1, and that "newly minted" tokens are not "held … by anyone else" before the staker, IRS-MSJ 4. No counterparty, no compensation.

A piece of open-source software like the Tezos protocol cannot provide the government with the counterparty that §61(a)(1) requires. To counsel's knowledge, no court has ever accepted the view that an inanimate object can serve as a party in a compensation relationship. And although a corporation, partnership, or association can act through human agents, the government's expert conceded that the Tezos protocol is not any of those things either. *See* Kaal-Depo. 30:14-31:17. As Dr. Kaal explained, "[t]he protocol is math instantiated in code," not an individual or other legal entity. *Id.* Treating a piece of open-source software like a person could sweep in created property that no one deems taxable as compensation, like Microsoft Word compensating an author for fixing typos, the forest compensating a hunter for preventing overpopulation, or the ocean compensating a fisherman for catching invasive species.

The government cites a regulation that adds items to §61(a)(1)'s list, *see* IRS-MSJ 13 (quoting 26 C.F.R. §1.61-2(a)(1)); but that regulation does not help the government's position. The regulation purports to classify a long list of transactions as compensation, including "[w]ages," "commissions," "tips," "bonuses (including Christmas bonuses)," "*rewards*," "marriage fees and other contributions received by a clergyman for services," and "pensions." 26 C.F.R. §1.61-2(a)(1) (emphasis added). While the regulation mentions "rewards," it nowhere says that rewards are taxable income even when they

14

are not received by any person or entity. Just like a piece of open-source software cannot pay a Christmas bonus, a commission, or a marriage fee, the Tezos protocol cannot give anyone a "reward" in the sense contemplated by the regulation. The opposite reading would violate the "noscitur a sociis" canon, since every other item in the list involves a transaction between two or more parties. *See Veltor Underground v. SBA*, 143 F.4th 727, 734-35 (6th Cir. 2025). If the regulation did cover "rewards" received from no person or entity, then it would exceed the ordinary meaning of "income" (and "compensation") under the tax code and the Constitution. It would thus receive no weight in the Court's analysis. *Smith v. Mich. Dep't of Corr.*, 159 F.4th 1067, 1082 (6th Cir. 2025); *see Loper Bright v. Raimondo*, 603 U.S. 369, 400 (2024).

**2.** The government's "compensation" argument under §83(a) fares no better. For starters, §83 does not expand the universe of income that is taxable under §61(a). The provision merely gives certain taxpayers an election to control the *timing* of taxation after receiving certain forms of deferred compensation. *See Alves v. Comm'r*, 734 F.2d 478, 480-81 (9th Cir. 1984). The statute applies when, "in connection with the performance of services, property is transferred" to a taxpayer. 26 U.S.C. §83(a). Its purpose was to remedy a perceived "disparity between the tax treatment of restricted stock plans and other types of deferred compensation arrangements." *Alves*, 734 F.2d at 480-81. It does not purport to alter the ordinary meaning of "compensation," or to treat things as "income" that do not otherwise fit within §61(a).

Whatever its practical import, §83 has no possible application to staking rewards, since the statute requires a "transfer" and no transfer occurs when a staker creates reward tokens. The word "transfer" refers to a conveyance of property "from one person to another." *Compare Transfer* (n), Black's Law Dictionary (6th ed. 1990), *with Transfer (n)*, Black's Law Dictionary 1167 (2d ed. 1910) (defining a "transfer" as "[t]he passing of a thing or of property from one person to another; alienation; conveyance" or "an act of the parties, or of the law, by which the title to property is conveyed from

15

one living person to another"). While the government claims that §83(a) "does not *by its terms* require that a person transfer the property to the recipient," it concedes that the statute at most "reaches any transfer." IRS-MSJ 16 (emphasis added). Yet a transfer requires a transferor. And there is no transfer here whatsoever. As the government acknowledges, "no one else owned [the newly minted staking reward tokens] before Mr. Jarrett did," IRS-MSJ 1, and the "newly minted" tokens were not "held … by anyone else" before they appeared in Jarrett's account, IRS-MSJ 4. Given these concessions, §83(a)'s critical "transfer" condition is not satisfied.

## II. The government's "burden" argument fails.

In a separate section of its brief, the government faults the Jarretts for not carrying their supposed "burden" of identifying some "exception" that carves out staking rewards from the tax code. IRS-MSJ 16-17, 14 n.5. It's not clear what this argument is. But no version of it could have any bearing on these cross-motions.

The government appears to be making a statutory-interpretation argument: that because staking rewards are income under the tax code, the Jarretts must identify a statutory exemption that "specifically" excludes staking rewards. IRS-MSJ 16 (citing *Greer*, 207 F.3d at 326). The problem with this argument is the first premise. The Jarretts do not need a statutory exemption because staking rewards are not covered by the tax code to begin with. This case isn't *Greer*, where there was "no dispute that the [transaction fell] well within the broad sweep of §61(a)" and so the taxpayer needed to prove his income was "specifically excluded elsewhere in the Code." 207 F.3d at 326. The Jarretts *do* dispute that staking rewards are income under §61(a). There is no "exemption" to construe "narrowly" because the Jarretts contend that those rewards are not income in the first place. *Cf. id.* Tellingly, the government seems to agree that "crops" and "books" are not income in the hands of their first owner, IRS-MSJ 17, but it omits that *nothing* in the tax code expressly excludes crops, books, or other created property from §61(a)'s definition of income. They are understood to fall outside the §61(a)'s definition

of income to begin with. Hence why, elsewhere, the government appears to agree that the Jarretts can prevail if they prove either "that section 61(a) does not apply to [created tokens], *or* that [created tokens] are exempted by some other section of the Internal Revenue Code." IRS-MSJ 9 (emphasis added).

When assessing whether something is income covered by the tax code, the presumptions run against the government. *See* 1 *Mertens Law of Fed. Income Tax'n* §3:9. It is Congress that must be "clear"; any "doubt must be resolved against the government and in favor of the taxpayer." *United States v. Merriam*, 263 U.S. 179, 187-88 (1923) (citing *Gould v. Gould*, 245 U.S. 151, 153 (1917), a case about the definition of "income"). While §61(a) broadly covers all "income," its specific terms are not limitless. *Smietanka v. First Tr. & Sav. Bank*, 257 U.S. 602, 605-06 (1922); *see Eisner v. Macomber*, 252 U.S. 189, 206 (1920) (stressing it's "essential to distinguish between what is and what is not 'income'" because the income tax cannot be "extended by loose construction"). Perhaps the clearest limit is that the IRS cannot violate the established meaning of "income" by taxing things that never "come in." *See* Jarretts-MSJ 8-12.

Aside from its statutory argument, the government might be making a regulatory argument: that because "[t]he IRS has notified taxpayers of its position" on staking rewards, those rewards are income unless the Jarretts identify some "exception" that specifically excludes them. IRS-MSJ 17. The government does not explain how the IRS "notified" taxpayers of "its" position. It cites no notice-and-comment regulation that defines staking rewards as taxable income (and none exists). Presumably the government means the IRS "notified" taxpayers of its position via Revenue Ruling 2023-14. But even before *Loper Bright*, revenue rulings received no *Chevron* deference. *Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d 173, 181 & n.3 (6th Cir. 2003). And after *Loper Bright*, the IRS has no power—by revenue ruling, regulation, or otherwise—to say what the tax code means. *Loper Bright*, 603 U.S. at 412; *see 3M*

17

*v. Comm'r*, 154 F.4th 574, 576 (8th Cir. 2025) (applying *Loper Bright* to the IRS). The IRS cannot "contravene the 'single, best meaning'" of the tax code "as determined by the courts." *FedEx v. United States*, 768 F. Supp. 3d 912, 923-24 (W.D. Tenn. 2025) (quoting *Loper Bright*, 603 U.S. at 400). The single, best meaning of the tax code favors the Jarretts, and no agency action can establish or alter that meaning.

In terms of the burdens that apply at summary judgment, the Jarretts carried any and all burdens they have. Once a taxpayer "'introduces credible evidence with respect to any factual issue relevant to ascertaining the liability … for any tax imposed,'" "*the government* 'ha[s] the burden of proof with respect to such issue.'" *McGowan v. United States*, 143 F.4th 686, 695 (6th Cir. 2025) (emphasis added; quoting 26 U.S.C. §7491(a)(1)). Here, the Jarretts introduced credible evidence, including through their expert Dr. McKeon, that Jarrett created the tokens, that no one owned them before him, that Jarrett received them from no other source, and so on. It is now the government's burden (especially on *its* motion for summary judgment) to disprove these facts or make them irrelevant under the law. *Id.* The government fails.

## III. Even under the government's theory, dilution means the Jarretts were overtaxed.

Even if Jarrett received income from staking in 2020, the government has not established that the amount of that income was $32,836. True, this figure reflects the fair market value of Jarrett's Tezos reward tokens at the time they became spendable. But that factual point does not resolve the relevant *legal* dispute. The legal dispute is whether, under the government's view of the tax code, that amount is a proper measure of the Jarretts' *gain*, or whether it overstates their gain because it does not account for dilution. The Jarretts admit that accounting for dilution in the context of a proof-of-stake cryptocurrency is complicated and raises many open questions. As the Jarretts explained and the government never denies, this problem does not arise under the Jarretts' position, which would tax actual gains at the time of sale. But it is a problem with the government's position, which would tax staking

rewards immediately. And the government's proposed solution—pretend that dilution does not exist—is legally wrong and factually unsupported by any real evidence.

**1.** Though not all gains are taxable income, the converse is not true. As the Jarretts have established, §61(a) reaches only taxpayer gains. *See* Jarretts-MSJ 19; *accord Clark v. United States*, 211 F.2d 100, 102 (8th Cir. 1954) ("gross income and not gross receipts is the foundation of income-tax liability"); 1 Mertens Law of Fed. Income Tax'n §5:7 ("The terms 'gross income' and 'gross receipts' are not synonymous."). The government's repeated emphasis on "gain" appears to concede the point. *E.g.*, IRS-MSJ 1, 9, 17.

A taxpayer who receives property does not necessarily realize a taxable gain equal to that property's fair market value. Section 61 taxes only gains, not necessarily the entire receipt. *Clark*, 211 F.2d at 102. For example, property received in repayment of a loan is not itself income; it is a return of capital, and only any excess (such as interest) is income. *See* 26 U.S.C. §61(a)(4); 26 C.F.R. §1.61-7(a). The same principle governs property transactions. Contra the government, "[g]ross income" is not simply "the fair market value of property received in payment for goods and services." IRS-MSJ 18 (citing *Baker v. Comm'r*, 88 T.C. 1282, 1288 (1987)). When a taxpayer exchanges property for other property, only the taxpayer's *gain* is income. *See* 26 U.S.C. §1001(a) (gain from disposition of property is the excess of the amount realized over the basis); 26 C.F.R. §1.61-6(a) ("gain realized," defined as the amount received reduced by its cost, "is included in gross income"). The fair market value is not itself gross income, with the taxpayer's cost later deducted from that amount. Only the taxpayer's gain is gross income to begin with. *See Alpenglow Botanicals v. United States*, 894 F.3d 1187, 1199 (10th Cir. 2018) ("To ensure taxation of income rather than sales, the 'cost of goods sold' is a mandatory exclusion from the calculation of a taxpayer's gross income."). Fair market value is relevant, as it's the starting point for calculating gain. But the law requires that fair market value be adjusted so that the income tax reaches only gains. *See* Jarretts-MSJ 19-23.

19

Courts must determine the taxpayer's actual economic gain, even if it's hard. In *Burnet v. Logan*, the Supreme Court rejected the IRS's attempt to tax the full value of property received where gain could not be reliably determined, holding that income arises only to the extent of actual profit. 283 U.S. 404, 413 (1931). Likewise, in *Raytheon Production v. Commissioner*, the First Circuit held that the tax treatment of a lump-sum settlement depends on what the payment is "in lieu of." 144 F.2d 110, 113 (1st Cir. 1944). The tax code requires disentangling recoveries for "loss of profits" (taxable gain) from recoveries for "injury to good will" (not taxable because merely "a return of capital"). *Id.* at 113-14. *Burnet* and *Raytheon* reflect a consistent rule: Taxable income is not the value of what is received in isolation, but only that portion of the receipt that represents an actual net increase in wealth. *See Indianapolis Power*, 493 U.S. at 209 (1990) (receipt of funds alone does not establish "an undeniable accessio[n] to wealth" under *Glenshaw Glass*).

This rule applies when the taxpayer acquires additional units tied to the same underlying economic interest. Stock splits are a classic example. Today, the taxation of stock splits (and pro-rata stock dividends) is governed by its own statute. *See* 26 U.S.C. §305. Prior to an express statute, the taxation of shares received from a corporation was analyzed under general income-tax principles, the same ones that apply here. The Supreme Court applied those principles in *Towne v. Eisner*. There, the taxpayer received 4,174.5 shares in a pro-rata stock dividend. 245 U.S. 418, 424 (1918). After paying tax on the fair market value of the new shares, the taxpayer sued for a refund. *Id.* at 424-25. The Supreme Court ruled that the taxpayer owed no tax because the shares were not gain: "[T]he new shares and the original shares together represen[t] the same proportional interest that the original shares represented before the issue of new ones." *Id.* at 426. Even "[i]f the plaintiff gained any small advantage by the change," his "old and new certificates together are worth only what the old ones were worth before." *Id.* In other words, the new shares diluted the old shares, and because the new

shares were distributed proportionally among all shareholders (*i.e.*, pro rata), the taxpayer ended up "no richer" than he was before. *Id.*

On the facts of *Towne*, dilution from the creation of the new units made the taxpayer's income zero; but the principle from *Towne* is broader. The Supreme Court explained as much in *Eisner v. Macomber*, which "confirm[ed] the view that the underlying ground of [*Towne*] is sound." 252 U.S. 189, 201 (1920). When considering a taxpayer's gain for purposes of assessing his taxable income, *Macomber* confirmed, courts must consider any decrease in value from "dilution." *Id.* at 211.

**2.** The government cannot jettison this rule by stressing factual distinctions between pro-rata stock splits and Tezos rewards. True, staking rewards are not distributed "proportionally among all holders as stock splits are." IRS-MSJ 21. But that just means the effect of dilution is not 100%—that dilution does not totally wipe out the staker's gains such that his taxable income is $0. Because not everyone stakes, the effect of dilution is not totalizing, McKeon-Rep. ¶95; but that fact does not mean *no* dilution occurs, or that courts are free to ignore the effect of the dilution that does occur. The legal principle from *Towne* and *Macomber* is not about corporate stock, but about the economic reality that "simply increas[ing] the number" of units tied to the same underlying economic interest does not itself make taxable gain. *Macomber*, 252 U.S. at 211. The Court recognizes that increasing the number of units has a "consequent dilution of the value of each" existing unit. *Id.* That dilution must be factored in, whether it eliminates the taxpayer's gain or merely reduces it, because only gain is income.

As Dr. McKeon testifies, the principle from *Towne* and *Macomber* applies more broadly, including to Tezos: "aggregate value is not a function of the number of units." McKeon-Rep. ¶91. Or, put another way, "market capitalization is not directly affected by the creation of new units." McKeon-Rebut. ¶27. The value of Tezos turns on demand-side factors—the various reasons why people believe this cryptocurrency is useful, valuable, and the like. McKeon-Rebut. ¶¶6-7; Kaal-Rep. ¶¶64-69; Kaal-Depo. 82:13-22. Merely increasing the number of tokens does not increase that aggregate value; the

21

creation of new tokens on its own can only *reduce* the value of each Tezos token. McKeon-Rep. ¶90. A staker thus acquires new tokens, but the creation of new tokens makes his and all other tokens worth less. McKeon-Rep. ¶86. The opposite assumption—that creating five percent more units increases the aggregate value of the whole by five percent—would be remarkable. Why stop there? Why not double the units, to double the aggregate value? Just like a corporation cannot increase the value of the underlying business by splitting its shares, the value of Tezos cannot be increased by creating new tokens. So like each share of stock after a stock split, creating new tokens makes each token worth less. *See* McKeon-Rep. ¶¶86-95.

To understand why Dr. McKeon is correct about dilution, assume that every Tezos holder acquired a share of the new tokens proportionate to his initial holding of tokens. In that hypothetical, "each holder would end the year with five percent more tokens." McKeon-Rep. ¶94. But "each holder would hold the same proportion of the total tokens." *Id.* Those five percent more tokens would be like "a five percent stock dividend for shareholders," *id.*, just like in *Towne.* "[N]o holder would be better off—they'd just hold more units." *Id.* A holder who began with 100 tokens and ended with 105 tokens would have zero gain because his five new tokens are offset by the five percent new tokens held by everybody else. *Id.* As with Mr. Towne's 4,174.5 new shares, calling those five new tokens "income" would be wrong; and including *any* of their value in taxable income would be barred by *Towne* and *Macomber.*

In the real world, Tezos stakers acquire reward tokens in proportion to the amount they have staked, but not every Tezos holder participates in staking. McKeon-Rep. ¶95. That wrinkle makes the math more complicated, but the basic result is clear. In 2020, about 80 percent of Tezos tokens were staked. McKeon-Rep. ¶96. That means the 40 million new tokens created from staking were shared among most, but not all, token holders. Instead of every participating holder starting with 100 tokens and then acquiring five additional tokens through staking, each participating staker ends up with

roughly 6.25 additional tokens. McKeon-Rep. ¶95. That is because the same five percent increase in total token supply is distributed among 80 percent of holders, rather than 100 percent of holders. McKeon Rep. ¶96. (The five-percent increase in token supply is divided among the holders of 80 percent of the tokens, and $0.05/0.8 = 0.0625$, or 6.25 percent. *See* McKeon-Rep. ¶¶95-96.) Of the 6.25 new tokens, five merely offset the five-percent increase in total token supply. Only the remaining 1.25 represent actual economic gain. *See* McKeon-Rep. ¶96

The government does not genuinely dispute that dilution occurs on Tezos. Its expert, Dr. Kaal, cites no evidence against this principle or why it would not apply to Tezos tokens. And he certainly presents no evidence for any alternative. Dr. Kaal presents no evidence that aggregate value *is* a function of the number of units, or that market capitalization *is* directly affected by the creation of new units.

Nor is the government able to point to any evidence that, on the facts of this case, dilution did not apply or was somehow too inconsequential to matter. The government offers an observation that does not qualify as evidence: "market capitalization has often increased even as new XTZ entered circulation through rewards." IRS-MSJ 22 (citing Kaal-Rep. ¶63, ¶¶74-77). Confusing correlation with causation, or identifying a random spurious correlation, does not create a genuine dispute of fact. *See Gilbreath v. Brookshire Grocery*, 400 F. Supp. 3d 580, 592 (E.D. Tex. 2019); *e.g.*, *Sheehan v. Daily Racing Form*, 104 F.3d 940, 942 (7th Cir. 1997) (holding that expert testimony "equating a simple statistical correlation to a causal relation" was "entitled to zero weight in considering whether to grant or deny summary judgment"). Proving the point, Dr. McKeon demonstrated that, using a longer time period, the same analysis could "prove" just the opposite: that token price *declined* with increased supply. McKeon-Rebut. ¶¶32-35 & Exhs. 2, 3.

Next, the government argues that dilution does not apply in Jarrett's case because the increase in token supply is known in advance and thus "priced in." IRS-MSJ 21. The government is confusing

the *informational* effect of known future changes in supply with the *supply* effect: unit price drops when the pie is *actually* cut into more pieces, not before. *See* McKeon-Rebut. ¶37, ¶42; McKeon-Depo. 102:17-104:19. Dilution from this supply effect is sometimes observable with the naked eye–for example, in a discrete two-for-one stock split, unit price will halve immediately following the split. *See* McKeon-Rebut. ¶¶37, 41; McKeon-Depo. 102:17-104:19, 106:9-107:21 (NVIDIA 10-for-1 split). But as Dr. McKeon explains, there is no relevant difference between a stock split and the gradual dilution occurring from the ongoing increase in the Tezos token supply; and neither the government nor its expert points to any evidence to the contrary. McKeon-Rebut. ¶¶40-41.

Perhaps most importantly, the government's expert agrees that new tokens created through staking cause dilution on Tezos. Dr. Kaal states that the new tokens dilute at the rate of 0.00001 percent per block of transactions. *See* Jarretts-MSJ 21-22; Kaal-Rep. ¶75 n.118; Kaal-Depo. 51:3-5, 70:13-16, 82:23-83:1. And he agrees that, because there were 522,267 blocks in 2020, the total supply of Tezos tokens increased by 40 million. *See* Kaal-Rep. ¶75 n.117; McKeon-Rep. ¶82. That activity adds up to annual dilution of five percent. *See* Kaal-Depo. 70:22-73:5. Dr. McKeon used that agreed-upon five-percent dilution figure in his analysis. *See* McKeon-Rep. ¶82 & Exh. 3.

**3.** Because dilution must be accounted for, the question is how to account for it under the government's view that staking rewards are taxable immediately. The government never tries. It does not attempt to show that Jarrett's taxable income was $32,836. The government makes much of its claim that Jarrett could have sold his new tokens for $32,836 on global cryptocurrency exchanges. IRS-MSJ 12-13, 19. But the taxpayer in *Towne* could have sold his new shares of stock for $417,450. *See* 245 U.S. at 424. The question is not the fair market value of the underlying assets, but the taxpayer's gain from the activity in question. Jarrett is not asking "to decrease the fair market value of [his] XTZ tokens," IRS-MSJ 22; he is asking to be taxed only on actual economic gain. And thanks to dilution, Jarrett's actual gain was not $32,836.

Only the Jarretts, through their expert, calculated the annualized effect of dilution; so if the Court accepts the government's reading of the tax code, there is no genuine dispute on the effect of dilution here. As explained, Dr. McKeon used the experts' agreed-upon rate of five-percent dilution. *See* McKeon-Rep. ¶82 & Exh. 3. And the government has never disputed that the Tezos staking rate during 2020 averaged nearly 80 percent. McKeon-Rep. ¶96 & Exh. 4. While the calculations are complex and while there is more than one method for establishing gain after dilution, Dr. McKeon carefully explained and justified his methodology and results. *See* McKeon-Rep. ¶¶94-104. His conclusion that Jarrett's true economic gain from staking was $7,023 is unchallenged. *Compare* McKeon-Rep. ¶112 (determining that Jarrett's economic gain was "$7,023, vastly lower than the FMV of the newly created tokens"), *with* Kaal-Rep. (not calculating a figure for Jarrett's economic gain). Having failed to engage or rebut Dr. McKeon's methodology or conclusion, the government does not create a genuine dispute that, even under its theory, the Jarretts owed tax on $7,023, not $32,836. So the Jarretts are entitled to a refund of the resulting overpayment. *See* Jarretts-SOF ¶72; Jarrett-Decl. ¶18.

To defeat the government's request for judgment on income of $32,836, the precise calculations do not matter. It is enough to observe that with a staking rate near 80 percent, the fair market value of all newly acquired tokens dramatically overstates the Jarretts' actual gain. And the Jarretts have, at minimum, "'introduce[d] credible evidence'" on that factual question such that "*the government* 'ha[s] the burden of proof with respect to such issue.'" *McGowan*, 143 F.4th at 695 (emphasis added; quoting 26 U.S.C. §7491(a)(1)). As Dr. McKeon explained, "[w]ith an eighty percent staking rate, the fair market value of new tokens overstates a staker's gain by about a factor of five." McKeon-Rep. ¶96. At a minimum, then, this Court cannot grant summary judgment to the government.

## CONCLUSION

The Court should deny the government's motion for summary judgment and grant the Jarretts' motion for summary judgment.

25

Respectfully submitted,

/s/ *Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
Cameron T. Norris
Zachary P. Grouev*
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: 703.243.9423
cam@consovoymccarthy.com
zach@consovoymccarthy.com

J. Abraham Sutherland*
106 Connally Street
Black Mountain, NC 28711
Telephone: 805.689.4577

*\* pro hac vice*

**CERTIFICATE OF SERVICE**

On May 22, 2026, I e-filed this opposition brief and all accompanying attachments with the

Court via ECF, which emailed everyone requiring service.

*/s/ Cameron T. Norris*