# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

JOSHUA JARRETT and )
JESSICA JARRETT, )　　Case No. 3:24-cv-01209
)
　　　　Plaintiffs, )
)
　　　v. )
)
UNITED STATES OF AMERICA, )
)
　　　　Defendant. )
_____ )

## PLAINTIFFS' RESPONSES & OBJECTIONS TO THE
## UNITED STATES' STATEMENT OF UNDISPUTED MATERIAL FACTS

## I.    Cryptocurrency and Blockchain Technology

1.    A digital asset, as defined by the Internal Revenue Code, is "any digital representation of value which is recorded on a cryptographically secured distributed ledger or any similar technology as specified by the [IRS]." 26 U.S.C. § 6045(g)(3)(D).

**Response:** Undisputed that §6045(g)(3)(D) is quoted correctly. Disputed to the extent the United States asserts any legal conclusions or a particular interpretation of §6045(g)(3)(D). *See* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

2.    A cryptocurrency is a type of digital asset, widely understood to include "digital payment systems operating independently of a central authority and employing cryptographic techniques to control and verify transactions in a unique unit of account." Oxford English Dictionary, available at https://www.oed.com/dictionary/cryptocurrency_n; Ex. 1 (Expert Report of Stephen McKeon), ¶ 26.

**Response:** Undisputed.

3.    A "public key" is a cryptographic code used to receive digital assets and verify digital signatures on a blockchain account. It is similar to a bank account number. Ex. 2 (Expert Report of Wulf Kaal), ¶ 15 n. 10, at 68 (pdf 71) (App'x C – Glossary). It can be shared openly with others, so that they know where to send transfers. *Id.*

**Response:** Undisputed that Dr. Kaal defined a "public key" as "[a] cryptographic key derived from a private key, which is publicly shared to receive funds in a blockchain by serving or generating a wallet address. Thus, enabling others to send crypto assets, similar to a bank account number. The public key works in conjunction with the private key through

1

asymmetric cryptography to verify transaction authenticity and ownership without exposing the private key." Kaal-Rep. at 69 (App'x C).

Disputed to the extent that the United States implies that stakers are engaged in a compensation-for-services relationship or use public keys to "receive" staking rewards, rather than creating new tokens. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

4. A "private key" is a cryptographic code known only to the user that is used to sign transactions and prove ownership of a blockchain account. Ex. 2, ¶ 15 n. 11, at 69 (pdf 72) (App'x C – Glossary). It is similar to a bank account password or PIN. *Id.*

**Response:** Undisputed that Dr. Kaal defined a "private key" as a "secret cryptographic key used to sign transactions and prove ownership of a blockchain wallet, similar to a bank account password or PIN code. It is kept secret by the owner because it is used to authorize any transfers or changes within the associated account. Losing the private key means irreversible loss of access to the funds in that wallet." Kaal-Rep. 68 (App'x C).

Disputed to the extent that the United States implies that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency "transactions," rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-

106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that Dr. McKeon explained that a "private key" is "akin to a password; used to demonstrate ownership of crypto assets; kept in a digital wallet." McKeon-Rep. ¶56, at 42 (App'x A).

5. Owners of cryptocurrencies use "wallets"—software or hardware that manage private keys and public keys—to authorize transactions on a blockchain network. Ex. 2, ¶ 15, at 70 (pdf 73) (App'x C – Glossary).

**Response:** Undisputed that Dr. Kaal defined a "wallet" as "[s]oftware or hardware that securely manages private keys and public keys, enabling crypto asset owners to add, sign, and broadcast transactions to the network." Kaal Rep. 70 (App'x C).

Disputed to the extent that the United States implies that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency "transactions," rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-

3

69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that Dr. McKeon explained that a "wallet" is "the functional equivalent of a bank account for cryptocurrency; it holds native cryptocurrency and private key(s) for a particular blockchain." McKeon-Rep. 44 (App'x A).

6. A "blockchain" is a permanent digital ledger that records transactions across a distributed network of computers. Ex. 2, ¶ 13, at 67 (pdf 70) (App'x C – Glossary).

**Response:** Undisputed that Dr. Kaal defined a "blockchain" as "decentralized digital ledger technology used to record transactions across a network of computers (also called nodes). It ensures that transaction data is secure, transparent, and immutable, meaning it cannot be changed once recorded." Kaal-Rep. 67 (App'x C).

Disputed to the extent that the United States implies that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency "transactions" "record[ed]" on the Tezos blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

4

Plaintiffs further respond that Dr. McKeon defined a "blockchain" as "a database that acts as a distributed digital ledger of crypto transactions. The basic unit of a blockchain is a block." McKeon-Rep. 40 (App'x A).

7.     Blockchain technology and blockchain ledgers are used for cryptocurrency transactions; e.g., when users want to transfer their crypto asset to another user. Ex. 2, ¶¶ 14–15; Ex. 1, ¶ 27.

**Response:** Undisputed that blockchain technology and blockchain ledgers can be used in cryptocurrency transactions and that a cryptocurrency user who wishes to transfer a crypto asset to another person can use blockchain technology and blockchain ledgers to effectuate that transaction.

Disputed to the extent that the United States implies that stakers are engaged in a compensation-for-services relationship or that staking rewards are "transfer[red]" between users in "cryptocurrency transactions," rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that blockchain technology and blockchain ledgers have applications other than facilitating transactions. For example, stakers create new property

using blockchain technology. Jarretts-SOF ¶¶9-19; *see also, e.g.*, Jarretts-SOF ¶¶56-57 (example of Josh Jarrett producing a Tezos block and creating 40 new Tezos tokens).

8.      Blockchain technology uses cryptography to protect information and prevent unauthorized parties from executing or altering transactions. Ex. 2, ¶ 14; Ex. 1, ¶¶ 27, 29, 31.

**Response:** Undisputed.

9.      Transactions on a blockchain are grouped into blocks, and each block refers to the block that came before it, forming a continuous chain. Ex. 2, ¶ 13; Ex. 1, ¶¶ 31–33.

**Response:** Disputed to the extent that the United States implies that staking rewards are received in cryptocurrency "[t]ransactions on a blockchain," rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that Dr. McKeon explained that "[a] blockchain is a database that acts as a digital ledger. It is composed of blocks, each of which is a group of transactions that have been validated to be authentic and authorized. The blockchain is the full ledger of transactions, organized into blocks." McKeon-Rep. ¶29.

6

10. Blocks contain groups of transactions that have been validated by users of the blockchain to be authentic and authorized. Kaal ¶¶ 13–15, at 66 (pdf 69) (App'x C – Glossary); Ex. 1, ¶ 29.

**Response:** Undisputed that Dr. Kaal defined a "block" as a "group of validated transactions bundled together and added to the blockchain. Each block is linked to the previous one using mathematical algorithms, forming a continuous 'chain' that is resistant to tampering and fraud. A block contains a list of transactions, along with other necessary data, such as a reference to the previous block." Kaal-Rep. 66-67 (App'x C).

Disputed to the extent that the United States implies that staking rewards are received in cryptocurrency "transactions" on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that Dr. McKeon defined a "block" as a "digital unit containing data on a set of verified cryptocurrency transactions; new blocks are appended to prior blocks to form a blockchain ledger." McKeon-Rep. 40 (App'x A).

7

11.     Blockchain ledgers are "decentralized and distributed," which means they are maintained by multiple parties who verify each other's work according to predefined rules. Ex. 2, ¶¶ 13, 16; Ex. 1, ¶ 31.

**Response:** Undisputed that multiple parties who verify each other's work according to predefined rules typically add blocks of transactions to a blockchain ledger. McKeon-Rep. ¶31. But contra the United States' characterization, it is possible for a single person to perform all the mining or staking on a blockchain. *See* Jarretts-SOF ¶¶111-12; McKeon-Rep. ¶¶78-79; Kaal-Rebut. ¶¶27-28.

Further disputed to the extent the United States implies that the externalities of staking mean that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency "transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

12.     Users of the blockchain network operate nodes—i.e., computers connected to the network—each of which maintain a copy of the distributed ledger and associated software containing the protocols or rules under which the blockchain operates. Ex. 2, ¶¶ 13, 16, at 68 (pdf 71) (App'x C – Glossary).

8

**Response:** Undisputed that Dr. Kaal defined a "node" as a "software instance running on a computer that participates in a blockchain network by maintaining a local copy of the ledger and communicating with other nodes through a peer-to-peer protocol. It validates incoming blocks and transactions against the network's consensus rules and keeps its copy of the blockchain synchronized. Nodes are generally classified into full nodes, which store the entire blockchain history, independently verify every transaction and block, and enforce all protocol rules; consensus (or validating) nodes, which are full nodes that also actively participate in block production and finalization (e.g., validators or bakers in Proof-of-Stake systems, or miners in Proof-of-Work systems); and light or non-consensus nodes, which store only partial data, rely on full nodes for verification, and are primarily used for relaying transactions or running wallet services." Kaal-Rep. 68 (App'x C).

Disputed to the extent the United States implies that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that Dr. McKeon defined a "node" as a "software and hardware tool used by stakers to produce new blocks on a blockchain network. Nodes connect

to the peer-to-peer network, maintain a local copy of the blockchain, and participate in consensus." McKeon-Rep. 42 (App'x A).

13.     Blockchain ledgers require a mechanism to ensure all the users operating nodes agree on the validity of transactions. Ex. 2, ¶ 16; Ex. 1, ¶ 58.

**Response:** Undisputed that cryptocurrencies have a consensus mechanism, which is a "system that allows all participants in a blockchain to agree on which transactions are legitimate and should be validated." McKeon-Rep. 41 (App'x A); *see also* Kaal-Rep. 67 (App'x C).

Disputed to the extent the United States implies that the existence of a consensus mechanism means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency "transactions" on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that Dr. McKeon defined a "consensus mechanism" as a "system that allows all participants in a blockchain to agree on which transactions are legitimate and should be validated (*e.g.*, Proof-of-Stake and Proof-of-Work)." McKeon-Rep. 41 (App'x A); *see also* McKeon-Rep. ¶55.

14. Blockchain ledgers use "consensus mechanisms," or "consensus protocols," to determine which transactions are valid. Ex. 2, ¶ 16, at 67 (pdf 70) (App'x C – Glossary); Ex. 1, ¶ 58.

**Response:** Undisputed that cryptocurrencies have a consensus mechanism, which is a "system that allows all participants in a blockchain to agree on which transactions are legitimate and should be validated." McKeon-Rep. 41 (App'x A); *see also* Kaal-Rep. 67 (App'x C).

Disputed to the extent the United States implies that the existence of a consensus mechanism means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency "transactions" on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that Dr. McKeon defined a "consensus mechanism" as a "system that allows all participants in a blockchain to agree on which transactions are legitimate and should be validated (*e.g.*, Proof-of-Stake and Proof-of-Work)." McKeon-Rep. 41 (App'x A); *see also* McKeon-Rep. ¶55.

15. Consensus mechanisms (consensus protocols or consensus algorithms) are a set of rules, encoded in software, for determining agreement on which transactions are legitimate and should be validated. Ex. 2, ¶ 16, at 67 (pdf 70) (App'x C – Glossary).

**Response:** Undisputed that Dr. Kaal defined "consensus mechanism" and "consensus protocol" as a "set of rules that ensures that all participants (nodes) in a blockchain Mechanism network achieve consensus on the current state of the ledger. This mechanism validates transactions, adds new blocks to the chain, and allows decentralized networks to function securely without a central authority." Kaal-Rep. 67 (App'x C).

Disputed to the extent the United States implies that the existence of a consensus mechanism or consensus protocol means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency "transactions" on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that Dr. McKeon defined a "consensus mechanism" as a "system that allows all participants in a blockchain to agree on which transactions are legitimate and should be validated (*e.g.*, Proof-of-Stake and Proof-of-Work)." McKeon-Rep. 41 (App'x A); *see also* McKeon-Rep. ¶55.

### A. "Proof of Work" consensus mechanisms

16. One widely adopted consensus mechanism approach for validating blocks on a blockchain is called "Proof of Work." Bitcoin, for example, uses a "proof of work" algorithm. Ex. 2, ¶¶ 17–18; Ex. 1, ¶ 59.

**Response:** Undisputed that "Proof-of-Work" is a widely used consensus mechanism and is used by the Bitcoin blockchain. *E.g.*, McKeon-Rep. ¶¶59-61.

Disputed to the extent the United States implies that the existence of a consensus mechanism means that stakers (or, using Proof-of-Work terminology, miners) are engaged in a compensation-for-services relationship or that staking rewards (or, using Proof-of-Work terminology, block rewards or mining rewards) are received in cryptocurrency transactions on a blockchain, rather than being created by stakers (or, using Proof-of-Work terminology, miners). *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that Dr. McKeon defined "Proof-of-Work" as "the original blockchain consensus mechanism, in which validators must solve a math puzzle to gain the right to add a block of transactions to the blockchain and create new units of the native cryptocurrency." McKeon-Rep. 42 (App'x A).

17. In a blockchain utilizing a Proof of Work consensus mechanism, the network users' computers (nodes) compete to solve mathematical puzzles. Ex. 2, ¶ 18; Ex. 1, ¶ 59.

**Response:** Undisputed that "[i]n proof-of-work, miners are competing to solve a math problem, and the miner that solves it first wins the right to post a block to the ledger. It requires expensive hardware and electricity to work on the math problem, and this expenditure is the incentive for honest behavior. If the block is not accepted by the network because it contains invalid transactions, then all the expenditure was for naught." McKeon-Rep. ¶59.

Disputed to the extent that the United States implies that the existence of a consensus mechanism means that stakers (or, using Proof-of-Work terminology, miners) are engaged in a compensation-for-services relationship or that staking rewards (or, using Proof-of-Work terminology, block rewards or mining rewards) are received in cryptocurrency transactions on a blockchain, rather than being created by stakers (or, using Proof-of-Work terminology, miners). *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

18. The participants in "Proof of Work" blockchains are called "miners." Ex. 2, ¶ 18; Ex. 1, ¶ 58.

14

**Response:** Undisputed that "[t]hose posting blocks of transactions to the ledger in a proof-of-work system are called 'miners.'" McKeon-Rep. ¶58.

Disputed to the extent the United States implies that the use of the term "miners" means that stakers (or, using Proof-of-Work terminology, miners) are engaged in a compensation-for-services relationship or that staking rewards (or, using Proof-of-Work terminology, block rewards or mining rewards) are received in cryptocurrency transactions on a blockchain, rather than being created by stakers (or, using Proof-of-Work terminology, miners). *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

19. The first miner to solve the mathematical puzzle broadcasts their solution to the network of other nodes, which is then verified by other participants. Ex. 2, ¶ 18.

**Response:** Undisputed that Dr. Kaal stated that "[t]he first miner to solve the puzzle broadcasts their solution to the network, which is then verified by other participants." Kaal-Rep. ¶18.

Disputed to the extent the United States implies that the use of the term "miner" means that stakers (or, using Proof-of-Work terminology, miners) are engaged in a compensation-for-services relationship or that staking rewards (or, using Proof-of-Work terminology, block

rewards or mining rewards) are received in cryptocurrency transactions on a blockchain, rather than being created by stakers (or, using Proof-of-Work terminology, miners). *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

20.     Miners expend significant computational work, as well as energy, to complete the mathematical puzzles. Ex. 2, ¶¶ 18–19; Ex. 1, ¶ 60.

**Response:** Undisputed that mining on a Proof-of-Work blockchain "requires expensive hardware and electricity to work on the math problem." McKeon-Rep. ¶59.

Disputed to the extent the United States implies that the use of the term "[m]iners" means that stakers (or, using Proof-of-Work terminology, miners) are engaged in a compensation-for-services relationship or that staking rewards (or, using Proof-of-Work terminology, block rewards or mining rewards) are received in cryptocurrency transactions on a blockchain, rather than being created by stakers (or, using Proof-of-Work terminology, miners). *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1)

16

(prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

21.     In return for validating the block, once the new block is added to the blockchain, the miner receives a rewards in the form of native cryptocurrency to that blockchain. Ex. 2, ¶ 18.

**Response:** Disputed. As Dr. McKeon explained, in a Proof-of-Work cryptocurrency "validators must solve a math puzzle to gain the right to add a block of transactions to the blockchain and *create new units of the native cryptocurrency.*" McKeon-Rep. 42 (App'x A) (emphasis added). Just like stakers, miners do not "receive" these new units of cryptocurrency from anyone. *Id.* Rather, they create them using hardware, software, and electricity. *Cf.* McKeon-Rep. ¶59, ¶74, ¶81.

Further disputed to the extent the United States implies that the use of the term "miner" means that stakers (or, using Proof-of-Work terminology, miners) are engaged in a compensation-for-services relationship or that staking rewards (or, using Proof-of-Work terminology, block rewards or mining rewards) are received in cryptocurrency transactions on a blockchain, rather than being created by stakers (or, using Proof-of-Work terminology, miners). *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1)

(prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

### B. "Proof of Stake" consensus mechanisms

22. Another widely adopted consensus mechanism used for validating blocks on a blockchain is called "Proof of Stake." Ethereum, for example, uses a "proof of stake" mechanism. Ex. 2, ¶ 17; Ex. 1, ¶ 58.

**Response:** Undisputed that Proof-of-Stake is a widely adopted consensus mechanism and is used by the Ethereum blockchain. *See* McKeon-Rep. ¶58, ¶61.

23. In a blockchain using a Proof of Stake consensus mechanism, the network users' nodes are called "validators." Ex. 2, ¶ 21.

**Response:** Disputed. As Dr. McKeon explained, a "node" is a "software and hardware tool used by stakers to produce new blocks on a blockchain network. Nodes connect to the peer-to-peer network, maintain a local copy of the blockchain, and participate in consensus." McKeon-Rep. 42 (App'x A). And a "validator" is just "one of many terms to describe an individual who validates transactions on the blockchain." McKeon-Rep. 44 (App'x C); *see also* McKeon-Rep. ¶32. On Tezos, individuals who use "the Tezos software to validate transactions are called bakers." McKeon-Rep. ¶58.

Further disputed to the extent the United States implies that the use of the term "validators" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. See Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18,

18

144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

24.     To participate, a validator (also called a "staker") must hold existing units of the native cryptocurrency, and must commit a portion of them to validate a block. Ex. 2, ¶ 21, at 69 (pdf 72) (App'x C – Glossary); Ex. 1, ¶ 63.

**Response:** Undisputed that a staker is another name for a validator. McKeon-Rep. ¶58. Undisputed that a staker on Tezos "must operate hardware and stake a minimum amount of tez." McKeon-Rep. ¶63.

Disputed to the extent the United States implies that the use of the term "validator" or "staker" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. See Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

19

25.     Stakers are selected to propose and attest new blocks to be added to the blockchain, typically based on the amount of the native cryptocurrency they have staked. Ex. 2, ¶ 22; Ex. 1, ¶ 63.

**Response:** Disputed. Stakers typically have the opportunity to "propose and endorse blocks based on the proportion of their stake." McKeon-Rep. ¶63. "The more tokens a staker controls, the higher their chance of being selected to produce or endorse blocks." *Id.* However, "random selection ensures that no individual participant unilaterally controls the process," *id.*, and no individual validator has discretion to approve or deny staking rewards outside the protocol rules, Jarretts-SOF ¶18; Kaal-Depo. 28:2-5. Put differently, no one selects which staker will have the opportunity to confirm a particular block. *See* Jarretts-SOF ¶18; Kaal-Depo. 28:2-5.

Further disputed to the extent the United States implies that the use of the term "staker" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. See Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

26. Stakers must stake their units of native cryptocurrency to propose new blocks themselves, and to attest to the validity of new blocks proposed by others. Ex. 2, ¶¶ 21, 22, 24.

**Response:** Undisputed that "[t]o become a staker on Tezos, a participant must operate hardware and stake a minimum amount of tez." McKeon-Rep. ¶63.

Disputed to the extent the United States implies that the use of the term "[s]takers" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. See Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19—20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

27. Proposing new blocks occurs at predetermined scheduled intervals. Ex. 2, ¶ 24. At each of these intervals, the protocol selects a staker to aggregate pending transactions from network participants into a new block and submit it to be included in the blockchain's permanent ledger. *Id.*

**Response:** Undisputed that "a new block was typically added to the Tezos blockchain every 60 seconds" in 2020. McKeon-Rep. ¶48; *see also* Kaal-Rep. ¶65 n.105.

21

Disputed to the extent that the United States implies that the Tezos protocol, which is computer software or "math instantiated in code," Kaal-Depo. 30:23-31:17, deterministically "selects" a staker to aggregate transactions and create a block of transactions. *See* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact). Such opportunities are determined by chance based on the amount of cryptocurrency that a staker has staked at the relevant time. *See* McKeon-Rep. ¶61, ¶63.

Further disputed to the extent the United States implies that the use of the term "staker" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. See Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1).

28.     When a staker is not selected to propose the block, the staker instead will review and confirm the block proposed by the staker who was selected, this is called "attesting." Ex. 2, ¶ 25.

**Response:** Disputed. When a staker does not propose a block, a staker *may* have the opportunity to review and confirm a proposed block. This is called "attestation" or "endorsement." McKeon-Rep. ¶65; *see also* McKeon-Rep. 40-41 (App'x A). In 2020, a staker

not proposing a particular block did not always have the opportunity to attest or endorse a given block. *See* McKeon-Rep. ¶66.

Further disputed to the extent the United States implies that the use of the term "staker" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. See Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

29. To "attest," the staker must confirm whether the block follows the consensus rules, confirm the authenticity of the transaction, and detect any signs of invalidity or malicious activity. Ex. 2, ¶ 25; Ex. 1, ¶ 65.

**Response:** Undisputed that stakers can endorse or attest to a block's validity. McKeon-Rep. ¶65. Undisputed that "[e]ndorsing [or attesting to] a block is like performing an audit on a block producer's work. Other stakers' endorsements show that the new block is valid and deserves to be permanently added to the blockchain." *Id.*; *see also* McKeon-Rep. ¶31.

Disputed to the extent the United States implies that the use of the term "staker" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency "transaction[s]" on a blockchain, rather than being created by

stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

30.    A staker "attests" to a block by producing a digital signature, referred to as an "attestation." Ex. 2, ¶ 25. A properly validated and attested block is then published or added to the blockchain. *Id.*

**Response:** Undisputed that stakers can endorse or attest to a block's validity. McKeon-Rep. ¶65. Undisputed that "[e]ndorsing [or attesting to] a block is like performing an audit on a block producer's work. Other stakers' endorsements show that the new block is valid and deserves to be permanently added to the blockchain." *Id.*; *see also* McKeon-Rep. ¶31.

Disputed to the extent the United States implies that the use of the term "staker" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1)

(prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

31. If a staker does not follow the pre-established rules of the protocol, or engages in malicious conduct, the validator will not receive rewards or (in the case of malicious conduct) will forfeit the native cryptocurrency they have staked. Ex. 2, ¶¶ 21 & n.24, 22, 45; Ex. 1, ¶¶ 67–68; *cf.* Ex. 3 (Expert Rebuttal Report of Wulf Kaal), ¶ 24. In that way, the staked units are security for validating blocks. *Id.*

**Response:** Disputed to the extent the United States implies that the use of the term "staker" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are "receive[d]" in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Further disputed to the extent the United States implies that the units of native cryptocurrency a staker stakes are held by anyone other than the staker as a "security for validating blocks." *Cf.* McKeon-Rep. 46 (App'x B).

Further disputed to the extent the United States implies that "slashing" affects all the units of native cryptocurrency a staker has staked. *See* Kaal-Rebut. ¶24 n.33.

32. In return for proposing blocks and attesting the proposed blocks of others, stakers receive newly-minted units of native cryptocurrency as rewards. Ex. 2, ¶ 23; Ex. 1, ¶ 19; Ex. 4 (Dep. Ex. 12 (Tezos Docs)) at 1 (Tezos Docs, *Staking*, https://docs.tezos.com/using/staking [https://perma.cc/5PRT-BX5P]).

**Response:** Disputed. Tezos stakers create new units of native cryptocurrency using "electricity, software, hardware, and pre-existing Tezos tokens." Jarretts-SOF ¶44; *see also* Jarrett-Decl. ¶5; McKeon-Rep. ¶18, ¶20, ¶74, ¶81; Kaal-Rep. ¶18. Stakers do not "receive" tokens "[i]n return for" anything. *Contra* IRS-SOF ¶32. There is no debit matching a staker's newly created tokens and no existing token holder loses a corresponding number of tokens. Jarretts-SOF ¶15-16; *see also* McKeon-Rep. ¶21, ¶74; McKeon-Rebut. ¶19; Kaal-Depo. 42:18-21. There is also no transaction on the blockchain recording any transfer of tokens between any other account and the staker. Jarretts-SOF ¶¶102-03; *see also* McKeon-Depo. 144:14-22.

Further disputed to the extent the United States implies that the use of the term "stakers" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are "receive[d]" in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

26

33.    The rewards are "newly-minted" by the protocol —that is, they are not transferred from one participant to another. Ex. 2, at 70 (pdf 73) (App'x C – Glossary), ¶ 42; Ex. 5 (Excerpts of Deposition of Stephen McKeon) at 80:4–14.

**Response:** Undisputed that staking rewards are not "transferred" to stakers. Jarretts-SOF ¶¶12-16; *see also* McKeon Depo. 80:4-14. Undisputed that staking rewards are "newly minted" tokens. Jarretts-SOF ¶¶37-40; *see also* Rev. Proc. 2025-31, 2025-48 I.R.B. 743 (Nov. 24, 2025).

Disputed to the extent the United States implies that the phrase "newly minted" means that the Tezos protocol, and not the staker, creates new units of native cryptocurrency. Further disputed to the extent the United States implies that stakers are engaged in a compensation-for-services relationship or that staking rewards are "transferred" in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

34.    Additionally, the stakers receive a small amount of "fees" from the parties whose transactions they validate and propose to add to a block. Ex. 1, ¶¶ 47, 109; Ex. 6 (Open Tezos, *Economics and Rewards*, https://opentezos.com/tezos-basics/economics-and-rewards/ [https://perma.cc/4JGA-QAKS]). The sender includes these fees in the transaction. *Id.*

27

**Response:** Undisputed that stakers may receive a small amount of "transaction fees" from the parties whose transactions they validate and propose to add to a block. McKeon-Rep. ¶50, ¶52; *see also* McKeon-Rep. 44 (App'x A).

Disputed to the extent that the word "[a]dditionally" implies agreement with the government's inaccurate characterizations of staking elsewhere. *E.g.*, IRS-SOF ¶33.

Further disputed to the extent the United States implies that the term "stakers" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are "receive[d]" in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

35. There are two primary ways to stake: as primary (or "solo") stakers or as delegators. Ex. 2, ¶¶ 29, 39.

**Response:** Undisputed that a staker may "either delegate to themselves if they are running one or more nodes, or to a third party if they lack the minimum number of tokens to serve as a validator using their own node (or simply do not wish to set one up)." McKeon-Rep. 45 (App'x B). Undisputed that, as Dr. McKeon explained, a "node" is a "software and hardware tool used by stakers to produce new blocks on a blockchain network. Nodes connect

28

Case 3:24-cv-01209    Document 55    Filed 05/22/26    Page 29 of 67 PageID #: 1474

to the peer-to-peer network, maintain a local copy of the blockchain, and participate in consensus." McKeon-Rep. 42 (App'x A).

Disputed to the extent that the United States denies that "all XTZ tokens that are used for staking are delegated" in the sense that what the United States calls "solo" stakers simply "delegate to themselves." *Id.*

Further disputed to the extent the United States implies that the terms "stakers" or "delegators" mean that stakers are engaged in a compensation-for-services relationship or that staking rewards are "receive[d]" in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

36.     In "solo staking," the staker operates their own node, which requires staking the minimum collateral required by the protocol and managing the necessary hardware, software, and security to comply with the protocol's standards. Ex. 2, ¶¶ 30.

**Response:** Undisputed that what the United States calls "solo staking" requires the staker to use "existing tokens, electricity, software, and hardware to create new tokens according to the protocol of a blockchain network." McKeon-Rep. ¶20. Undisputed that, as Dr. McKeon explained, a "node" is a "software and hardware tool used by stakers to produce

new blocks on a blockchain network. Nodes connect to the peer-to-peer network, maintain a local copy of the blockchain, and participate in consensus." McKeon-Rep. 42 (App'x A).

Disputed to the extent the United States implies that the term "staker" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

37.    In "delegated staking," individual token holders ("delegators") can participate in staking without running their own node. Ex. 2, ¶ 33, at 67 (pdf 70) (App'x C – Glossary); Ex. 4 at 2–3.

**Response:** Undisputed that a staker may delegate "to a third party if they lack the minimum number of tokens to serve as a validator using their own node (or simply do not wish to set one up)." McKeon-Rep. 45 (App'x B).

Disputed to the extent the United States implies that the term "delegators" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-

Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

38. In "delegated staking", delegators assign their own staking power (i.e., the right to use their units of native cryptocurrency) to an existing active validator. When a validator is selected to validate a block and receives rewards as a result, the delegators receive a proportional share of the staking rewards. Ex. 2, ¶ 33; Ex. 1, (App'x B) at 45–46; Ex. 6 at 3–4; Ex. 7 at 4–5 (Octez, *The consensus algorithm*, https://octez.tezos.com/docs/active/consensus.html [https://perma.cc/5QP8-QZUD]).

**Response:** Undisputed that a staker may delegate "to a third party if they lack the minimum number of tokens to serve as a validator using their own node (or simply do not wish to set one up)." McKeon-Rep. 45 (App'x B). Undisputed that, in what the United States calls "delegated staking," new tokens are "split … according to a predetermined rate" as "new tokens are created using the delegated assets." *Id.*

Disputed to the extent the United States implies that stakers, whether they have delegated tokens to themselves or a third party, are engaged in a compensation-for-services relationship or that staking rewards are "receive[d]" in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rep. 45-46 (App'x B). McKeon-Rebut. ¶¶19-

20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

### C. Economics and use of cryptocurrencies

39. Owners of cryptocurrencies can sell them to others in exchange for cash or another cryptocurrency through online trading venues. One such venue is Coinbase. Ex. 1, ¶ 72.

**Response:** Undisputed that owners of cryptocurrencies may be able to use online trading platforms like Coinbase to sell tokens in exchange for fiat currency or another digital asset if supported by the platform. *E.g.*, McKeon-Rep. ¶72.

Disputed that every such platform supports every cryptocurrency.

Further disputed to the extent that the United States implies that the mere fact that cryptocurrency tokens can be sold or exchanged online is legally significant to the question of whether a staker's newly created tokens are income under the tax code or the Sixteenth Amendment. *See generally* Jarretts-MSJ; *see also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

40. Crypto asset trading platforms operate twenty four hours per day, trading continuously. Ex. 3, ¶ 36; Ex. 1, ¶ 111.

**Response:** Undisputed that crypto assets trade 24/7 and that some crypto asset trading platforms may operate 24/7 and accept trades continuously. *E.g.*, McKeon-Rep. ¶111.

Disputed that every such platform necessarily operates in this manner all the time. For example, platforms may undergo regular maintenance or experience temporary disruptions in service.

Further disputed to the extent that the United States implies that the mere fact that cryptocurrency tokens can be sold or exchanged online is legally significant to the question of whether a staker's newly created tokens are income under the tax code or the Sixteenth Amendment. *See generally* Jarretts-MSJ; *see also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

41.　Owners of cryptocurrencies can also use them as payment for a good or a service, or as a gift. Ex. 1 ¶ 72.

**Response:** Undisputed that owners of cryptocurrency may "transfe[r] the asset as payment for a good, or gif[t] the asset to a third party." McKeon-Rep. ¶72.

Disputed to the extent that the United States implies that the mere fact that cryptocurrency tokens can be transferred as payment for a good or given as a gift is legally significant to the question of whether a staker's newly created tokens are income under the tax code or the Sixteenth Amendment. *See generally* Jarretts-MSJ; *see also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

## II.　Tezos

### A.　Background

42.　Tezos is an open source proof-of-stake protocol, meaning that users of the Tezos protocol have access to the source code. Ex. 2, ¶ 37; Ex. 1, ¶ 85.

**Response:** Undisputed that Tezos is an open-source Proof-of-Stake protocol, meaning that the Tezos protocol is a piece of open-source software and that no one can "unilaterally change the protocol." Jarretts-SOF ¶24; *see also* McKeon-Rep. ¶85; Kaal-Rep. ¶37; Kaal-Depo. 30:14-17.

43. The native cryptocurrency of Tezos is called tez or XTZ. Ex. 2, ¶ 37; Ex. 1, ¶ 50.

**Response:** Undisputed.

44. Tezos has had numerous amendments to its operation over the years. Ex. 2, ¶¶ 38 n. 46, 48–49; Ex. 8 (Tezos Docs, *History of amendments*, https://docs.tezos.com/architecture/governance/amendment-history [https://perma.cc/N45Y-WBPL]).

**Response:** Undisputed that the Tezos protocol has had numerous amendments over the years. *E.g.*, McKeon-Supp.

Plaintiffs further respond that one such amendment was the Ithaca 2 proposal, which was adopted on April 1, 2022 in Tezos block number 2,244,609. Jarretts-SOF ¶97; *see also* McKeon-Supp. ¶5.

45. The source code for the Tezos protocol is called Octez. Octez is used by developers. Ex. 5 at 46:16–18.

**Response:** Disputed. Dr. McKeon was simply explaining that Octez is, as Dr. Kaal stated in his report, a "widely used Tezos node and staking software" maintained by Nomadic Labs and used by a variety of developers. Kaal-Rep. ¶38. But the source code for the Tezos

protocol is not itself "called Octez." Put differently, Octez is a widely used implementation of the Tezos blockchain. *See* Kaal-Rep. ¶38.

46. One of the primary developers of Tezos is Nomadic Labs. Ex. 5 at 81:21–82:8.

**Response:** Undisputed that Nomadic labs is a software developer that does work on the Tezos source code. *E.g.*, McKeon-Depo. 81:21-82:8.

Disputed to the extent that the United States implies that Nomadic Labs has a proprietary interest in, owns, or has a corporate association with the Tezos protocol, which is a piece of open-source software. Jarretts-SOF ¶24; *see also* McKeon-Rep. ¶85; Kaal-Rep. ¶¶37-38; Kaal-Depo. 30:14-17; L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

47. Octez contains both the Tezos source code and explanatory documentation of the source code. Ex. 5 at 46:16–18, 78:2–6, 126:8–10; Ex. 2, ¶ 38.

**Response:** Undisputed that Octez is an implementation of the Tezos blockchain consisting of the Octez toolsuite and the Tezos protocol, and that Octez includes explanatory documentation. *See* Kaal-Rep. ¶38.

Disputed to the extent the United States asserts that Octez is official "documentation" of the Tezos protocol, as the Tezos blockchain "is ultimately composed of decentralized code maintained by its user base." Kaal-Rep. ¶38.

Further disputed to the extent that the United States implies that Nomadic Labs has a proprietary interest in, owns, or has a corporate association with the Tezos protocol, which is a piece of open-source software. Jarretts-SOF ¶24; *see also* McKeon-Rep. ¶85; Kaal-Rep. ¶¶37-

35

38; Kaal-Depo. 30:14-17; L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

48.     Training and explanatory materials for Tezos are published and available at htts://opentezos.com ("Open Tezos"). "Open Tezos" is an authoritative source with respect to describing Tezos. Ex. 5 at 60:19–61:1.

**Response:** Undisputed that Open Tezos exists and provides training and explanatory materials.

Disputed to the extent that the United States implies that Open Tezos is an official source with respect to describing Tezos, as the Tezos blockchain "is ultimately composed of decentralized code maintained by its user base." Kaal-Rep. ¶38.

Further disputed to the extent that the United States implies that Open Tezos has a proprietary interest in, owns, or has a corporate association with the Tezos protocol, which is a piece of open-source software. Jarretts-SOF ¶24; *see also* McKeon-Rep. ¶85; Kaal-Rep. ¶¶37-38; Kaal-Depo. 30:14-17; L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

49.     Tezos protocol documentation is also available at https://docs.tezos.com ("Tezos Docs") and https://opentezos.com ("Open Tezos").

**Response:** Undisputed that these websites exist and contain documents discussing Tezos.

Disputed to the extent that the United States characterizes information available at either website are official "documentation" of the Tezos protocol, as the Tezos blockchain "is ultimately composed of decentralized code maintained by its user base." Kaal-Rep. ¶38.

36

Further disputed to the extent that the United States implies that Open Tezos or the Tezos Foundation have a proprietary interest in, own, or have a corporate association with the Tezos protocol, which is a piece of open-source software. Jarretts-SOF ¶24; *see also* McKeon-Rep. ¶85; Kaal-Rep. ¶¶37-38; Kaal-Depo. 30:14-17; L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

50. The Tezos protocol is also self-amending, meaning that the participants on the network have the right to propose, vote on, and amend the protocol's rules. Ex. 2, ¶¶ 37 n.49, 48–49, 68; McKeon Dep at 59:8–12; Ex. 9 at 1; (OpenTezos, *On-chain governance*, https://opentezos.com/tezos-basics/governance-on-chain/ [https://perma.cc/F3FL-KRML]).

**Response:** Undisputed that participants on the Tezos blockchain can propose amendments to the protocol's rules and vote on amendments proposed by other participants.

Disputed to the extent the United States implies that the possibility of protocol amendments means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rep. 45-46 (App'x B). McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

51.     Protocol amendments can change various things, including (e.g.) the per-block reward for staking. Ex. 2, ¶¶ 42, 48–49. All changes done to the protocol are done by consensus. *Id.*

**Response:** Undisputed that proposed protocol amendments may touch on various topics, including the number of new Tezos tokens created when a staker confirms a block on the Tezos blockchain. *See* Kaal-Rep. ¶47 (inaccurately characterizing staking rewards but correctly noting that the number of new tokens created with each new block has changed over time).

Disputed to the extent the United States implies that the prospect of a proposed protocol amendment affecting the number of new tokens created when stakers confirm a block means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rep. 45-46 (App'x B). McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

### B.     <u>Staking on Tezos</u>

52.     Stakers on the Tezos network are referred to as "bakers." Ex. 2, ¶ 39, at 66 (pdf 69) (App'x C – Glossary); Ex. 4 at 1 ; Ex. 6 at 3.

38

**Response:** Undisputed.

53. Individuals can participate in staking as bakers (validating or endorsing new blocks), or as delegators. Ex. 1, at 45 (Appendix B), ¶ 65; Ex. 2, ¶ 39.

**Response:** Undisputed that a Tezos staker may "either delegate to themselves if they are running one or more nodes, or to a third party if they lack the minimum number of tokens to serve as a validator using their own node (or simply do not wish to set one up)." McKeon-Rep. 45 (App'x B). Undisputed that, as Dr. McKeon explained, a "node" is a "software and hardware tool used by stakers to produce new blocks on a blockchain network. Nodes connect to the peer-to-peer network, maintain a local copy of the blockchain, and participate in consensus." McKeon-Rep. 42 (App'x A).

Disputed to the extent that the United States implies that delegators do not participate in validating or endorsing. *See* McKeon-Rep. 45 (Appendix B).

Further disputed to the extent the United States implies that the use of the terms "bakers" and "delegators" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

54. When bakers stake their XTZ, the software locks up the staked XTZ. Ex. 2, ¶ 23 & n.28; Ex. 5 at 62:2–15.

**Response:** Undisputed that stakers lock up XTZ during staking.

Disputed to the extent that the United States asserts that "the software," by which Plaintiffs take the United States to mean the Tezos protocol, "locks up the staked XTZ" of its own accord. *Contra* IRS-SOF ¶54. The Tezos protocol, which is open-source computer software or "math instantiated in code," Kaal-Depo. 30:23-31:17, does not do anything of its own accord. Rather, stakers cause staked XTZ to become locked up as part of the process of confirming blocks and creating new tokens. *E.g.*, McKeon-Rep. ¶20.

Further disputed to the extent the United States implies that the use of the term "bakers" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

55. Bakers are selected semi-randomly for opportunities to validate a block, with their chances of being selected weighted to the amount of their staked XTZ. Ex. 3, ¶ 22; Ex. 10 (Octez, *Baking Power*, https://octez.tezos.com/docs/alpha/baking_power.html

[https://perma.cc/5TER-3C9P]) ("for this selection process, each baker is weighted according to its baking power. . .[which] is determined from the staked and non-steaked funds owned by the baker itself and all its delegators."); Ex. 1, ¶ 63.

**Response:** Undisputed that stakers typically have the opportunity to "propose and endorse blocks based on the proportion of their stake." McKeon-Rep. ¶63. "The more tokens a staker controls, the higher their chance of being selected to produce or endorse blocks." *Id.* However, "random selection ensures that no individual participant unilaterally controls the process," *id.*, and no individual validator has discretion to approve or deny staking rewards outside the protocol rules, Jarretts-SOF ¶18; Kaal-Depo. 28:2-5. Put differently, no one selects which staker will have the opportunity to confirm a particular block. *See* Jarretts-SOF ¶18; Kaal-Depo. 28:2-5.

Further disputed to the extent the United States implies that the use of the term "[b]akers" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

41

56. Blocks are validated and XTZ are minted at regular intervals, per the protocol; in 2020, that interval was every thirty to sixty seconds. Ex. 5 at 109:9–12; Ex. 3, ¶ 21; *cf.* Ex. 2, ¶¶ 24, 64 n.103.

**Response:** Undisputed that, during 2020, stakers had the opportunity to confirm a new block on the Tezos blockchain every thirty to sixty seconds.

57. The security and economic viability of the Tezos blockchain, and its basic function as a ledger, depend on staking. Ex. 1, ¶ 75; Ex. 2, ¶ 44.

**Response:** Undisputed that staking contributes to the Tezos blockchain's security and functionality. *E.g.*, McKeon-Rep. ¶75.

Disputed to the extent the United States implies that the externalities of staking mean that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

58. Staking requires investment and effort from validators: they must operate a node (computer running the required software) that is connected to the other nodes on the network, hold a certain amount of XTZ, and meet accuracy and performance standards, to

receive rewards. Ex. 2, ¶¶, 45 n. 68 (requirements include "server available round the clock and stable internet connection" and "at least one roll (8000tz)"), 54.

**Response:** Undisputed that stakers like Jarrett must use electricity, software, hardware, and pre-existing Tezos tokens to produce and endorse new blocks on the Tezos blockchain and that stakers must comply with the rules of the Tezos protocol. *E.g.*, Jarretts-SOF ¶44; *see also* Jarrett-Decl. ¶5; McKeon-Rep. ¶18, ¶20, ¶74, ¶81; Kaal-Rep. ¶18.

Disputed to the extent that the United States implies that stakers are engaged in a compensation-for-services relationship or that staking rewards are "receive[d]" in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

59.     Staking "upholds the network's functionality, security, accuracy, and governance. Ex. 2, ¶ 8; *see also id.* ¶ 36; Ex. 1, ¶ 75 ("stakers contribute to network security and consensus, which is essential for maintaining the blockchain's functionality.")

**Response:** Undisputed that staking contributes to the Tezos blockchain's security and functionality. *E.g.*, McKeon-Rep. ¶75.

Disputed to the extent the United States implies that the externalities of staking mean that stakers are engaged in a compensation-for-services relationship or that staking rewards

are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

### C. The mechanism of tez rewards

60.     Tez rewards are "minted" only once the validator has met the requirements of the protocol necessary to propose or attest a block. Ex. 2, ¶¶ 52, 54–55; Ex. 3, ¶¶ 7, 16–20, 24.

**Response:** Undisputed that stakers must comply with the rules of the Tezos protocol in order to stake, propose or attest a block, or create or mint new tokens. *E.g.*, Jarretts-SOF ¶¶4-5, ¶17; *see also* McKeon-Rep. ¶36, ¶51, ¶54; McKeon Rep. 41 (App'x A); Kaal-Rep. 67 (App'x C); Kaal-Depo. 27:9-17.

Disputed to the extent that the United States implies that the term "validator" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo.

44

27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

61.     Tezos documentation does not anywhere state that bakers "create" new units of XTZ as staking rewards; rather, the documentation states that bakers "receive" staking rewards upon completion of the staking requirements of the protocol. Ex. 6 at 4; Ex. 7 at 13 at 4–5; *see also* Ex. 3, ¶ 8.

**Response:** Disputed that the cited documents are official "documentation" of the Tezos protocol, as the Tezos blockchain "is ultimately composed of decentralized code maintained by its user base." Kaal-Rep. ¶38.

Further disputed to the extent that the United States implies that the drafters of these documents have a proprietary interest in, own, or have a corporate association with the Tezos protocol, which is a piece of open-source software. Jarretts-SOF ¶24; *see also* McKeon-Rep. ¶85; Kaal-Rep. ¶¶37-38; Kaal-Depo. 30:14-17; L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that Dr. Kaal stated that the staking process generates new Tezos tokens. Kaal-Depo. 38:12-39:23; *see also* Jarretts-SOF ¶¶37-40; Rev. Proc. 2025-31, 2025-48 I.R.B. 743 (Nov. 24, 2025).

62.     The Tezos source code also states that its economic protocol "issues new tez" to bakers. Ex. 11 at 1 (Octez, *Adaptive Issuance*,

https://octez.tezos.com/docs/active/adaptive_issuance.html, https://perma.cc/L3MS-R9BY]); Ex. 5 at 124:21–126:1.

**Response:** Undisputed that the cited website includes the quoted language.

Disputed that the cited website is official "documentation" of the Tezos protocol, as the Tezos blockchain "is ultimately composed of decentralized code maintained by its user base." Kaal-Rep. ¶38.

Further disputed to the extent that the United States implies that Octez or Nomadic Labs has a proprietary interest in, owns, or has a corporate association with the Tezos protocol, which is a piece of open-source software. Jarretts-SOF ¶24; *see also* McKeon-Rep. ¶85; Kaal-Rep. ¶¶37-38; Kaal-Depo. 30:14-17; L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Further disputed to the extent that the United States implies that the use of the term "issues" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1).

63.     Newly minted XTZ staking rewards are frozen for around 14 days. Ex. 12 at 2 (Open      Tezos,      *Rewards*,      https://opentezos.com/node-baking/baking/reward/

[https://perma.cc/39ZG-PLSL]); Ex. 1, ¶ 69 ("Rewards for staking on Tezos are subject to a delay of about 14 days, meaning the rewards are initially frozen and do not become spendable until the delay has elapsed."). This lockout period allows time for the detection of bad behavior or non-compliance with the protocol's rules. Ex. 2, ¶ 23. If that is the case, then the frozen rewards are slashed and do not enter circulation. Ex. 5 at 71:10–15.

**Response:** Undisputed that the cited source is accurately quoted. Undisputed that Tezos staking rewards "are subject to a delay of about 14 days, meaning the rewards are initially frozen and do not become spendable until the delay has elapsed." McKeon-Rep. ¶69. Undisputed that the "staker's newly created tokens must clear the security window before they can be spent." *Id.*

Disputed to the extent that the United States implies that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

D. **Economics of XTZ**

64. XTZ are actively traded on major global crypto asset exchanges, including Coinbase, at publicly quoted prices and with significant trading volumes. Ex. 2, ¶¶ 9, 56; Ex. 5 at 52:6–14; *see also* Ex. 13 (Expert Rebuttal Report of Stephen McKeon) ¶¶ 3, 50.

**Response:** Undisputed that owners of cryptocurrencies may be able to use online exchanges like Coinbase to trade tokens in volume at publicly quoted prices. *E.g.*, McKeon-Rep. ¶72.

Disputed that every cryptocurrency "actively" trades on every such platform in "significant … volume." *Contra* IRS-SOF ¶64.

Further disputed to the extent that the United States implies that the mere fact that cryptocurrency tokens can be traded online is legally significant to the question of whether a staker's newly created tokens are income under the tax code or the Sixteenth Amendment. See generally Jarretts-MSJ; *see also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

65. On these exchanges, XTZ can readily be exchanged for fiat currency (cash) or other digital assets. Ex. 2, ¶ 56; *see also* Ex. 5 at 52:6–14 ("There are trading venues that will trade Tez against an equivalent US dollar asset as well as other assets.").

**Response:** Undisputed that owners of XTZ may be able to use online exchanges to trade tokens in volume at publicly quoted prices. *E.g.*, McKeon-Rep. ¶72.

Disputed to the extent that the United States implies that the mere fact that Tezos tokens can be traded online is legally significant to the question of whether a staker's newly created tokens are income under the tax code or the Sixteenth Amendment. See generally

Jarretts-MSJ; *see also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

66. XTZ tokens are tangible, liquid assets with immediate tradability and hold demonstrable market value, readily realizable upon earning. Ex. 2, ¶¶ 8–9, 56–59.

**Response:** Undisputed that Tezos tokens are tangible assets that can hold market value once unfrozen.

Disputed that Tezos tokens are immediately tradeable upon creation. *E.g.*, McKeon-Rep. ¶69 (explaining that newly created tokens are "initially frozen" for about fourteen days).

Further disputed to the extent that the United States is making a legal argument about whether staking rewards are income under the tax code or the Sixteenth Amendment. *See generally* Jarretts-MSJ; *see also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Further disputed to the extent that the United States implies that stakers are engaged in a compensation-for-services relationship or that staking rewards are "earn[ed]," rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1).

67. In practice, many cryptocurrencies like XTZ are not only used as stores of value but as mediums of exchange. Ex. 2, ¶ 57; *see also* Ex. 13, ¶¶ 3, 50.

**Response:** Undisputed that cryptocurrencies, including XTZ, are sometimes used as mediums of exchange.

Disputed to the extent that the United States implies that the mere fact that XTZ is sometimes used as a medium of exchange is legally significant to the question of whether a staker's newly created tokens are income under the tax code or the Sixteenth Amendment. *See generally* Jarretts-MSJ; *see also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

68.     XTZ tokens have served as a formal payment mechanism within the Tezos community itself, and global cryptocurrency exchanges provide owners of XTZ access to liquidity by lending them funds against the value of the tokens being held by the exchange. Ex. 2, ¶¶ 59, 61.

**Response:** Disputed to the extent the government implies American taxpayers had access to such a lending program. The source cited by the government's expert, https://www.binance.com/en/support/announcement/detail/b9e9fc075aec4465b3a2e35b3 f81a85c, concerns Binance.com, not Binance.US, which is the version of Binance exchange available to U.S. customers. Kaal-Rep. ¶61 n.101. The source states only that Binance.com added XTZ as collateral for Binance Loans in October 2020. The record contains no evidence that Binance.US offered crypto-backed loans secured by XTZ in 2020, or that Binance.com's lending products were legally available to U.S. taxpayers. *Id.* The cited source therefore does not support the proposition that U.S. taxpayers could borrow against XTZ held on an exchange.

69. The ability to exchange XTZ for other assets, to use it directly for goods and services, or to use it as collateral for borrowing, confirms that stakers received tokens with actual, spendable value. Ex. 2, ¶ 62; *see generally id.* ¶¶ 56–69; *see also* Ex. 13, ¶¶ 3, 50 ("There is no dispute that XTZ tokens have value, are tradable, and can be used as collateral").

**Response:** Undisputed that XTZ are assets, are valuable, and can, in some circumstances, be exchanged for other assets or services and used as collateral.

Disputed to the extent that the United States improperly characterizes the above fact as "confirm[ing]" other additional factual or legal propositions. *See* L.R. 56.01(c) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Further disputed to the extent that the United States implies that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1).

70. Staking rewards constitute genuine economic value for stakers. Ex. 2, ¶ 63; Ex. 1, ¶¶ 22 ("it is my opinion that Jarrett's economic gain from staking . . . "), 86 ("For staking rewards, the staker's economic gain from staking is . . . ").

51

**Response:** Undisputed that staking rewards have economic value and can sometimes result in true economic gain despite dilution, as Dr. McKeon explained. *E.g.*, McKeon-Rep. ¶22, ¶¶86-104.

Disputed to the extent the United States implies that the term "economic gain" or "economic value" means that staking rewards are income under the tax code or the Sixteenth Amendment. *See generally* Jarretts-MSJ; *see also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Further disputed to the extent that the United States implies that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1).

71.     Among other things, staking yields gains relative to non-stakers since passive holders who do not stake see their proportional share decline as stakers accumulate additional tokens. Ex. 2, ¶ 73.

**Response:** Undisputed that, when the staking rate is less than 100 percent, stakers can experience economic gain from staking. *See* McKeon-Rep. ¶¶86-104. Undisputed that, when the staking rate is less than 100 percent, non-stakers see their proportional token-share decline. *Id.*

Disputed to the extent that the United States is making a legal argument that non-stakers' declining share of the total token supply reflects a staker's true economic gain or that staking rewards are income under the tax code or the Sixteenth Amendment. *See generally* Jarretts-MSJ; *see also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

### III. Joshua Jarrett's staking in 2020

### A. Staking rewards rates

72. From October 2019 through February 2021, staking rewards amounts were allocated as follows:

**FIGURE 1: BLOCK AND ATTESTATION REWARDS ON TEZOS IN 2020**

| Protocol [A] | Period [B] | Maximum Reward for Proposing a Block [C] | Maximum Attestation Reward per Validator [D] | Maximum Number of Attestations [E] | Maximum New Tokens Minted per Block [F] |
|---|---|---|---|---|---|
| Babylon | October 2019 - March 2020 | 16 XTZ | 2.00 XTZ | 32 | 80 XTZ |
| Carthage 2.0 | March 2020 – November 2020 | 40 XTZ | 1.25 XTZ | 32 | 80 XTZ |
| Delphi | November 2020 – February 2021 | 40 XTZ | 1.25 XTZ | 32 | 80 XTZ |

Ex. 2, ¶ 48; Ex. 8, https://docs.tezos.com/architecture/governance/amendment-history; https://blog.unit410.com/tezos/2020/02/11/voting-yay-on-carthage.html [https://perma.cc/5TER-3C9P].

**Response:** Undisputed.

73. In 2020, Joshua Jarrett staked on the Tezos network, which he documented, and which generated 13,713.63 XTZ in staking rewards to him. Ex. 14 (Cointracking Report).

**Response:** Undisputed as to the amount of XTZ, other than noting that Jarrett rounded this number up to "13,714." *See* Jarretts-SOF ¶53; *see also* Answer ¶4, ¶48, ¶51, ¶143; Jarrett-Decl. ¶8.

Further disputed to the extent that the United States implies that the phrase "to him" means that Jarrett was engaged in a compensation-for-services relationship or that his staking rewards were received in cryptocurrency transactions on a blockchain, rather than being created by himself. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

74. Mr. Jarrett also earned a small amount of rewards from delegated staking activities through Coinbase. Ex. 15 (Coinbase Report).

**Response:** Undisputed that Mr. Jarrett, through delegated staking activities through Coinbase, acquired a small amount of staking rewards. *See* United States Exh. 15.

Disputed to the extent that the United States implies that Jarrett was engaged in a compensation-for-services relationship or that his staking rewards were "earned," rather than being created by himself. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16;

Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

### B.       The Jarretts' 2020 income tax return

75.       The Jarretts filed their Form 1040 Joint Income Tax return for the 2020 tax year on April 29, 2021. Ex. 16; Ex. 17 at USAJAR000035.

**Response:** Undisputed.

76.       On the Jarretts' original Form 1040 return, they reported $384,253 in taxable income, but reported no income from staking. With payments and credits, their original Form 1040 income tax return reported a tax owing of $807. Ex. 16 at 1 (row 15), 2 (row 37).

**Response:** Undisputed.

77.       On August 24, 2023, the Jarretts filed a Form 1040X Amended United States Income Tax Return for the 2020 tax year ("First Amended Return"). Ex. 18 (1040X amended return).

**Response:** Undisputed.

78.       The First Amended return reported an additional $32,836 in income from Joshua Jarrett's staking activities on the Tezos platform, resulting in an increase in tax of $13,050. Ex. 18 at USAJAR000081 (row 1), USAJAR000084 (row 37).

**Response:** Disputed as to a small discrepancy in the increase of tax. Undisputed that the First Amended return reported an additional $32,836 (row 1) in income from Joshua Jarrett's staking activities on the Tezos platform, resulting in an increase in "tax" (row 6) of

$10,579, the loss of a "credit" (row 7) of $1,600, and resulting in "total tax" (row 8) due of $12,179 and an "Amount you owe" (row 20) of $12,179. All figures from the United States' Exhibit 18 at USAJAR000081 (rows 1, 6, 7, 8, and 20); *see also* U.S. Exh. 17 (IRS account transcript for 2020) showing "Additional tax assessed" of $12,179 on 2-19-2024. *See also* Jarretts-SOF ¶¶68-78.

79. Attached to the First Amended Return was a "Staking Schedule," showing the dates and amounts of XTZ Joshua Jarrett received as staking awards, along with a column reporting the "value in USD" of the amount of XTZ as of the date of receipt. Ex. 18 at USAJAR000108–112.

**Response:** Undisputed that the cited document is accurately described except to the extent that the United States implies that Jarrett's staking schedule shows that he "received" staking rewards from anyone.

Further disputed to the extent that the United States implies that Jarrett was engaged in a compensation-for-services relationship or that his staking rewards were "received" in cryptocurrency transactions on a blockchain, rather than being created by himself. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

80.    The "Staking Schedule" reported that Joshua Jarrett received 13,713.63 XTZ in staking rewards in 2020. Ex. 18 at USAJAR000112.

**Response:** Undisputed that the cited document is accurately described except to the extent that the United States implies that Jarrett's staking schedule shows that he "received" staking rewards from anyone.

Further disputed to the extent that the United States implies that Jarrett was engaged in a compensation-for-services relationship or that his staking rewards were "received" in cryptocurrency transactions on a blockchain, rather than being created by himself. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

81.    With the First Amended Return, the Jarretts made a payment of $13,600. Ex. 17 at USAJAR000035.

**Response:** Undisputed with the clarification that the Jarretts mailed a check for $13,600 with the First Amended Return, of which $12,179 paid "additional tax assessed" of $12,179 and $1,331.01 paid "Interest charged for late payment" in the amount of $1,331.01. The IRS refunded the Jarretts $93.03 and the transcript reflects an adjustment of $3.04; the payments, refund, and adjustments sum to $13,600. *See* United States Exh. 17 (the Jarretts' account transcript).

82. On October 16, 2023, the Jarretts filed a Second Amended Return that excluded from the Jarretts' income the $32,836 previously reported from Joshua Jarrett's staking, and sought a refund of the $12,179 in income tax paid with the First Amended Return, plus interest. Ex. 19 (1040X second amended return). Attached to the return was an explanation of Mr. Jarrett's position that staking rewards are not taxable as income. *Id.* at USAJAR000141.

**Response:** Undisputed.

83. The IRS did not grant or deny the requested refund and the Jarretts filed this action on October 10, 2024.

**Response:** Undisputed.

**IV.    Economic Gain from Staking on Tezos**

84. The Jarretts retained Stephen McKeon as an expert to opine as to whether "[Joshua] Jarrett's gain from staking in 2020 was $32,836, which is the amount the IRS seeks to include in his 2020 income; and if not, how his gain should correctly be calculated." Ex. 1, ¶¶ 2, 19; Ex. 5 at 48:15–49:1.

**Response:** Undisputed.

85. Mr. McKeon testified that "economic gain" is "the value that they hold sort of before and after the XTZ staking rewards are issued." Ex. 5 at 102:8–15.

**Response:** Undisputed that Dr. McKeon's testimony is accurately quoted.

Disputed to the extent that the United States mischaracterizes Dr. McKeon's testimony as part of a legal argument on whether staking rewards are income under the tax code or Sixteenth Amendment. *See* L.R. 56.01(c) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact). Dr. McKeon testified that "the

economic gain is not the same as what you could sell the new units for. The economic gain is a representation of the total economic gain to the staker." McKeon-Depo. 117:6-9. And Dr. McKeon explained in his report that "a staker's economic gain from staking is the value of the staker's new units minus the reduction in value of the staker's existing units from dilution." McKeon-Rep. ¶95.

86.     Staking rewards confer economic value on stakers once they are unfrozen and thus spendable. Ex. 1, ¶ 69; Ex. 2, ¶¶ 23 n. 28, 56–59, 62.

**Response:** Undisputed that, when the staking rate is less than 100 percent, stakers can experience economic gain from staking. McKeon-Rep. ¶¶86-104. Undisputed that, when the staking rate is less than 100 percent, non-stakers see their proportional share decline. *Id.*

Disputed to the extent that the United States implies that Jarrett was engaged in a compensation-for-services relationship or that his staking rewards were "confer[red]" in cryptocurrency transactions on a blockchain, rather than being created by himself. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Plaintiffs further respond that staking rewards replace the reduction in value of the staker's existing units caused by dilution and, because not all token holders participate in staking, new tokens can increase their fractional share of the token supply. McKeon Rep. ¶95.

59

87.     It is standard industry practice to measure fair market value of the newly created property on the date the tokens become spendable. Ex. 1, ¶ 70.

**Response:** Undisputed, to the extent the government is stating that, to measure the fair market value of newly created tokens, it is standard industry practice to establish that value on the date the tokens become spendable.

Disputed to the extent the United States is making a legal argument about whether the fair market value of newly created tokens is equal to the staker's true economic gain or whether staking rewards are income under the tax code or the Sixteenth Amendment. *See* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

88.     The minting of new XTZ does not dilute the economic value of XTZ. Ex. 2, ¶¶ 63, 70.

**Response:** Disputed. Dr. McKeon devotes his expert reports to establishing "how [Jarrett's] economic gain from staking should be calculated in light of any dilution caused by the creation of new tokens." *E.g.*, McKeon-Rep. ¶2.

89.     New XTZ tokens are issued according to deterministic protocol rules which are public, stable, and known to all market participants. Ex. 2, ¶¶ 64–66; *see also* Ex. 5 at 121 ("it is publicly available what the supply schedule will be"); Ex. 20 (Octez, *Validation and Application*, https://octez.tezos.com/docs/alpha/validation.html [https://perma.cc/C4NS-CA2P]) ("The economic protocol is responsible for providing the rules that govern the Tezos network, and for enforcing that these rules implement a correct blockchain protocol").

60

**Response:** Undisputed to the extent that the United States asserts that new XTZ come into existence pursuant to protocol rules which are public, stable, and known to all market participants.

Disputed to the extent that the United States implies that the use of the term "issued" means that stakers are engaged in a compensation-for-services relationship or that staking rewards are received in cryptocurrency transactions on a blockchain, rather than being created by stakers. *See* Jarretts-SOF ¶¶9-19, ¶¶21-32, ¶¶97-106; McKeon-Rep. ¶¶21-23, ¶65, ¶74, ¶85; McKeon-Rebut. ¶¶19-20 & n.1; McKeon-Supp. ¶5, ¶11; McKeon-Depo. 78:17-18, 144:14-22, 145:7-9; Kaal-Rep. ¶12 & n.5, ¶28 & n.34, ¶37, ¶63, ¶75; Kaal-Rebut. ¶12 n.16; Kaal-Depo. 27:9-17, 28:2-5, 30:4-10, 30:14-17, 30:24-31:15-16, 38:12-39:23, 42:18-21, 43:21-45:1, 50:5-16, 51:23-52:1, 52:7-13, 58:16-22, 64:10-12, 68:23-69:2; 95:1-97:10. *See also* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

90.     As a result, issuance of new XTZ tokens is fully anticipated and "priced in," which even Mr. McKeon concedes. *Id.*; Ex. 5 at 103:8–10 ("information is priced in as soon as that information becomes publicly available to market participants"), 109:5–7 ("fair to say that the price is an aggregate of . . . [demand-side and supply-side] variables"); 110:17–19 ("fair market value is determined by numerous factors, information entering the market").

**Response:** Disputed as an impermissible characterization and a mischaracterization of McKeon's testimony. *See* L.R. 56(c)(1) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact). The supply effect of "issuance of new XTZ tokens" is not "priced in" before the fact; the supply effect of new tokens occurs

when new tokens are actually added to the supply. McKeon-Rebut. ¶41. Dr. McKeon is clear that the supply effect of an increase in supply—such as the NVIDIA stock split in 2024 that reduced per-share price by 90%—occurs when 1 share actually becomes 10 shares, not when the stock split or other increase in units is announced. McKeon-Depo. 102:17-105:16. Dr. McKeon provides extensive evidence that, to the contrary, "following an increase in units, each unit is worth proportionally less ex post *ceteris parabus*. Dr. Kaal has presented no evidence to suggest that blockchain networks are unique in this respect." McKeon-Rebut. ¶41. Dr. McKeon clearly distinguishes "information effects" from "supply effect" in his written and deposition testimony. McKeon-Depo. 99:16-111:6.

91. Rather than seeing a regular, predictable downward pressure on the token's price coinciding with each issuance cycle (which would be consistent with the plaintiffs' dilution claim based on a fixed market capitalization), market data show no such pattern. Ex. 2, ¶¶ 66–67, 70–75.

**Response:** Undisputed that the Tezos token supply increased by approximately five percent in 2020. Undisputed that in 2020 the Tezos market capitalization ranged between $1 billion and $3.5 billion. Otherwise disputed as improper characterization of the underlying data. *See* L.R. 56.01(c) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact); Kaal-Rep. ¶5 (Figure 2).



**FIGURE 2: XTZ MARKET CAPITALIZATION AND CIRCULATING SUPPLY**

92.     The data shows the opposite: market capitalization has often increased even as new XTZ entered circulation through rewards. Ex. 2, ¶¶ 63, 74–77.

**Response:** Disputed. First, the United States improperly characterizes the underlying data. *See* L.R. 56.01(c) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact). Second, the statement is disputed because the data shows the statement is obviously wrong. The data shows the opposite of what the government claims the data shows. Market capitalization has often decreased even as new XTZ entered circulation through rewards. The data shows this in Dr. Kaal's own chart. *See* Kaal-Rep. ¶75 (Figure 2). Dr. McKeon's chart shows the same thing. *See* McKeon-Rep. ¶32 (Exh. 2)

63



**Exhibit 2:** *Time series of XTZ Price and Total Supply*

93. While the rate of token issuance was relatively constant in 2020, market capitalization of XTZ did not remain constant. Ex. 2, ¶¶ 63, 74–77. Instead, there were periods during which XTZ's market capitalization rose significantly, despite continued increases in supply. *Id.*

**Response:** Undisputed as to the fact that the price of Tezos has changed over time. Otherwise disputed as an impermissible characterization of Kaal's data. *See* L.R. 56.01(c) (prohibiting "legal conclusions, arguments, or characterizations" in Statements of Undisputed Material Fact).

Dated: May 22, 2026

/s/ *Cameron T. Norris*
CONSOVOY MCCARTHY PLLC
Cameron T. Norris
Zachary P. Grouev*
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: 703.243.9423
cam@consovoymccarthy.com
zach@consovoymccarthy.com

J. Abraham Sutherland*
106 Connally Street
Black Mountain, NC 28711
Telephone: 805.689.4577

*\* pro hac vice*

**Certificate of Service**

On May 22, 2026, I e-filed this response and all accompanying attachments with the Court

via ECF, which emailed everyone requiring service.

*/s/ Cameron T. Norris*