# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION

JOSHUA JARRETT and
JESSICA JARRETT,

    *Plaintiffs,*

  v.

UNITED STATES OF AMERICA,

    *Defendant.*

Case No. 3:24-cv-01209

The Hon. William L. Campbell, Jr.,
U.S.D.J.

The Hon. Luke A. Evans,
U.S.M.J.

## BRIEF FOR *AMICUS CURIAE* TAX LAW CENTER AT NYU LAW IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Contents................................................................................................i

Table of Authorities.........................................................................................ii

Interest of *Amicus Curiae* and Summary of Argument .............................. 1

    I.     Staking rewards are realized income when the validator obtains
         dominion and control.................................................................. 4

          A.    Income includes compensation for services, rents, and
              royalties regardless of the form of compensation.......................... 4

          B.    Staking rewards are income earned by validators upon
              receipt..................................................................................... 5

          C.    Staking rewards are not excludable as self-created property........ 6

    II.    Staking rewards constitute an undeniable accession to wealth............. 18

          A.    Plaintiffs have failed to show that staking rewards dilute
              the value of their pre-existing tokens ......................................... 18

          B.    Dilution does not affect whether there is an accession to
              wealth for the purposes of section 61.......................................... 19

          C.    Even if the net result of staking over a year did not change
               any owner's proportionate share of XTZ, staking rewards
              would be taxable upon receipt..................................................... 24

Conclusion.........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Burnet v. Logan*, 283 U.S. 404 (1931) ................................................................. 20

*Burroughs Adding Mach. Co. v. Terwilliger*, 135 F.2d 608 (6th Cir. 1943) ............. 21

*Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955), *reh'g denied*, 349 U.S. 925 (1955) ............................................................... 1, 2, 3, 6, 17, 18, 25

*Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134 (1974) 1, 21

*Cottage Sav. Ass'n v. Commissioner*, 499 U.S. 554 (1991) ............................... 3, 12, 14

*Davis v. United States*, 87 F.2d 323 (2d Cir. 1937), *cert. denied*, 301 U.S. 704 (1937), *reh'g denied*, 302 U.S. 773 (1937) ...................................................... 21, 24

*Eisner v. Macomber*, 252 U.S. 189 (1920) ........................................................... 2, 17

*HCSC-Laundry v. United* States, 450 U.S. 1 (1981) ................................................ 19

*Hellermann v. Commissioner*, 77 T.C. 1361 (1981) ........................................... 20, 22

*Helvering v. Indep. Life Ins. Co.*, 292 U.S. 371 (1934) ........................................... 10

*Helvering v. Northwest Steel Rolling Mills*, 311 U.S. 46 (1940) ............................... 19

*Hord v. Commissioner*, 143 F.2d 73 (6th Cir. 1944) ................................................. 19

*INDOPCO, Inc. v. Commissioner*, 503 U.S. 79 (1992) .............................................. 21

*Interstate Transit Lines v. Commissioner*, 319 U.S. 590 (1943) .............................. 21

*Lary v. United States*, 787 F.2d 1538 (11th Cir. 1986) .............................................. 4

*McGowan v. United States*, 143 F.4th 686 (6th Cir. 2025) ....................................... 21

*Moore v. United* States, 602 U.S. 572 (2024) ...................................................... 16, 17

*New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934) .......................................... 1, 21

*Nordtvedt v. Commissioner*, 116 T.C. 165 (2001), *aff'd*, 22 Fed. App'x 790 (9th Cir. 2001) ......................................................................................................... 20

*Pedone v. United States Court of Claims*, 151 F. Supp. 288 (Ct. Cl. 1957), *cert. denied*, 355 U.S. 829 (1957) ...................................................................... 20

*Pledger v. Comm'r of Internal Revenue*, 71 T.C. 618 (1979), *aff'd*, 641 F.2d 287 (5th Cir. 1981), *cert. denied*, 454 U.S. 954 (1981) ............................................. 3

*Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429 (1895), *vac'd on reargument*, 158 U.S. 601 (1895) ............................................................................................. 16

*Sisson v. United States*, No. 70-CV-298, 1973 WL 515 (N.D.N.Y. Mar. 7, 1973), *aff'd*, 487 F.2d 1393 (2d Cir. 1973) (Table) .................................................... 5

Case 3:24-cv-01209    Document 57-1    Filed 06/04/26    Page 3 of 33 PageID #: 1523

**Cases (cont.)**

*Stelly v. Commissioner*, 761 F.2d 1113 (5th Cir. 1985), *cert. denied*, 474 U.S. 851 (1985) ...................................................................................................... 20

*United States v. Phellis*, 257 U.S. 156 (1921) ........................................................ 17, 18

*United States v. Wells Fargo Bank*, 485 U.S. 351 (1988) ............................................ 6

*Wolter Const. Co., Inc. v. Commissioner*, 634 F.2d 1029 (6th Cir. 1980) .................... 19


**Internal Revenue Code (26 U.S.C.)**

Section 1(f) ........................................................................................................ 20, 23

Section 61 ............................................................................................... 1, 3, 7, 10

Section 61(a) ........................................................ 1, 2, 4, 6, 10, 16, 17, 20, 22

Section 83 ...................................................................................................... 4, 6

Section 83(a)(1) ................................................................................................... 3

Section 83(b) ...................................................................................................... 23

Section 1001 ............................................................................................. 4, 6, 12

Section 1001(a) ................................................................................................... 23


**Statutes**

One Big Beautiful Bill Act, Pub. L. 119-21, § 70114, 139 Stat. 72, 166 (2025) (codified at section 165(d)) ....................................................................... 20


**Treasury Regulations (26 C.F.R.)**

Treas. Reg. §1.61-1(a) ....................................................................................... 4, 12

Treas. Reg. §1.61-2(d)(1) ............................................................................ 4, 6, 12, 22

Treas. Reg. §1.61-3 ........................................................................................... 13, 20

Treas. Reg. §1.61-4 ............................................................................................... 13

Treas. Reg. §1.61-14(a) ......................................................................................... 17


**Other Authorities**

B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts ¶ 5.3.2 (March 2026) ................................................................................................ 14

Clint Wallace & Bret Wells, *The Past and Future of Taxing "Incomes,"* 104 N.C. L. Rev. 1 (2025) .................................................................................................. 17

**Other Authorities (cont.)**

Donald B. Marsh, *The Taxation of Imputed Income*, 58 Pol. Sci. Q. 514 (1943) . 11, 13

Henry M. Ordower, *Block Rewards, Carried Interests, and Other Valuation Quandaries*, 175 Tax Notes Federal 1551 (June 21, 2022) .............. 5, 10, 13, 18, 23

Jasper L. Cummings, *Taxing Digital Assets*, 190 Tax Notes 1081 (Feb. 12, 2026) .. 15

Legal Authority of the Department of the Treasury to Issue Regulations Indexing Capital Gains for Inflation, 16 Op. O.L.C. 136 (1992) ............................................. 23

Mattia Landoni & Abraham Sutherland, *Dilution and True Economic Gain from Cryptocurrency Block Rewards*, Tax Notes (Aug. 17, 2020) ................................... 22

Mertens Law of Federal Income Taxation § 5:10 (May 2026 Update) ...................... 21

New York State Bar Association, Report No. 1461 – Report on Cryptocurrency and Other Fungible Digital Assets, at 47 (2022) ...................................... 8, 9, 10, 15, 16

Notice 2014-21, 2014-16 I.R.B. 938............................................................................ 6

Omri Marian, *Law, Policy, and the Taxation of Block Rewards*, 175 Tax Notes Federal 1493 (June 6, 2022) ........................................................... 5, 9, 11, 15, 17

Reuven S. Avi-Yonah & Mohanad Salaimi, *A New Framework for Taxing Cryptocurrencies*, 77 Tax Law. 1 (2023) ........................................................... 13, 15

Rev. Rul. 2023-14, 2023-33 I.R.B. 484 .................................................................. 3, 6

## INTEREST OF *AMICUS CURIAE* AND SUMMARY OF ARGUMENT[1]

The Tax Law Center at NYU Law is a nonpartisan, nonprofit center dedicated to improving the integrity of the federal tax system. Its staff comprises tax law experts with experience in policymaking and administration as well as practice of tax law on behalf of clients. The Center aims to protect and preserve tax revenues, advance equity through the tax system, and improve tax administration. Drawing on its expertise regarding Congress's taxing power, as well as the taxation of digital assets, the Center submits this brief on why the full fair market value of staking rewards constitutes "income" within the meaning of section 61 of the Internal Revenue Code ("the code"). This brief clarifies the long-standing doctrine and rules for taxation of income received in the form of property, as well as the code's treatment of factors that could be understood to "dilute" the value of income.

The tax code defines income broadly. Section 61(a) of the code defines gross income as "all income from whatever source derived." Exceptions to this broad definition of income are a matter of legislative grace. *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 148-49 (1974) (quoting *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934)); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 432-33 (1955), *reh'g denied*, 349 U.S. 925 (1955). No such legislative grace has been extended to staking rewards.

---

[1] This brief does not represent the views, if any, of NYU School of Law. No counsel for a party authored any part of this brief, and no one other than *amicus curiae* paid for its preparation or submission. Plaintiffs consent to the filing of this brief, and Defendant does not consent.

Under section 61(a), staking rewards constitute taxable income once the taxpayer gains dominion and control over them (i.e., at the moment the taxpayer can sell, exchange, or otherwise dispose of the rewards).[2] As the Supreme Court explained in *Glenshaw Glass*, unless another code section provides for non-recognition, section 61 requires taxpayers to recognize income when they have "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." 348 U.S. at 431; *see also id*. at 432-33.[3]

First, the receipt of staking rewards constitutes an undeniable accession to wealth. As discussed in section II, *infra*, when a validator receives tokens (XTZ) on the Tezos blockchain as a reward for staking, they have an "undeniable accession to wealth" equal to the full, fair market value of the token.

Second, the tokens are not merely an increase in the value of existing property, which is not generally recognized until sale or exchange. Rather, the tokens are new property received as income, earned in exchange for the validator's participation in

---

[2] Fees received by validators (or "stakers") from other network participants for the validators' services to the network are likewise taxable once the taxpayer gains dominion or control. However, the vast majority of tokens the Plaintiffs received in this case were rewards for either creating ("baking") a new block on the Tezos blockchain or endorsing a new block that another network participant created. *See* U.S.'s Separate Statement of Undisputed Material Facts ("SSUMF") ¶¶ 73, 80. Thus, this brief will focus on rewards rather than fees.

[3] *Glenshaw Glass* states that the characterization of income in *Eisner v. Macomber*, 252 U.S. 189 (1920), "was not meant to provide a touchstone to all future gross income questions." *Glenshaw Glass*, 348 U.S. at 431. The *Glenshaw Glass* court found *Macomber*'s definition of income too *restrictive*; where there was—as in *Glenshaw Glass*—"undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion[,]" the court need look no further. 348 U.S. at 431-33. The *Glenshaw Glass* court did not suggest that there could be some other, unstated prerequisite to "income." *See* 348 U.S. at 432-33.

the network (i.e., validating network transactions). As such, staking rewards are clearly realized. As discussed further in section I, *infra*, taxpayers' receipt of tokens is a clear realization event because it provides them with new legal entitlement to the rewards. *Cottage Sav. Ass'n*, 499 U.S. 554, 565-66 (1991). And taxpayers have complete dominion and control over staking rewards when they can sell, exchange, or otherwise dispose of the rewards freely.[4] As the parties agree, this occurs when the validator can spend the reward tokens, which happens after validation takes place and a protocol-enforced freeze period lifts. SSUMF ¶ 63.

Further, no section of the code excludes staking rewards from income, provides a deduction for any portion of staking rewards that dilutes the value of the validator's pre-existing tokens, or otherwise provides that realized staking rewards are not required to be recognized upon receipt.

Thus, since staking rewards are taxable as income under section 61 of the tax code and judicial precedent including *Glenshaw Glass,* and because such rewards are not excluded from income or deferred by any other section of the code, they are includible in gross income at the time the taxpayer receives and obtains dominion and control over the tokens.

---

[4] Because there is no dispute that Plaintiffs had dominion and control, this brief will use "receipt" as a shorthand, even though the concepts are not identical. For similar reasons, this brief, like Rev. Rul. 2023-14, 2023-33 I.R.B. 484, at 5 & n.3, assumes that taxpayers have income when they can sell, exchange, or otherwise dispose of rewards; however, in some cases, taxable income arises earlier—e.g., from receipt of property that a taxpayer cannot sell immediately, such as stock subject to transfer restrictions. *See* section 83(a)(1); *Pledger v. Comm'r of Internal Revenue*, 71 T.C. 618 (1979), *aff'd*, 641 F.2d 287 (5th Cir. 1981), *cert. denied*, 454 U.S. 964 (1981).

# I. Staking rewards are realized income when the validator obtains dominion and control

Staking rewards received by users of the Tezos blockchain are taxable income once the validator obtains dominion and control because the rewards are realized income received in return for services validators provide to the network. Whether "baking" or endorsing blocks of transactions, stakers receive rewards in exchange for services they perform for the network.

## A. Income includes compensation for services, rents, and royalties regardless of the form of compensation

The tax code defines income broadly. Section 61(a) of the code defines gross income as "all income from whatever source derived." This includes, but is not limited to, compensation for services, business income, gains from dealings in property, rents, and royalties. Section 61(a); *see also, e.g.*, *Lary v. United States*, 787 F.2d 1538, 1540-41 (11th Cir. 1986) (resolving that "profit from the sale of blood does constitute gross income" without needing to determine whether it resulted from "the performance of a service or the sale or contribution of a product.").

Treas. Reg. §1.61-1(a) further clarifies that "[g]ross income includes income realized in any form, whether in money, property, or services." Treas. Reg. §1.61-2(d)(1) provides that if services are paid for other than in money, the fair market value of the property or services taken in payment must be included in income. *See also* section 83, 1001. Neither the statute nor the regulations distinguish between liquid and illiquid property; the key is the fair market value at the time the taxpayer obtains possession and control. *See* Treas. Reg. §1.61-2(d)(1). Courts, too, have held that the liquidity of the property used as compensation is irrelevant to the timing of taxation,

holding illiquid property taxable in the context of restricted stock, *Pledger*, 71 T.C. 618, and used coast guard equipment, *Sisson v. United States*, No. 70-CV-298, 1973 WL 515 (N.D.N.Y. Mar. 7, 1973), *aff'd*, 487 F.2d 1393 (2d Cir. 1973) (Table).[5]

Thus, income includes compensation for services, rents, royalties, and interest regardless of the form of such income.

### B.  Staking rewards are income earned by validators upon receipt

Staking rewards are earned by validators in exchange for their participation in an essential mechanism of the network. Specifically, validators are compensated with tokens (here, XTZ) for validation services:

> Stakers (and miners) are not creators of new tokens. They do not create anything by themselves. They provide a service of validating transactions of other network participants. In exchange, validators are paid in newly created tokens…. validators are not the ones who created them. Validators did not program the new tokens into existence. They follow a fixed protocol.

Omri Marian, *Law, Policy, and the Taxation of Block Rewards*, 175 Tax Notes Federal 1493, 1499 (June 6, 2022) (citations omitted); *see also* Henry M. Ordower, *Block Rewards, Carried Interests, and Other Valuation Quandaries*, 175 Tax Notes Federal 1551, 1563 (June 21, 2022) ("Staking complicates and obfuscates the simple characterization of tokens for services as compensation income but should not alter the compensation outcome."). On the Tezos blockchain, validators stake their existing tokens to provide the service of validating transactions. This process is integral to the operation and security of the blockchain. SSUMF ¶ 57. Because this function is integral to the functioning of the blockchain, and because performing this function

---

[5] Regardless, as discussed in Section I.C.1.b., *infra*, XTZ are readily tradeable on an exchange, including for cash, and thus are not illiquid. *See* SSUMF ¶ 64-69.

improperly can jeopardize the blockchain and the value of existing tokens, the network protocols give users an incentive to participate in the validation process—*i.e.*, through the potential to receive rewards in return for successful validation.

The Tezos protocol selects validators to validate a transaction by adding a block to the blockchain. Bakers are chosen to validate transactions based on how many XTZ they have staked. Once a successful validation is complete, bakers receive newly minted XTZ as rewards, as well as transaction fees from other participants. Validators not chosen to bake a block may instead be chosen to endorse a block. Endorsers also receive reward tokens for this service.

The process of validating operations and maintaining the integrity of the blockchain is a service provided by the baker and endorsers to the network through staking XTZ. The reward received is not the result of capital appreciation, but rather is compensation for the role played in the consensus validation mechanism.

This view is consistent with IRS guidance: Notice 2014-21, 2014-16 I.R.B. 938 and Rev. Rul. 2023-14 treat both mining and staking rewards as income realized upon receipt. The IRS's approach is based on the core tax principle that when a taxpayer receives property in exchange for services, that property is income, and its fair market value is includible in gross income at the time of receipt. *See* Rev. Rul. 2023-14, at 4; sections 61(a), 83; Treas. Reg. §1.61-2(d)(1).

**C.** **Staking rewards are not excludable as self-created property**

It is "settled principle that exemptions from taxation are not to be implied; they must be unambiguously proved." *United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988); *Glenshaw Glass*, 348 U.S. at 430-33.

Despite failing to identify such an exception, Plaintiffs argue that staking rewards are self-created and therefore not taxable until sale or other disposition. Pls.' Mem. Supp. Sum. J. ("Pls'. MSJ"), at 8-11. Plaintiffs make three arguments in support. They argue: (1) that income must "come in" rather than be self-created; (2) that income must be "derived" from a "source" rather than be self-created; and (3) that income must be clearly realized (and that this does not occur until sale for self-created property). *Id.* However, these arguments are wrong both on their face and as applied to staking rewards.

*First*, Plaintiffs misunderstand self-created property. Staking rewards are not created by validators solely and independently through inputs the validator owns and their own labor. More particularly, the XTZ that Plaintiffs earned as staking rewards were not self-created by them. Further, Plaintiffs err by suggesting that the deferral of tax on certain self-created property means that there is a general rule deferring tax on all self-created property. Although certain types of self-created property are not taxed until sale, this deferral would not apply to staking rewards *even if* the rewards were self-created by the validator. *See* Section I.C.1.b, *infra*. Rather, section 61(a) and the regulations thereunder defer tax on certain property when taxing such property may entail taxing imputed or unrealized income. But the rewards at issue here are not imputed income—unlike imputed income, staking rewards are generated in a marketplace transaction and not consumed by the validator. And they are not unrealized income—instead, the taxpayer has a clear change in legal entitlement to them upon receipt. To the extent that Treasury has, by regulation, chosen to defer

taxation of certain additional self-created property, it has not done so here, and, in any case, none of the rationales for deferral of tax on such income apply to staking rewards. Therefore, there is no rationale for excluding staking rewards from income at the time they are received.

*Second*, as property received as income, staking rewards are realized income that is derived from—and received from—a source, whether or not that source is singular or dispersed, external, or easily defined. Neither the Constitution nor the code restricts the type of source of income (such as easy identification); instead, both emphasize that income can be derived from "whatever" source.

### 1. Staking rewards are not excludable as self-created property

#### a. Staking rewards are not self-created by validators

Staking rewards are not self-created. That is, they are not created solely and independently through inputs the validator owns and their own labor. *See* New York State Bar Association, Report No. 1461 – Report on Cryptocurrency and Other Fungible Digital Assets, at 47 (2022) [hereinafter, "NYSBA"]. Rather, staking rewards are issued by the blockchain protocol as compensation for the validator's services in maintaining the network.

In this case, the staking rewards are derived through the Tezos protocol, which sets rewards for certain actions, and which is ratified and can be changed through collective action by and among the users of Tezos. The users of Tezos are a group of people who define the circumstances under which stakers may receive new XTZ. *See* NYSBA, *supra*, at 46 ("[T]he protocol is a decentralized computer network that

8

reflects the collective will of its participants, and the rewards are received for participating in its consensus mechanism and thereby securing the integrity of its blockchain.").

The validator does not self-create the rewards, as an individual validator cannot control whether they will validate or endorse a block—and thereby receive the corresponding rewards for their actions. "It is hard to see how one can claim to create property when one lacks the power to decide whether the property is created in the first place." Marian, *supra*, at 1499; NYSBA, *supra*, at 47. While validators can choose whether to offer to use their XTZ for staking, they cannot ultimately choose whether they perform a service that will allow them to receive staking rewards. Instead, bakers and endorsers are chosen based on the network protocol. The validator raises their hand and offers to work; the protocol decides if they get the work, and ultimately the reward. Because the protocol dictates the full rewards cycle, from who gets the work to how much they are rewarded for that work, an individual validator cannot be said to self-create the reward.

Instead, validators earn rewards for performing a transaction validation service that benefits and is integral to the entire network. They therefore earn staking rewards as compensation for services, rather than from self-creating property outside of a marketplace transaction for future personal use or sale. The concept of compensation for the service of validating transactions is not novel. For example, title agents and banking compliance officers receive income for validating transactions (including approving transactions as they happen) and are taxed upon receipt of

9

income for that service. *Cf.* Ordower, *supra*, at 1561. Similarly, accountants and notaries public are taxed upon receipt of income for the service of validating the identity of a party to or source of funds for a transaction. Because validators receive rewards for a service they provide for others, staking rewards are not analogous to self-created property, such as a farmer's crops or an author's manuscript.

### b. Staking rewards are neither outside of the bounds of income nor otherwise excluded from taxation

Even if staking rewards were "self-created" in some sense, there is no legal basis to exclude them from income until sale. The general rule still applies to self-created property: income, including income from self-created property, is excluded from income (or tax on it is deferred) only when within the scope of a specific exclusion. NYSBA, *supra*, at 46-47. There are no grounds for exclusion or deferral of income from staking rewards.

Plaintiffs point to certain types of self-created property on which tax is deferred until sale and attempt to create a new general rule. But no such rule exists. Rather, there are certain types of self-created property that may be outside of the reach of section 61(a) of the code, and that are outside of the scope of the regulations thereunder, because they entail taxing imputed or unrealized income. But staking rewards are neither imputed nor unrealized income.

Courts have suggested that section 61 does not apply to "imputed income." *Helvering v. Indep. Life Ins. Co.*, 292 U.S. 371, 376-79 (1934). Imputed income is "a flow of satisfactions from durable goods owned and used by the taxpayer, or from goods and services arising out of the personal exertions of the taxpayer on his own

behalf." Donald B. Marsh, *The Taxation of Imputed Income*, 58 Pol. Sci. Q. 514, 514 (1943). The "distinguishing characteristic" [of imputed income] is that it arises outside the ordinary processes of the market." *Id.* While imputed income includes certain "non-cash income or income in kind[,]" not all such income is imputed income. *Id.* For example, "[i]ncome in kind [] received in return for services rendered," is *not* imputed income; rather, it is "an ordinary market transaction without a transfer of cash but with a direct monetary valuation implied." *Id.* Similarly, "income in kind arising from ownership" such as "where the landlord receives rent in the form of produce" is not imputed income. *Id.* In other words, income that arises in a market transaction and that is not consumed by the taxpayer through personal use is not "imputed income" for tax purposes, even if received as non-cash. By contrast, imputed income from property is the benefit a taxpayer derives from creating property outside of a marketplace transaction for self-consumption. For example, a farmer consuming the produce they grew is imputed income.

Staking rewards are not imputed income. Although they are non-cash income, they are "received in return for services rendered" (validation services) "as part of an ordinary market transaction" (a service performed by the validator in support of the network) and with "direct monetary valuation implied" (the fair market value of the rewards). And even if validators are somehow understood to have "created" digital tokens, tokens cannot be consumed through personal use. That is, Plaintiffs do not use up the tokens they receive as staking rewards; rather, Plaintiffs save or exchange them. *See* Marian, *supra*, at 1499 & n.66. The imputed income analogy thus fails.

Nor are staking rewards unrealized income. Under the code and the longstanding regulations, "[g]ross income includes income realized in any form, whether in money, property, or services." Treas. Reg. §1.61-1(a).[6] For example, if an employer gives an employee art as compensation, it is no less income just because it is received in the form of property. *See* Treas. Reg. §1.61-2(d)(1). Similarly, if an employer gives an employee digital assets as compensation, it is immediately taxable. *Id.* There is no requirement that property received as compensation for services be converted to money before it is taxable as income.[7] This is true even if the property received as compensation was created by the recipient as part of the job: for example, if a worker employed by a bakery receives a share of the cakes they bake as compensation, those cakes are realized income to the worker when received.

Staking rewards are realized income received in the form of property. They are not capital appreciation on pre-existing property that is only realized when the property is sold. Rather, the receipt of staking rewards constitutes a change in the validator's legal entitlement to the rewards. In *Cottage Savings*, the Supreme Court found that such a change in legal entitlement is sufficient for realization. 499 U.S. at 559, 565 (finding, for the purposes of section 1001, that realization is a rule of "administrative convenience" that requires only the slightest difference in "legal entitlements that are different in kind or extent."). Although *Cottage Savings*

---

[6] This is distinct from income *from* property, e.g., rents, which is also income.

[7] The statement that "[t]axable income refers only to proceeds realized 'from the sale or other disposition of property'" is clearly wrong, *contra* Pls.' MSJ at 11, in that it appears to exclude all income from labor, whether or not in the form of property, as well as some common forms of income from capital (e.g., rents).

involved sale or disposition of property, whereas this case involves receipt of property, realization requires no higher bar in this context. Here, there was a complete change in legal entitlement to the tokens received as staking rewards: before performing validation services, the Plaintiffs had no right to the rewards; they received the rewards—and full legal entitlement to them—as compensation. Therefore, staking rewards are realized—and recognized as income—at their fair market value, at the time they are received.

In certain cases, Treasury and the IRS have deferred, via regulation, taxation of certain self-created property that may be neither imputed nor unrealized income. Consistent with accounting rules, the regulations exclude certain forms of self-created property until sale for some taxpayers. *See* Marian, *supra*, at 1498; Treas. Reg. §1.61-3 (excluding income from manufacturing or mining until property is sold); *see also* Treas. Reg. §1.61-4 (allowing farmers to include income upon sale of farming products if they choose the cash method of accounting). This may be largely a matter of administrative convenience: certain forms of self-created property are hard to value until sale. But these regulations do not apply here, and because XTZ are tradeable on an established exchange, this rationale for excluding certain self-created property until sale also does not apply to them. SSUMF ¶ 64-69; Ordower, *supra*, at 1564 ("Given the ongoing trading in each cryptocurrency's tokens, there is no uncertainty as to the value of the rewards when received."); see also Reuven S. Avi-Yonah & Mohanad Salaimi, *A New Framework for Taxing Cryptocurrencies*, 77 Tax Law. 1, 36 (2023).

In addition to the general concept of administrative convenience, the possibility of consumption (and thus exclusion from section 61(a) as imputed income) helps explain why Treasury and the IRS grant deferral in certain cases. If, for example, a taxpayer bakes bread, it may be unknowable until sale whether the taxpayer will eat that bread (resulting in imputed income) or have taxable income from it. *See, e.g.*, B. Bittker & L. Lokken, Federal Taxation of Income, Estates and Gifts ¶ 5.3.2 (March 2026) (explaining that, sometimes, "the exclusion of imputed income is only temporary[,]" which "generates some troublesome peripheral issues, primarily for farmers, restaurateurs, and other taxpayers who produce goods for the public but also consume some of their output.").[8] As above, this rationale is also inapplicable here as taxpayers do not consume the tokens received.

### 2. The source of staking rewards does not exclude them from the definition of income

#### a. Staking rewards are derived from and received from a source

Moreover, staking rewards are received by stakers for their separate benefit and use. The XTZ that Plaintiffs receive from staking "comes in"—i.e., is received, in

---

[8] Further, an item of income is not excluded just because it bears some resemblance to other items that may be excluded due to administrative convenience. It is often difficult for any party other than the government to challenge interpretations of the code that are taxpayer-favorable. This means that when the government uses "administrative convenience" to create safe harbors, exclusions, or deferrals that are more generous than the underlying code, such policy may remain even if it is neither the best interpretation of the statute nor properly within the bounds of discretion. It is all the more improper to extend policy derived from administrative convenience to novel items of income when neither the rules that provide the safe harbor or exclusion, nor the rationales for the original safe harbor or exclusion, apply to such items of income. *Cf. Cottage Sav. Ass'n*, 499 U.S. at 565-66.

any sense of the term—and can be readily used. XTZ can be easily traded on an established market. As a result, no separate, severance event is needed for the rewards to constitute income.

Staking rewards are also derived from a source. As explained above, the rewards in this case are derived through the Tezos protocol, which sets rewards for certain actions, and which can be ratified and changed through collective action among the users of Tezos. The circumstances when the protocol rewards new tokens are therefore defined by a group of people (Tezos users). Marian, *supra*; NYSBA, *supra*, at 46-47. Even if the source of the XTZ Plaintiffs received as staking rewards were unclear, the Plaintiffs have clearly received the tokens, derived through the Tezos protocol, in the form of realized income, and they get a clear benefit from such receipt.

Though it may not be fully clear how to characterize the counterparty in a staking transaction, there is such a counterparty. *Compare* Marian, *supra*, at 1501-2 (suggesting the owners of all other XTZ tokens constitute counterparties); Jasper L. Cummings, *Taxing Digital Assets*, 190 Tax Notes Federal 1081, 1094 (Feb. 12, 2026) (same) *with, e.g.*, Avi-Yonah & Salaimi, 77 Tax Law. at 36-37 (suggesting the network protocol itself is the counterparty). But even if neither the holders of the other tokens nor the protocol were properly conceived of as a *counterparty* from which a validator

receives staking rewards, there would still be a *source*: validators would still derive and receive staking rewards through the protocol as clearly realized income.[9]

### b. Neither the Constitution nor the code requires that the source of income be a single, easily identified, and external source

Section 61(a) defines "gross income" as "all income from whatever source derived," tracking the language of the Sixteenth Amendment. The Sixteenth Amendment was intended to overturn the Supreme Court's missteps in *Pollock v. Farmers' Loan & Trust. Co.,* in which the Supreme Court erroneously placed limits on Congress's taxing power. *Moore v. United* States, 602 U.S. 572, 583 (2024). In *Pollock I,* the Supreme Court held that income derived from certain sources (real property) was not income, finding that taxes on such income were in substance taxes on real property. *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 579-83 (1895), *vac'd on reargument*, 158 U.S. 601 (1895). On reargument, the Supreme Court compounded this error, holding that Congress lacked the power to tax income derived from any property without apportionment—and striking down the entirety of the income tax, even where it taxed income not derived from property at all. 158 U.S. 601, 618 (1895). The Sixteenth Amendment overturned *Pollock* and clarified that Congress could tax income without apportionment *regardless* of the source—i.e., even if it was income derived from property. *Moore,* 602 U.S. at 583.

---

[9] Understanding the source of staking rewards more precisely may have consequences for how they are treated in certain circumstances. See, e.g., NYSBA, *supra*, at 50-54. But this does not alter the fact that staking rewards are taxable on receipt regardless of their source unless some other provision of law provides otherwise. *See* section 61(a).

16

For this reason, the Sixteenth Amendment's "from *whatever* source derived" language, as echoed in section 61(a), is not a constraint on Congress's power to tax income; it is a clarification of its breadth. *See* Clint Wallace & Bret Wells, *The Past and Future of Taxing "Incomes,"* 104 N.C. L. Rev. 1, 8, 39-40, 58 (2025); *Moore*, 602 U.S. at 583. As such, neither the Sixteenth Amendment nor section 61(a) limits taxation of income to income from a person, group of people, or any easily delineated source. Indeed, the taxing power and section 61(a) reach income without a clear source, such as treasure troves. *See* Treas. Reg. §1.61-14(a); Marian, *supra*, at 1498; U.S. Br. Opp. MSJ, at 4-5.

Nor is there any requirement that the source be wholly or partly external— and thus there is no blanket exclusion for self-created property. Plaintiffs' argument that income must "come in" appears to come from a highly selective misreading of language in *United States v. Phellis*, 257 U.S. 156 (1921). Pls.' MSJ at 9-10. In *Macomber*, decided in 1920, the Supreme Court had found that stock received in a pro rata stock dividend was not taxable as income. 252 U.S. 189. Far from imposing any additional constraint on "income," *Phellis*, decided the next year, started the process of narrowing *Macomber* to its facts, by finding that a stock dividend received as part of a corporate reorganization *was* income. *Phellis*, 257 U.S. 156; *Glenshaw Glass*, 348 U.S. at 431; *see also Moore*, 602 U.S. at 587-88 & n.3 (declining to rule on whether *Macomber* has been abrogated by subsequent decisions, but collecting cases cited by the Government). In distinguishing *Macomber*, the *Phellis* court looked, in part, to whether the stock dividend at issue constituted a "gain … coming in, that is,

17

*received* or drawn by the claimant for his separate use, benefit, and disposal." 257 U.S. at 169 (emphasis added). Plaintiffs suggest that *Phellis* and the other cases they cite support the idea that income "must be received from someone," Pls.' MSJ at 9, but the language they quote is unrelated to there being an identifiable party (and particularly an identifiable single party) from whom the taxpayer receives gain. Instead, the language refers to the ability of the recipient to use the income—i.e., to "dominion and control" in the *Glenshaw Glass* framework. *See Phellis*, 257 U.S. at 169. A taxpayer can have "receipts" regardless of the source of those receipts.

In sum, staking rewards are not excludable as self-created property; rather, they are taxable income. And because they are taxable income, there are no grounds to invoke constitutional avoidance to exclude such income. *Contra* Pls.' MSJ at 11-12.

## II. Staking rewards constitute an undeniable accession to wealth

### A. Plaintiffs have failed to show that staking rewards dilute the value of their pre-existing tokens

Plaintiffs have not shown that staking rewards dilute the value of existing XTZ. Because the frequency and amount of staking rewards depends on a pre-set protocol, the market effects of new tokens are generally already priced in before those tokens are awarded. SSUMF ¶ 90.

Additionally, in part because demand for a token may interact with supply in complicated ways, it is not clear that staking rewards dilute the value of existing tokens at all. *See* SSUMF ¶¶ 91-92; U.S. Exh. 2 ¶ 11; Ordower, *supra*, at 1562 ("It is difficult to ascertain with certainty whether outstanding tokens would increase in value more if no additional tokens were issued as block rewards; although, each token

18

holder might have to pay a network maintenance fee directly rather than through the block reward system. It is equally unknowable whether an increase in value of outstanding tokens might flow from the increasing supply evidencing a well-functioning network.").

**B.      Dilution does not affect whether there is an accession to wealth for the purposes of section 61**

Even if Plaintiffs had shown that staking rewards dilute the value of their pre-existing tokens, they would not be entitled to adjust the amount of income they recognize. Unless a specific section provides otherwise, the code taxes "*gross* income." Sections 61(a); 63(a). "Under our system of federal income taxation therefore, every element of gross income of a person, corporate or individual, is subject to tax unless there is a statute or some rule of law that exempts that … element." *HCSC-Laundry v. United* States, 450 U.S. 1, 5 (1981); *see also Wolter Const. Co., Inc. v. Commissioner*, 634 F.2d 1029, 1039 (6th Cir. 1980).

In line with this, section 61(a) does not only tax that portion of income that is pure net gain. *See Helvering v. Northwest Steel Rolling Mills*, 311 U.S. 46, 53 (1940) ("Nor is it true … that because there might be an impairment of the capital stock, the tax on the current annual profit would be the equivalent of a tax upon capital. Whether there was an impairment of capital stock or not, the tax here under consideration was imposed on profits earned during a definite period—a tax year—and therefore on profits constituting income within the meaning of the Sixteenth Amendment."); *see also, e.g.*, *Hord v. Commissioner*, 143 F.2d 73, 76 (6th Cir. 1944).

Particularly, there is nothing in the code or the Constitution that limits taxation under section 61 only to income that constitutes economic gain net of all costs,[10] inflation, or other dilution. *See, e.g., Hellermann v. Commissioner*, 77 T.C. 1361, 1366 (1981) ("The extra dollars they received are well within the common perception of income, even though each 1976 dollar received represents less purchasing power than each 1964 dollar paid."); *Stelly v. Commissioner*, 761 F.2d 1113, 1115 (5th Cir. 1985), *cert. denied*, 474 U.S. 851 (1985); *Nordtvedt v. Commissioner*, 116 T.C. 165, 168-72 (2001), *aff'd*, 22 Fed. App'x 790 (9th Cir. 2001); *see also Pedone v. United States Court of Claims*, 151 F. Supp. 288, 291-92 (Ct. Cl. 1957), *cert. denied*, 355 U.S. 829 (1957).[11] Construing section 61(a) to cover only net income would override its plain language, which refers to "gross income." Moreover, when Congress wishes to tax only net income, it provides a deduction to achieve this. Redefining "gross income" to reach only net income would effectively nullify the tax code's regime of specified deductions and exclusions from income.[12]

---

[10] For a trade or business, certain costs (i.e., the cost of goods sold) are subtracted from sales to arrive at gross income. Treas. Reg. §1.61-3.

[11] Congress provides for inflation adjustments, *see* U.S. Opp. to MSJ, at 14 (citing section 1(f)), or the deductibility of losses where it wants to allow them. Even when Congress provides for the deductibility of losses, Congress sometimes limits the extent of such deductibility, as a policy matter. *E.g.*, One Big Beautiful Bill Act, Pub. L. 119-21, § 70114, 139 Stat. 72, 166 (2025) (codified at section 165(d)) (limiting deductible losses from wagering to 90 percent of the amount of the losses).

[12] Plaintiffs may be arguing that part of the fair market value of staking rewards is excluded from income under the "return of capital" doctrine, under which "amounts received as a return of capital or investment are not income[,]" or, under *Burnet v. Logan*, 283 U.S. 404 (1931), which allows taxpayers to temporarily treat certain income as capital recovery when it is property "received as part of the

"The propriety of a deduction" or an exemption or exclusion "does not turn upon general equitable considerations, such as a demonstration of effective economic and practical equivalence. Rather, it 'depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed.'" *National Alfalfa Dehydrating & Milling Co.*, 417 U.S. at 148-49 (quoting *New Colonial Ice Co.*, 292 U.S. at 440); *see also INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992) (quoting *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593 (1943)); *Burroughs Adding Mach. Co. v. Terwilliger*, 135 F.2d 608, 610 (6th Cir. 1943); *McGowan v. United States*, 143 F.4th 686, 701 (6th Cir. 2025). Moreover, neither section 61(a) nor the Constitution requires netting across multiple transactions to determine which gain produces an economic benefit. *See Davis v. United States*, 87 F.2d 323, 325 (2d Cir. 1937), *cert. denied*, 301 U.S. 704 (1937), *reh'g denied*, 302 U.S. 773 (1937).[13]

These authorities establish that, in the absence of a code provision excluding staking rewards (or of any portion of staking rewards that dilute the value of the

consideration on a sale but [that has] no ascertainable fair market value at the time of [] receipt." Mertens Law of Federal Income Taxation § 5:10 (May 2026 Update). But this doctrine "has no application . . . [w]hen the taxpayer has a zero basis for property[,]" and where the relevant property has a readily ascertainable fair market value at all times. *Id.* The doctrine therefore does not apply to staking rewards. And although Plaintiffs may have basis in their pre-existing tokens, any return of capital on those assets is not recognized until those assets are sold or disposed—at which time the taxpayer will recognize income (or loss) based on the fair market value of the tokens minus their basis. And the fair market value at that time will reflect the amount—if any—by which the value of those tokens has been diluted by staking.

[13] Any such rule would be hugely complicated: it would require determining which transactions get netted together and would mean that a taxpayer would not know whether they had taxable income upon receipt. Congress can provide for the taxation of net income, but when it does so, it can also provide rules to make such taxation administrable.

validator's pre-existing tokens) from tax, section 61(a) requires taxing the rewards on their full fair market value. *See* Treas. Reg. §1.61-2(d)(1). The Plaintiffs have identified no such provision; therefore, their staking rewards are taxable even if—and even to the extent that—they dilute the value of the Plaintiffs' pre-existing tokens. *Cf.* Mattia Landoni & Abraham Sutherland, *Dilution and True Economic Gain from Cryptocurrency Block Rewards*, Tax Notes (Aug. 17, 2020) ("if new tokens are viewed as distributions … and are taxed in the year in which they are acquired, current law does not provide a way for the taxpayer being diluted by those tokens to obtain a corresponding deduction.").

To the extent that staking rewards do dilute the value of existing tokens, that means, essentially, that they are inflationary. That is, to the extent that the effect of rewards are not already priced in, the newly rewarded tokens may deflate the value of existing tokens because they increase the supply. But when a taxpayer recognizes gain, the gain recognized is the nominal gain (not the inflation-adjusted gain), unless the tax code specifically provides otherwise. *See, e.g.*, *Hellermann*, 77 T.C. at 1366. The tax code does not provide otherwise here.

The following examples illustrate that tax law does not adjust income for dilution unless Congress specifically so provides:

- If the government causes inflation by adding to the money supply, that will not entitle taxpayers to pay tax on only inflation-adjusted income, except where Congress specifically provides for inflation adjustments, *e.g.*, section 1(f).

When a taxpayer receives money as compensation for services, the amount of tax the taxpayer owes on that compensation does not depend on any inflation that occurs between the date the price is agreed to, the service date, the date of compensation, and the date when taxes are owed.

- When a taxpayer sells a capital asset, the gain the taxpayer recognizes is generally the fair market value minus the non-inflation adjusted basis. *See* section 1001(a). Even if the asset is not worth more than the inflation-adjusted value of its basis, the taxpayer must still pay taxes on the nominal gain, unless some specific provision of the code provides otherwise. *See* Legal Authority of the Department of the Treasury to Issue Regulations Indexing Capital Gains for Inflation, 16 Op. O.L.C. 136 (1992).

- When an employee who owns stock of a corporation receives newly issued stock as compensation, the stock compensation increases the taxpayer's share of the corporation's total stock and constitutes income to the full extent of its fair market value.[14] *See* Ordower, *supra*, at 1562-63. Because the stock is newly issued, it in some sense dilutes the existing shares of the taxpayer and of the other shareholders; the pre-existing shares now represent a smaller percent ownership of the company. Nonetheless, the compensated employee cannot adjust their income from the newly issued stock down for this dilution of their

---

[14] The timing of such income will be when the stock vests, or earlier if the taxpayer makes a section 83(b) election.

pre-existing shares; rather, they will recognize any dilution of the value of their pre-existing shares when they sell or dispose of those shares.

**C.    Even if the net result of staking over a year did not change any owner's proportionate share of XTZ, staking rewards would be taxable upon receipt**

Even if a taxpayer has not received net monetary gain as a result of a series of transactions, the taxpayer may still have taxable income. *See Davis*, 87 F.2d at 325. For example, suppose A is an electrician, and B is a plumber. Further suppose A pays B $100 for plumbing services at A's home, and B pays A $100 for electrical work at B's home. In this example, each of A and B will owe taxes on the $100 of income received from the other. The $100 each of A and B spent is not deductible against their respective $100 of income. Rather, each taxpayer received $100 of income and then spent that income on non-deductible expenses.

Similar logic applies to staking. Stakers are compensated for validating transactions. Validating transactions provides a service to the network. Even if the net result of the validation services in a year were that every XTZ holder's share increased on a pro rata basis, the rewards that each staker received upon each transaction would still be income to that staker. Transactions during a year do not have to be netted together to assess whether a taxpayer had income under section 61(a). *See Davis*, 87 F.2d at 325. To the extent that there is dilution of the validator's pre-existing tokens, that may be viewed as the cost of the validation service that was performed, akin to the plumber's payment of $100 for electrical work. That is, the validation service was performed in support of the overall network, including the validator's tokens, and absent a deduction or exclusion, the cost of that validation

service does not reduce the validator's income from providing validation services. *Cf.* US Exh. 2 ¶ 28.

## CONCLUSION

Because staking rewards are "instances of undeniable accession to wealth" and "clearly realized," *Glenshaw Glass*, 348 U.S. at 431, they are taxable as income, at their fair market value, once the taxpayer obtains dominion and control. Accordingly, this Court should deny the Plaintiffs' motion for summary judgment.

25

Respectfully submitted,

/s/ Mozianio S. Reliford, III

MOZIANIO S. RELIFORD, III (No. 036170)
POLSINELLI
501 Commerce Street, Suite 1300
Nashville, TN 37203
(615) 252-3948
treliford@polsinelli.com

THALIA TSAKIRGIS SPINRAD*
(*pro hac vice* forthcoming)
TAX LAW CENTER AT NYU LAW
110 West 3rd Street #204
New York, NY 10012
(615) 426-7529
Thalia.spinrad@nyu.edu

June 4, 2026

*Counsel for Amicus Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Middle District of Tennessee by using the CM/ECF system, which automatically sends email notification of such filing to the following counsel of record:

Zachary P. Grouev
Cameron Norris
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(850) 454-7460
(703) 243-9423
Zach@consovoymccarthy.com
Cam@consovoymccarthy.com

J. Abraham Sutherland
106 Connally Street
Black Mountain, NC 28711
(805) 689-4577
Abesutherland@gmail.com

*Counsel for Plaintiffs*

Stephen S. Ho
Department of Justice
P O Box 227
Ben Franklin Station
Washington, DC 20044
(202) 616-3309
Stephen.S.Ho@usdoj.gov

Ryan O'Connor McMonagle
U.S. Department of Justice, Tax Division, Civil Trial
PO Box 227
Washington, DC 20044
(202) 307-1355
Ryan.McMonagle@usdoj.gov

*Counsel for Defendant*

Mark Alexander Carver
Sherrard Roe Voigt & Harbison, PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
Tel. (615) 742-4200 | Fax. (615) 742-4539
acarver@srvhlaw.com

Tiffany J. Smith
Wilmer Cutler Pickering
Hale and Dorr LLP
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800
tiffany.smith@wilmerhale.com

Kelly P. Dunbar
Cristina Jaramillo-Rincon
Michael Baer
Wilmer Cutler Pickering
Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6000
kelly.dunbar@wilmerhale.com
cristina.jaramillo@wilmerhale.com
michael.baer@wilmerhale.com

*Counsel for Amici Curiae, Blockchain Association, Crypto Counsel for Innovation, and Solana Policy Institute*

*/s/ Mozianio S. Reliford, III*
MOZIANIO S. RELIFORD, III (No. 036170)